**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PNY TECHNOLOGIES, INC., <br><br>    Plaintiff, <br><br>    vs. <br><br>SANDISK CORPORATION, <br><br>    Defendant. | Case No.: C-11-04689 YGR <br><br> **ORDER GRANTING SANDISK CORPORATION'S MOTION TO DISMISS WITH LEAVE TO AMEND** |

Plaintiff PNY Technologies, Inc. ("PNY") filed suit against Defendant SanDisk Corporation ("SanDisk") alleging antitrust violations stemming from SanDisk's extensive patent portfolio in the flash memory technology upstream market. In summary, PNY alleges that SanDisk is misusing the market power inherent in its patent portfolio to demand multi-tiered licensing and royalties in the downstream markets which then suppresses price competition in the United States. PNY's Complaint alleges Monopolization and Attempted Monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, (First and Second Counts); Conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1, between SanDisk and certain of its licensees (Third Count); and state law claims for intentional interference (Fourth Count) and unfair competition under California Business & Professions Code §§ 17200 *et seq*. (Fifth Count). PNY seeks a declaratory judgment, damages, restitution and injunctive relief.

SanDisk moves to dismiss all five claims for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In particular, SanDisk argues that the Complaint is not specific enough to meet federal pleading standards in antitrust cases.

Having carefully considered the papers and the pleadings submitted, and the argument of counsel, for the reasons set forth below, the Court hereby **GRANTS** the Motion to Dismiss **WITH LEAVE TO AMEND**.

## I. BACKGROUND

### A. THE MARKETS

PNY's Complaint, Dkt. No. 1, alleges as follows:  PNY and SanDisk are competitors in the flash memory market.  *Id.* ¶ 1.  Flash memory is a type of removable data storage device for computer memory.  *Id.* ¶¶ 22-23.  The technology is used in consumer products such as Universal Serial Bus drives ("USB flash drives"), Compact Flash cards, and solid-state drives.  *Id.* ¶ 23.  Consumers throughout the United States use these products which are considered one of the most important forms of data storage in the marketplace.  *Id.* ¶ 27.  In 2010 alone, over one billion dollars of flash memory products were sold in the United States.  *Id.*

A flash memory product is comprised of three parts:  one, a "device," commonly referred to as a memory chip[1]; two, a "controller," which acts as the interface between the flash memory device and the computer; and three, a flash memory "system," which combines the component parts into a "systems product," such as a USB flash drive, which is the end product sold to the consumer.  *Id.* ¶¶ 24-26.  The distribution chain that results in the eventual sale of flash memory systems products (such as USB flash drives) has four segments: first, developers and licensors of the flash memory technology needed to manufacture flash memory devices, systems, and products; second, device manufacturers; third, aggregators that purchase component parts and assemble systems products; and fourth, purchasers of "finished" systems products (called resellers) for resale.  *Id.* ¶¶ 29-31, 71.  The flash memory device is by far the largest part of the overall cost of any flash memory system or product.  *Id.* ¶ 28.

Some companies, such as SanDisk, are vertically-integrated, producing flash memory devices, systems, and products both for their own use (*e.g.*, SanDisk-branded products that are ultimately sold to consumers), and for sale to aggregators and resellers.  *Id.* ¶¶ 30, 33, 71.  In 2010, SanDisk-branded

---

[1] The parties use the terms "device" and "chip" interchangeably in their papers.  The Court will use the term "device" in this Order.

United States District Court

flash memory products accounted for more than 40% of all retail sales of flash memory products in the United States. *Id.* ¶ 42. Other companies manufacture only flash memory devices. *Id.* ¶ 29. PNY is an aggregator, which means that it does not manufacture its own flash memory devices, but instead purchases the devices from manufacturers and assembles those devices with other component parts to create a flash memory systems product. *Id.* ¶¶ 31-33. Aggregators can take advantage of an oversupply of flash memory devices and produce lower-cost flash memory systems products. *Id.* ¶ 33.

### B.   SANDISK'S PRESENCE IN THE FLASH MEMORY MARKET

According to the Complaint, SanDisk claims to own more than 1,400 United States patents related to flash memory technology that cover 100% of the flash memory technologies that are or can be used to manufacture or assemble flash memory devices, flash memory systems, or flash memory products for sale in the United States. *Id.* ¶ 36. PNY alleges there are no closely suitable substitute technologies to which a manufacturer or aggregator of flash memory devices, systems, or products can switch to avoid using SanDisk's flash memory patented technology. *Id.* ¶ 40. Additionally, PNY alleges that SanDisk has taken the position that any firm manufacturing, assembling, or selling flash memory devices, flash memory systems, or flash memory products in the United States is using one or more of SanDisk's patents and must pay a royalty to SanDisk or face litigation. *Id.* ¶¶ 36, 42-43, 50-51, 55-83.

PNY alleges that there are significant barriers to entering the flash memory market. Specifically, PNY alleges that developing a new portable technology for storing and transferring data that would function as a suitable substitute for flash memory technology could cost billions of dollars. *Id.* ¶¶ 44-45, 49. And these high costs would prevent new competition from entering the technology market for at least two years. *Id.* ¶¶ 44, 52.

### C.   SANDISK'S ALLEGED ANTICOMPETITIVE LICENSE AND LICENSING PROGRAM

PNY alleges that SanDisk uses the specter of expensive and endless patent infringement litigation to coerce its competitors into signing (under the guise of a settlement) its uniform, non-negotiable license, which gives SanDisk control over the pricing of flash memory technology and products sold to its competitors and, ultimately, to consumers. *Id.* ¶¶ 1-2, 4-6, 42-43, 50-51, 55-62,

United States District Court

69-70, 75-76, 80, 85-86, 88, 97, 99, 100-05.  According to the Complaint, SanDisk's license violates the antitrust laws because it requires licensees to:  (1) pay multiple royalties on the same product as it is sold downstream, once when the flash memory device is sold by one of SanDisk's flash memory device manufacturer licensees, and again (after SanDisk's patent rights have been exhausted) after the flash memory device is incorporated into a "system" or "product" and sold by an aggregator such as PNY, *id.* ¶¶ 4, 42-43, 50-51, 77-80, 91-99, 116; (2) pay a royalty on worldwide sales (including sales in countries where SanDisk does not have any patent rights), *id.* ¶¶ 4, 8, 84-89, 116; (3) license an omnibus, unspecified patent portfolio (rather than specific individual patents), *id.* ¶¶ 4, 84-89, 116; and (4) grant-back to SanDisk a worldwide, royalty-free cross-license to all future flash memory-related technological innovations within the scope of the portfolio developed by the licensee, inhibiting efforts to design around SanDisk's patents and stifling licensees' incentives to innovate, *id.* ¶¶ 3-4, 8, 38, 90, 104, 116, 121, 133.  Additionally, the royalty structure of SanDisk's licensing agreement allegedly is anticompetitive because it ensures that SanDisk's competitors:  (a) purchase products from SanDisk at prices set by SanDisk; (b) purchase products from a supplier licensed by SanDisk and pay a royalty on patented technology to SanDisk, in addition to the royalty already paid by the licensed supplier; (c) purchase the products from an unlicensed supplier and pay SanDisk a very high royalty; or (d) manufacture the product and pay SanDisk the same very high royalty on sales.  *Id.* ¶ 143.  The cost of the royalty is passed on to consumers in the form of increased retail prices.  *Id.* ¶ 88.

### D.   SANDISK'S ALLEGEDLY PREDATORY BEHAVIOR

In January 2008, PNY entered into such a licensing agreement with SanDisk in order to settle two patent infringement lawsuits, "under the threat of continuing patent litigation."  *Id.* ¶ 1.  PNY was "willing to enter the license because at that time, 95% of [its] flash memory related purchases were of . . . finished end-user products . . . sold by Toshiba and Samsung."  *Id.* ¶ 71.  "[T]he license was expected to have minimal impact on PNY's business" because at that time, PNY functioned primarily as a reseller of Toshiba and Samsung flash memory products and the license would not require PNY to pay any royalties on these purchases, and entering into the license would settle SanDisk's patent infringement lawsuit against PNY.  *Id.*  "But as the markets changed and the availability of lower cost

flash memory devices and systems from other manufacturers grew, PNY changed its purchasing mix to de-emphasize the purchase of flash memory systems products, and instead focus on purchasing the component parts" for assembly and resale. *Id.* ¶ 72. In addition to the changing market conditions, PNY claims to have altered its purchasing behavior because Toshiba and Samsung's pricing of finished products (a market in which PNY functioned only as a reseller) "was no longer competitive." *Id.* ¶ 73.

PNY alleges that SanDisk, Toshiba, Samsung and other vertically-integrated manufacturers conspired to increase or hold steady the prices of the flash memory system products so that resellers, like PNY, would purchase the component parts and assemble the flash memory systems products themselves, and pay a royalty to PNY. *Id.* ¶ 74. PNY also alleges that SanDisk's conspiracy with the other vertically-integrated manufacturers (like Toshiba and Samsung), with whom SanDisk also has licenses, has forced low-cost aggregators like PNY to pay duplicate and inflated royalties to SanDisk when they purchase flash memory devices, systems, or products from SanDisk or one of its vertically-integrated licensees. *Id.* ¶¶ 2, 6, 42, 50, 74-80, 93-95, 98, 140-45. Through these licenses, PNY alleges SanDisk ensures that it controls the prices at which flash memory technology and products are sold and SanDisk precludes its competitors from selling low-cost flash memory products.

PNY also alleges that SanDisk's licensing scheme has caused competitors to exit one of these markets, though it does not specify which market. For example, PNY believes that SanDisk entered into a licensing agreement with one of SanDisk's larger competitors, Buffalo, "that requires Buffalo to exit one or more of the Relevant Markets." *Id.* ¶ 82. In addition, PNY alleges that "[s]everal competitors, including Buffalo, have exited or significantly reduced their presence in one or more of the Relevant Markets as a result of SanDisk's anticompetitive licensing scheme." *Id.* ¶ 103.

PNY alleges that SanDisk's licensing and royalty scheme harms competition in the United States markets for flash memory by keeping the prices for flash memory artificially high and under SanDisk's control. PNY further alleges that SanDisk's exclusionary licensing and royalty scheme operates to preserve and enhance SanDisk's existing monopoly power in all flash memory-related

United States District Court

markets or threatens to monopolize additional downstream product markets in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and California business tort law.

## II.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In the antitrust context, "a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citing *Twombly*, *supra*, 550 U.S. at 556). Although the court must construe all allegations of material fact in the light most favorable to the plaintiff, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, *supra*, 550 U.S. at 555 (alteration in original).  If the allegations in the complaint fail to give rise to a plausible claim for relief, "'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* at 558 (citations omitted).  *Twombly* was itself an antitrust case and the Supreme Court's caution to proceed in these cases only upon a complaint with specific allegations is particularly apt.

## III.   DISCUSSION

### A.   TENSION BETWEEN PATENT RIGHTS AND ANTITRUST CLAIMS

Courts continue to define at what point conduct stemming from the legitimate exercise of patent rights is transformed into an antitrust claim and/or a defense based on the patent misuse doctrine.[2]  It has long been held that a "patentee has the exclusive right to manufacture, use and sell his invention." *Zenith Radio Corp. v. Hazeltime Research, Inc.*, 395 U.S. 100, 136 (1969) (*citing Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 88-89 (1902)).  The Supreme Court continued: "The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent.  The law also recognizes that he may assign to another his

---

[2] See discussion of historical context in Geoffrey D. Oliver, *Princo v. International Trade Commission: Antitrust Law and the Patent Misuse Doctrine Part Company*, 25 ANTITRUST 62, 63 (2011).

United States District Court

1   patent, in whole or in part, and may license others to practice his invention." *Id.* (internal citations

2   omitted).

3           Although the patent laws grant the inventor a limited monopoly over the patented invention,

4   "the ultimate goal of the patent system is to bring new designs and technologies into the public

5   domain through disclosure." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151

6   (1989); *see also, Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 626 (2008) ("the primary

7   purpose of our patent laws is not the creation of private fortunes for the owners of patents but is 'to

8   promote the progress of science and useful arts'") (quoting *Motion Picture Patents Co. v. Universal

9   Film Mfg. Co.*, 243 U.S. 502, 511 (1917)).[3]  Thus, the patent laws strike a balance: the inventor is

10  rewarded with a limited patent monopoly, which enables the inventor to reap the financial rewards of

11  the invention, in return for full disclosure of the patented invention and its dedication to the public

12  domain on expiration of the patent.  *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249 (1945)

13  *rehearing denied* 326 U.S. 811.  The "patent empowers the owner to exact royalties as high as he can

14  negotiate with the leverage of that monopoly," *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964); and,

15  subject to the general law, refuse to license an invention altogether.  *Image Technical Servs., Inc. v.

16  Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997) (noting that it could find "no reported case

17  in which a court ha[s] imposed antitrust liability for a unilateral refusal to sell or license a patent").

18  However, once the patent owner has sold or licensed the invention, "it may fairly be said that the

19  patentee has received his reward for the use of the patent."  *United States v. Masonite Corp.*, 316 U.S.

20  265, 278 (1942).

21          Courts have established limits which the patentee must not exceed in employing the leverage

22  of his patent to control or limit the operations of the licensee.  A patent owner may not "extend the

23  monopoly of his patent to derive a benefit not attributable to use of the patent's teachings." *Zenith

24  Radio Corp.*, *supra*, 395 U.S. at 136.

25

26  _____

27      [3] The Patent Clause of the Constitution grants Congress the power "[t]o promote the Progress of
    Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their
28  respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  The means adopted by Congress of
    promoting the progress of science is by granting the inventor a limited patent monopoly.

United States District Court

1    Under the doctrine of patent exhaustion, the initial "authorized sale of an article that

2  substantially embodies a patent exhausts the patent holder's rights" under the patent. *Quanta*

3  *Computer, Inc.*, *supra*, 553 U.S. at 638.  After a patent right is exhausted, it is no longer enforceable

4  by the patentee.  *Id.* at 626.  Accordingly, a patent holder may not collect a "double royalty," that is,

5  collect a royalty from both a licensee and a purchaser of the licensee's product under the same patent

6  for the same patented product without violating the patent exhaustion doctrine.  *PSC Inc. v. Symbol*

7  *Techs., Inc.*, 26 F. Supp. 2d 505, 510 (W.D.N.Y. 1998).  However, patent exhaustion is not a cause of

8  action, but an affirmative defense to a patent infringement lawsuit that "prohibits patent holders from

9  selling a patented article and then 'invoking patent law to control the postsale use of the article.'"

10  *ExcelStor Tech., Inc. v Papst Licensing GMBH & Co. KG*, 541 F.3d 1373,1376 (Fed. Cir. 2008)

11  (quoting *Quanta Computer, Inc.*, *supra*, 553 U.S. at 638).

12    While the patent system serves to encourage innovation, the antitrust laws serve to foster

13  competition.  *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) (citing

14  *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866-67 (Fed. Cir. 1985).  Thus, the statutory rights

15  extended by intellectual property laws do not confer upon the patent owner a privilege or immunity to

16  violate the antitrust laws.  *Id.*; *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed

17  Cir. 1990) (patent does not shield patent owner from the antitrust laws).  But the Supreme Court has

18  cautioned that even if patent misuse exists, "it does not necessarily follow that the misuse embodies

19  the ingredients of a violation of either § 1 or § 2 of the Sherman Act."  *Zenith Radio Corp.*, *supra*,

20  395 U.S. at 140.  The intersection between these two competing concepts continues to develop.

21    The tension between these concepts is particularly important here, as the gravamen of

22  Plaintiff's Complaint arises from a change in market conditions and Plaintiff's current dissatisfaction

23  with the licenses entered into in January 2008.  However, because Plaintiff has styled these

24  allegations of patent misuse as violations of antitrust law, they must be analyzed as such under the

25  *Twombly* standard.[4]

26    _____

27    [4] PNY urges the Court to look at the overall scheme alleged in the Complaint to determine whether it
    has stated a claim for antitrust violation.  Pl.'s Opp'n 14 (citing *Continental Ore Co. v. Union Carbide &*
28  *Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts should not "tightly compartmentaliz[e] the various factual
    components and wip[e] the slate clean after scrutiny of each").  While the slate need not be "wiped clean" after

**B.** **SHERMAN ACT § 2 CLAIMS: MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION**

Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize.[5]  PNY brings claims for both Monopolization (Count I) and Attempted Monopolization (Count II) in *each* of the flash memory-related markets.

To state a cause of action for the offense of monopoly under Section 2 of the Sherman Act, a plaintiff must plead two elements:  (1) possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

If a defendant does not possess monopoly power, a Sherman Act Section 2 claim may be maintained for attempted monopolization if (1) there is "a dangerous probability" that the defendant may be able to achieve monopoly power and (2) the defendant is engaged in predatory or anticompetitive conduct with (3) "a specific intent to monopolize."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (the elements for attempted monopolization are "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish monopolization; (3) dangerous probability of success; and (4) causal antitrust injury").

Additionally, because PNY seeks relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26,[6] it must allege that it has suffered (Section 4) or faces the threat of (Section 16) antitrust

---

scrutiny of a particular theory, each legal theory must be examined for its sufficiency separately.  In *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) (quoted in *Intergraph Corp.*, *supra*, 195 F.3d at 1367) , the Second Circuit explained:

> [W]e reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fraction is one or more, the plaintiffs have proved a violation of section 1 or 2 of the Sherman Act.  The proper inquiry is whether, qualitatively, there is a "synergistic effect."

While the ultimate determination of an antitrust violation rests on the "overall combined effect" of the alleged acts, *see City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), "there can be no synergistic result" if none of the acts alleged is an antitrust violation.  *Cal. Computer Prods. v. Int'l Bus. Machs., Corp.*, 613 F.2d 727 (9th Cir. 1979).

[5] 15 U.S.C. § 2. Monopolizing trade a felony; penalty

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . .

United States District Court

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  injury of "'the type the antitrust laws were designed to prevent and that flows from that which makes

2  defendants' acts unlawful.'"  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986)

3  (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

4  The first step in the analysis is to define the relevant market or markets.  No dispute appears to

5  exist that the relevant markets are (a) the upstream market consisting of the flash memory technology

6  itself and (b) the downstream markets flowing therefrom consisting of flash memory devices,

7  systems, and products.  Further, all relevant markets are based only in the United States.

8  Accordingly, the Court will discuss the remaining elements in turn.  The Court further notes, at this

9  juncture, that because PNY does little to separate the facts alleged for the conduct relative to each

10  market, the discussion of each element, to the extent necessary, will be analyzed with each specific

11  market in mind.

12  ### 1.    Nature of SanDisk's Market Power in the Relevant Markets

13  All Section 2 Sherman Act claims require that the plaintiff adequately plead either

14  monopoly power or "a dangerous probability" that the defendant may be able to achieve monopoly

15  power.  *Newcal Indus. v. Ion Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008).  The Supreme

16  Court defines monopoly power as the "power to control prices or exclude competition."  *See United*

17  *States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956).  For purposes of a motion to

18  dismiss, a plaintiff may plead this market power through allegations concerning (i) direct evidence

19  showing the effects of the anticompetitive behavior or (ii) indirect evidence of market power.  "If the

20  plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of

21  the injury to competition which a competitor with market power may inflict, and thus, of the actual

22  exercise of market power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.

23  1995) (summary judgment).  To demonstrate market power indirectly, or circumstantially, a plaintiff

24  must define the relevant market, and show that (i) the defendant owns a dominant share of that

25

26

27

28

[6] Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."  15 U.S.C. § 15.  Section 16 of the Clayton Act provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

Case4:11-cv-04689-YGR   Document50   Filed04/20/12   Page11 of 23

market and (ii) there are significant barriers to entry and existing competitors lack the capacity to increase their output in the short run. *Id.* at 1439 (the "barriers to entry" test looks at not only whether "there are significant barriers to entry [but also whether] . . . existing competitors lack the capacity to increase their output in the short run").

### a)   *Upstream Market: flash memory technology*

#### i.   Market share

PNY alleges that SanDisk is a monopolist in the flash memory technology market because SanDisk purports to own 100% of the United States patents in flash memory technology. Complaint ¶ 36. Courts generally require a 65% market share to establish a prima facie showing of market power. *Image Technical Servs.*, *supra*, 125 F.3d at 1206 (evidence supported jury verdict finding defendant controlled monopoly share of parts market where jury instruction required 65% market share in order to find that defendant monopoly power). Thus, although ownership of a patent does not necessarily confer market power, *see Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006), the allegation that SanDisk owns 100% of the technology patents is sufficient to plead a dominant share of the market.

#### ii.   Barriers to entry

PNY combines its allegation of 100% ownership of United States patents with other allegations, showing not just a dominant market share, but the ability to control prices and the existence of entry barriers. Specifically, PNY alleges: "there are no closely suitable technologies to which a manufacturer of flash memory systems products could switch in the event of a price increase for the patents SanDisk claims cover all forms of flash memory technology." Complaint ¶ 40. In other words, if SanDisk owns all the flash memory technology patents, it has the ability to set the price to license its patents. Additionally, PNY alleges that the flash memory technology market is characterized by high entry barriers, which would prevent new competition from entering the market. *Id.* ¶¶ 44-46, 52, 118, 130. To support this factual conclusion PNY further alleges that new competitors would require two years of time and billions of dollars in capital investment to develop the technology to compete in this upstream market. *Id.*

United States District Court

11

United States District Court

1    SanDisk does not dispute the significant investment to develop flash memory technology, but

2   instead argues that PNY fails to allege any facts of market power or exclusionary conduct beyond that

3   inherent in SanDisk's patents.  SanDisk's Motion to Dismiss, Dkt. No. 29, ("Mot. to Dismiss") 13.

4   SanDisk notes that PNY alleges that "alternative designs [of flash memory systems products] exist

5   that do not infringe some or all of SanDisk's patents." *Id.* (citing Complaint ¶ 83).  Thus, according

6   to SanDisk, both the availability of competing technologies and the existence of other flash memory

7   technology patent holders negate any inference that SanDisk is a monopolist in the upstream flash

8   memory technology market.  *Id.*

9        Based upon the specificity of the allegations in the Complaint, which support at least the

10   inference of SanDisk's total dominance of the upstream market, the Court finds that PNY has

11   sufficiently pled this element of a Section 2 Sherman Act violation for monopolization of the

12   upstream flash memory technology market.  Consequently, the corresponding element under a claim

13   for attempted monopolization is satisfied as an alternative theory.

14              *b)*       ***Downstream Markets: flash memory devices, systems, and products***

15              With respect to the downstream markets consisting of (i) devices, (ii) systems,

16   and (iii) products, PNY alleges that SanDisk has a "monopolistic grip" over these markets and brings

17   Section 2 Sherman Act claim under theories of both monopolization and attempted monopolization.

18   Complaint ¶¶ 42, 50.

19        PNY alleges that SanDisk possesses the power to control prices and exclude competition in

20   the downstream markets and, thus, argues that it has alleged direct proof that SanDisk is a monopolist

21   in all the downstream markets.[7]  The conclusory allegations, which mirror the requisite elements, are

22   based on the allegation that SanDisk uses its licenses to extract a royalty on the same patented

23   technology on all downstream market sales, which has the effect of controlling prices.  Pl.'s Opp'n

24   16-17 (citing Complaint ¶¶ 2, 4-6, 38, 74, 76, 80, 88, 97, 99, 101-02, 104, 117, 121, 128-29, 133,

25   142-43, 151).  It is unclear from the Complaint or PNY's opposition brief how collecting royalties

26   _____

27        [7] PNY's reasoning is somewhat circular: "SanDisk's anticompetitive licensing scheme has given it the
28   power to control prices and exclude competition, as evidenced by SanDisk's actual exercise of control over
     prices and the actual exclusion of competition in the Relevant Markets."  Complaint ¶ 117.

demonstrates the ability to set prices.  Perhaps there is an effect, but whether the effect is specific to PNY or to the market generally is an important distinction.  Without more, these allegations do not support the claim that SanDisk has the power *to control* prices and thus, PNY has not alleged facts to show market power directly.  *See United States v. Syufy Enters.*, 903 F.2d 659, 670 (9th Cir. 1990) (defendant lacked power to control prices where evidence showed he did not possess power to set prices).

PNY further suggests that it has plausibly alleged that SanDisk has the power to exclude competition based on the allegation that SanDisk entered into contracts with "several competitors, including Buffalo, a large manufacturer of electronic devices," which required them "to exit one or more of the Relevant Markets."  *See* Complaint ¶¶ 82, 103.  PNY fails to specify which market the competitors allegedly exited.  Moreover, PNY needs to support this conclusion with facts that show SanDisk has the "power to exclude competition from the relevant market generally, not just to exclude a particular competitor."  *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426-27 (9th Cir. 1993).  The allegation that SanDisk contracted with a small number[8] of competitors to exit "one or more of the Relevant Markets" does not support the conclusion that SanDisk has sufficient power to exclude all competition *generally* from any of the downstream markets.  *See id.*  Further, unlike the specific claims of exclusionary conduct and suppression of competition in *Continental Ore*, *supra*, PNY has identified only one specific instance of a competitor leaving the market.  *See* 370 U.S. at 694 (alleging defendants' monopolistic and restrictive practices caused producers and distributors of iron ore, including plaintiffs, to be eliminated from market).

The facts alleged do not show directly that SanDisk has market power in any of the downstream markets.  Accordingly, the Court next will analyze whether PNY alleges sufficient facts concerning market share and barriers to entry in any of the downstream markets to show indirectly that SanDisk has monopoly power or a dangerous probability thereof.

_____

[8] The Court assumes that PNY uses the term "several" in its ordinary meaning: a small number; more than two or three but not very many.  OXFORD ENGLISH DICTIONARY ONLINE, http://www.oed.com/viewdictionaryentry/Entry/176914 (last visited Apr. 17, 2012).

i.      *Market share*

In terms of market share, PNY alleges that SanDisk has at least a 40% market share of retail sales of flash memory products, such as USB flash drives.  *Id.* ¶¶ 36, 42.  PNY admits that it does not know SanDisk's market share in the two other downstream markets, but alleges that SanDisk exerts direct control over those downstream markets through its uncompetitive licenses.

As stated above, generally, courts require a 65% market share to establish a prima facie showing of monopolistic market power.  *See Image Technical Servs.*, *supra*, 125 F.3d at 1206.  PNY's Complaint in its current form at best articulates only a 40% share in the retail market for products.  With respect to the other two downstream markets, the allegations regarding this element are wholly lacking.  Accordingly, PNY has failed to plead sufficient facts supporting an allegation of monopoly power in these downstream markets either directly or circumstantially.

The next question is whether PNY has sufficiently alleged the first element regarding market power to state a claim for attempted monopolization.  PNY must plead facts sufficient to allege that "a dangerous possibility" exists that SanDisk may be able to achieve monopoly power.  In *Rebel Oil*, *supra*, the Ninth Circuit found a market share of 44% to be sufficient in an attempt case, although it cautioned against a purely mathematical analysis.  51 F.3d at 1438 & n.10.

However, PNY admits that it has does not know the extent of SanDisk's share *at all* for the downstream markets for (i) flash memory devices or (ii) flash memory systems.  Without any quantitative or qualitative allegations of market share, PNY may not pursue claims for attempted monopolization of the flash memory devices or systems market.

By contrast, PNY does allege that SanDisk possesses a 40% share of the retail market for flash memory products.  A 40% share of the retail market is a sufficient share of the market for an attempt case provided there are barriers to entering the market.

ii.     *Barriers to entry*

To establish, as PNY alleges, that SanDisk has a "monopolistic grip" over the downstream markets, PNY also must allege facts that show there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run.  *Rebel*

*Oil*, *supra*, 51 F.3d at 1439.  There are no factual allegations that could support the conclusion that there are barriers to entry in any of the downstream markets.  As an initial matter, PNY's allegations of barriers to entry into the downstream market focus on barriers existing in the upstream market.  PNY alleges that significant barriers exist because it would require two years of time and billions of dollars in capital investment to develop new *technology*.  Complaint ¶¶ 44-45, 52.  However, the flash memory technology market, which PNY defines as "the technology needed to manufacture, import, and sell flash memory devices, systems, and products," *id*. ¶ 35, is not the relevant market to analyze barriers to entering the downstream markets.  PNY does not allege facts of such barriers to entering into any of the downstream markets.

In addition, the facts alleged do not show that existing competitors lack the capacity to increase output in the short run; actually, the facts alleged in the Complaint show the opposite.  According to the Complaint, after SanDisk and other vertically-integrated firms conspired to increase prices in the flash memory systems products market to a supracompetitive level, PNY and other companies increased output in the flash memory systems products market.  *Id.* ¶¶ 72-75.  Thus, the evidentiary facts, which are pled – that existing competitors increased output in the short run in response to a price increase – contradict PNY's conclusion that existing competitors do not have the capacity to increase output in the short run.

Based upon the foregoing, the Court finds that PNY has not sufficiently pled that SanDisk has a monopoly in any of the downstream markets or that there is "a dangerous probability" that SanDisk may be able to achieve monopoly power in any of the downstream markets.  Thus, PNY fails to state a claim for monopolization or attempted monopolization of the downstream markets for flash memory devices, systems, and products.

## 2. Allegations of Anti-Competitive Conduct

### a) *Legal Framework*

For a claim of monopoly, the second and final element to be pled "is the use of that monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).  If SanDisk uses its license "as part of a

scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2."  *Id.*
(citing *Grinnell Corp.*, *supra*, 384 U.S. at 570-71; *United States v. Aluminum Co. of Am.*, 148 F.2d
416, 432 (2d Cir. 1945); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-605
(1985).  Thus, mere possession of monopoly power will not be found unlawful unless it is
accompanied by an element of anticompetitive conduct done with the intent to maintain or acquire a
monopoly.

Similarly, for a claim of attempted monopolization, a plaintiff must allege facts to
demonstrate that the defendant is engaged in predatory or anticompetitive conduct with "a specific
intent to monopolize."  *Spectrum Sports, Inc.*, *supra*, 506 U.S. at 456.  Or, as further explained by the
Ninth Circuit, the plaintiff must allege "predatory or anticompetitive conduct to accomplish
monopolization" with the "specific intent to control prices or destroy competition."  *Cost Mgmt.*
*Servs., Inc.*, *supra*, 99 F.3d at 949.  Therefore, the relevant inquiry for a Section 2 claim of attempted
monopolization is whether the defendant has engaged in improper conduct that has or is likely to
have the effect of controlling prices or excluding competition, thus, creating or maintaining market
power.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002).

### b)    *Factual Allegations*

PNY alleges that SanDisk has either extended or sought to extend its patent
monopolies related to flash memory technology, devices, systems, and products beyond their lawful
grants through (1) anticompetitive terms in its uniform, nonnegotiable license (double royalty,
worldwide royalty-free cross license on future innovations, payment of royalties on worldwide sales,
and portfolio licensing of patents); and (2) execution of its coercive licensing scheme against all of its
low-price competitors in the United States markets for flash memory technology, devices, systems,
and products.  Complaint ¶¶ 1-6, 8, 38, 42-43, 50-51, 55-62, 69-70, 75-80, 84-99, 100-05, 116, 121,
133.

An overarching inadequacy with PNY's Complaint is its failure to distinguish factual
allegations regarding the alleged antitrust violations without distinguishing between and among the
various markets and causes of action.  The Complaint admits that SanDisk's monopoly in the flash
memory technology market is a consequence of the patent laws.  The Complaint is devoid of any

1  allegations of "willful acquisition" of this monopoly.   Further, while PNY alleges "anticompetitive

2  conduct" generally, it fails to relate that conduct to the maintenance of SanDisk's legally obtained

3  monopoly of the patented technology.  Accordingly, at its most basic level, PNY fails to state a

4  Section 2 claim for monopolization in the flash memory technology market.[9]

### iii.   *Conduct Relative to the Licenses*

6           First, PNY alleges that SanDisk's licensing agreements violate the

7  patent exhaustion doctrine because SanDisk collects a royalty on the sale of a flash memory device

8  twice:  first when the device is sold by the manufacturer and PNY charges a second royalty on the

9  sale of the same device after the device is incorporated into a flash memory system or product.  Pl.'s

10 Opp'n 10-11; Complaint ¶ 79.  To the extent PNY believes SanDisk is charging a double royalty on

11 its patents, PNY needs to set out its claim more clearly to state a Sherman Act claim.  The Complaint

12 alleges that any firm manufacturing, assembling or selling flash memory devices, systems or products

13 is practicing one of SanDisk's patents and thus must pay SanDisk a royalty.  *See id.* ¶ 36.  The

14 Complaint also alleges that the patent portfolio consists of 1,400 patents.  *Id.*  This suggests that

15 SanDisk is not collecting a "double royalty," but rather enforcing its rights under the patent laws by

16 collecting a separate royalty for a different set of patent rights.  Accordingly, PNY has failed to allege

17 anticompetitive conduct.

18          Second, SanDisk's license allegedly requires licensees to "grant-back" a "cross-license" that

19 covers any new technological innovations developed by the licensee on flash memory-related

20 technology within the scope of the patent portfolio license, thereby stifling the incentive to innovate.

21 *Id.* ¶ 90.  According to the Complaint, "requiring licensees to share their future technological

22 innovations with SanDisk on a worldwide royalty-free basis" is anticompetitive because "even if a

23 licensee develops or obtains access to an alternative technology that it could use to practice fewer or

─────────────────────

25       [9] PNY alleges in its Complaint that Kingston's Counterclaim in *SanDisk Corp. v. Kingston Tech. Co.*,

26 10-cv-00243 (W.D. Wis.) survived a motion to dismiss.  In its opposition, it adds that "PNY's allegations are nearly identical to the claims that were the subject of a trial in the Western District of Wisconsin."  Pl.'s Opp'n

27 1-2.  The Counterclaim in *Kingston* (which was filed under seal) does not nudge PNY's claims in this case across the line from possible to plausible.  Moreover, the Court notes that in the *Kingston*, after a full trial on

28 the merits, the Judge's findings of fact do not support many of PNY's allegations about SanDisk's market power or the barriers to entry into the downstream markets.

United States District Court

1    none of SanDisk's patents, the licensee would still be required to pay a royalty to SanDisk on any

2    sales of the new product and SanDisk would have the right to use the new technology on a worldwide

3    royalty-free basis."  Complaint ¶¶ 4(d), 90.  PNY alleges that this "grant-back" provision in

4    SanDisk's license is part of SanDisk's unlawful scheme to maintain its market power and suppress

5    competition.

6        There is nothing inherently illegal or anticompetitive about a grant-back provision in a patent

7    license.  *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 647 (1947) (finding no

8    antitrust behavior and holding grant-back provision "is not per se illegal and unenforceable," but

9    noting the possibility of abusing this practice).  With respect to this claim, the mere transfer of a valid

10   patent "has no antitrust significance," but merely shifts a lawful monopoly to different hands."  *See*

11   *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984).  To show that a grant-

12   back provision is unlawful, PNY must allege facts that demonstrate a restraint on competition that

13   violates the antitrust laws.  *See Cutter Laboratories v. Lyophile-Cryochem Corp.*, 179 F.2d 80, 92

14   (9th Cir. 1949) (citing *United States v. Line Material Co.*, 333 U.S. 287 (1948); *Morton Salt Co. v.*

15   *Suppiger Co.*, 314 U.S. 488 (1942); and *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)).

16       While it is possible that, as PNY alleges, the grant-back provision is part of an overall scheme

17   by SanDisk to maintain control of a patent monopoly in the flash memory technology market, PNY

18   does not allege facts to show that the grant-back provision is anticompetitive.  Instead, PNY alleges

19   the conclusion that the license provision violates the antitrust laws but no facts to support such a

20   conclusion.  Indeed, though PNY alleges that the grant-back provision lessens the incentive to

21   innovate, PNY stops short of alleging that this licensing provision actually *has* stifled innovation.  *See*

22   Complaint ¶¶ 3, 90.[10]  To state a Section 2 Sherman Act claim based upon the grant-back provision,

23   PNY will need to do more than allege the ultimate conclusion of anticompetitive behavior; it will

24   need to allege facts, which if proven, would establish anticompetitive conduct.

25

26

27   _____

28   [10] At best, PNY alleges patent misuse through this licensing provision.  Complaint ¶ 90.  While this
     may suffice as an equitable defense to a patent infringement lawsuit, it stops well short of establishing a
     Sherman Act violation.

18

United States District Court

Third, PNY alleges that the license is anticompetitive because it requires a licensee to pay for a broad and unspecified patent portfolio, rather than specific, individual patents; and to pay royalties on worldwide sales, which would include sales in geographic markets that are not covered by its patents.  *Id.* ¶¶ 84-86.[11]  The fact that PNY entered into a form license over which SanDisk was able to negotiate more favorable terms does not constitute anticompetitive conduct for antitrust purposes. *Spectrum Sports, Inc.*, *supra*, 506 U.S. at 458 ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").  PNY must allege facts – not conclusions – that would tend to demonstrate anticompetitive conduct that has the effect of maintaining, or a dangerous probability of creating, a monopoly.

For the reasons set forth above, PNY has not sufficiently alleged the anticompetitive behavior required to state a Section 2 Sherman Act claim for monopolization or attempted monopolization.

### 3.    Antitrust Injury

To bring a private action for violation of the antitrust laws, PNY must allege that it has suffered or faces the threat of antitrust injury of "'the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Thus, it is not enough to allege that the complained of acts are linked to anticompetitive conduct, "unless [the injury] is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  SanDisk argues that PNY does not allege causal antitrust injury because the alleged injury flows from the financial terms of the parties' license agreement, to which PNY willingly and voluntarily agreed, rather than any claimed competition-reducing conduct by SanDisk.  Mot. to Dismiss 6-8.  PNY counters that its alleged injury flows directly from the oppressive SanDisk license itself, and the fact that PNY

---

[11] SanDisk cites court cases upholding, as procompetitive, licensing agreements, much like its contract with PNY, requiring royalty payments on sales of products not covered by the licensor's patents where the parties' contract contained a clause stating that this method for calculating royalties was a convenient means to calculate royalties.  Mot. to Dismiss 7-9.  Because all of the cases cited were decided on with the benefit of a full evidentiary record, either following trial or on summary judgment, it is not clear whether, as a matter of law, because the parties' contract contains such a convenience of the parties license recital, PNY is precluded from alleging that the method for calculating royalties is anticompetitive.

submitted to SanDisk's market power and coercion when it signed SanDisk's license does not immunize the terms of that license from the antitrust laws.  Pl.'s Opp'n 7.  Although in one paragraph PNY indicates that it entered into the contract willingly, elsewhere it alleges SanDisk used coercion to force the terms of the contract upon PNY.

The "injury" alleged here arises out of the payment of royalties to practice SanDisk's patents. SanDisk argues that this is not antitrust injury because all of PNY's alleged harm flows from the terms of the contract into which it voluntarily entered.  Because PNY has not adequately pled that it entered into the unfavorable license with SanDisk as a result of anticompetitive conduct,[12] or how exactly it has suffered antitrust injury based upon the terms of the contract, it cannot rely upon its performance of the terms of that contract to establish causal antitrust injury.

Based on the foregoing analysis, the Court hereby **GRANTS** the Motion to Dismiss as to PNY's Section 2 Sherman Act claims, Counts I and II **WITH LEAVE TO AMEND**.

**C.    SHERMAN ACT § 1 CONSPIRACY CLAIM: COMBINATION IN RESTRAINT OF TRADE[13]**

Liability under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination . . ., or conspiracy, in restraint of trade or commerce."  *Twombly*, *supra*, 550 U.S. at 548.  To state a claim under Section 1 of the Sherman Act, the claimant must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce; (3) which actually injures competition.  *Id.*  "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" for purposes of Section 1.  *Id.* at 557.  To plead an "agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged

---

[12] PNY alleges that it entered into the agreement to put an end to a patent infringement lawsuit PNY brought against it, but it does not suggest that the lawsuit was a "sham litigation" or "bad faith prosecution." *See Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979) (prosecution of patent enforcement actions are presumed to be in good faith, but if prosecuted in bad faith, it may violate antitrust laws).

[13] 15 U.S.C. § 1. Trusts, *etc.*, in restraint of trade illegal; penalty
    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint
    of trade or commerce among the several States, or with foreign nations, is declared to
    be illegal. Every person who shall make any contract or engage in any combination or
    conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . .

conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) (quoting *Twombly*, *supra*, 550 U.S. at 565 n.10).

PNY has failed to allege any evidentiary facts of a conspiracy.  Rather, it alleges "[u]pon information and belief, SanDisk and certain manufacturers of flash memory technology products licensed by SanDisk, including Toshiba, Samsung, and others have entered into continuing and ongoing contracts, combinations, agreements, and/or conspiracies to unreasonably restrain trade and commerce in the Relevant Markets." *Id.* ¶ 140.  This "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" for purposes of Section 1. *Twombly*, *supra*, 550 U.S. at 557.  Accordingly, PNY fails to plead evidentiary facts to state a cause of action for a Section 1 conspiracy.[14]

Based on the foregoing analysis, the Court hereby **GRANTS** the Motion to Dismiss as to PNY's Section 1 Sherman Act claim, Count III, **WITH LEAVE TO AMEND**.

### D.   COUNT IV – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

The elements for a cause of action for intentional interference with contractual relations and for intentional interference with prospective economic advantage essentially are: (1) a contract or other economic relationship between plaintiff and a third party; (2) the defendant's knowledge of the contract or relationship; (3) defendant's intentional acts designed to induce a breach or disrupt the contract or relationship; (4) actual breach or disruption; and (5) damage.  *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (Cal. 1998); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (Cal. 2003).  PNY provides no facts from one can discern the relationships with which SanDisk has interfered (or at least more specific than every contractual relationship PNY has ever or will ever enter into).  PNY's alleges: "PNY has existing and valuable business relationships, as well as reasonable expectations of further and future relationships, with manufacturers, retailers,

---

[14] PNY argues in its opposition that through discovery it expects to get more information about the contracts.  Pl.'s Opp'n 20.  Unfortunately, PNY cannot save its Section 1 claim based on the expectation that through discovery it might find a factual basis for its conspiracy claim.  In *Twombly*, *supra*, the Supreme Court cautioned "a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed."  550 U.S. at 558.  Based on the present state of the pleadings, PNY may not obtain this discovery.

United States District Court

1    and purchasers relating to flash memory technology," that "SanDisk was aware of these prospective

2    business and actual contractual relationships and engaged in intentional and wrongful conduct

3    designed or calculated to disrupt and interfere with those relationships" and that "SanDisk's conduct

4    in interfering with such prospective business and actual contractual relations is intentional, malicious,

5    and without justification."  Complaint ¶¶ 149-151.  These are not "facts."  They are legal conclusions.

6        The parties dispute whether PNY needs to identify the particular third-party with whom

7    Plaintiff has a relationship.  The contractual party "must be identified in some manner."  *Ramona*

8    *Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1133 (Cal. Ct. App. 1986).  Here,

9    PNY provides no facts from which the Court can discern impacted relationships.  Without any details

10   of the relationships with which SanDisk allegedly interfered, SanDisk cannot be expected to frame an

11   answer to these allegations.  Accordingly, PNY has failed to state a claim for either intentional

12   interference with contractual relations or intentional interference with prospective economic

13   advantage.

14       Based on the foregoing analysis, the Court hereby **GRANTS** the Motion to Dismiss as to

15   PNY's claim for intentional interference with contractual relations and for intentional interference

16   with prospective economic advantage, Count IV, **WITH LEAVE TO AMEND**.

17       **E.    COUNT V – UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS &
            PROFESSIONS CODE §§ 17200 *et seq.***

18

19       California's UCL statute prohibits "any unlawful, unfair or fraudulent business act or

20   practice."  Cal. Bus. Prof. Code. § 17200; *Cel-Tech Comm., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th

21   163, 180 (Cal. 1999). PNY purports to plead claims under the unlawful and unfair prongs of the UCL.

22   Complaint ¶¶ 158-59.  With respect to PNY's allegations under the unlawful prong of the UCL, PNY

23   simply borrows from its federal antitrust claims, claiming that the alleged federal antitrust violations

24   are the "unlawful" conduct which the UCL claim is directed to.  *Id.* ¶ 159.  If the antitrust claims were

25   adequately plead, this would establish the unlawful prong.  But because PNY has failed to adequately

26   plead its antitrust claims, its unlawful-prong UCL claim necessarily fails as well.  *See Ingels v.*

27   *Westwood One Broadcasting Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (Cal. Ct. App. 2005) ("'If the

28   [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base [] the derivative

United States District Court

Unfair Competition claim'") (second alteration in original); *Scripps Clinic v. Sup. Ct.*, 108 Cal. App. 4th 917, 934-39 (Cal. Ct. App. 2003); *see also Krantz v. BT Visual Images*, 89 Cal. App. 4th 164 (Cal. Ct. App. 2001) (the viability of an unlawful UCL claim stands or falls with the underlying claim).

Likewise, PNY's unfair-prong UCL claim also is deficient. Where, as here, a competitor alleges a violation of the UCL's unfair-prong, "unfair" "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns*, *supra*, 20 Cal. 4th at 186-87; Complaint ¶ 1 ("PNY and SanDisk are competitors."). Because PNY has not adequately pled its federal antitrust claims, and because its UCL claims are not materially different than its federal antitrust claims, it follows then, that PNY's claim under the unlawful and unfair prongs of the UCL fails as well.[15]

Based on the foregoing analysis, the Court hereby **GRANTS** the Motion to Dismiss as to PNY's claim for Unfair Competition in Violation of Cal. Bus. Prof. Code §§ 17200 *et seq.*, Count V, **WITH LEAVE TO AMEND**.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED WITH LEAVE TO AMEND**. Plaintiff shall file an amended complaint within 28 days from the date this Order is filed. Defendant shall file its response to the amended complaint within 28 days of service.

This Order Terminates Docket Number 29.

**IT IS SO ORDERED**.

April 20, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[15] In its opposition, PNY indicates that the claim for intentional interference could satisfy the unfair prong. Because this is not pled as a basis for the UCL claim, and also because the claim for intentional interference fails to state a claim, this argument cannot prevent dismissal.