UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PNY TECHNOLOGIES, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SANDISK CORPORATION,<br><br>    Defendant. | Case No. 11-cv-04689-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 195 |

**INTRODUCTION**

Defendant SanDisk Corporation moves to dismiss causes of action for exclusive dealing in, and attempted monopolization of, the market for Secure Digital cards in the United States from plaintiff PNY Technologies, Inc.'s Second Amended Complaint ("SAC"). Because the exclusive contracts alleged by PNY are short-term or easily terminable, they do not unreasonably restrain trade. PNY has not plausibly alleged that SanDisk unlawfully attempted to monopolize the market for Secure Digital cards. Accordingly, SanDisk's motion to dismiss is GRANTED. PNY may have leave to amend its complaint within ten days of this Order.

**FACTUAL BACKGROUND**

**I.  FACTS ALLEGED IN THE COMPLAINT**

SanDisk is the dominant manufacturer of flash memory technology in the world. SAC ¶ 1. Flash memory is found in many consumer electronic devices and memory products, such as Universal Serial Bus ("USB") flash memory drives. Through its large share of the flash memory technology market, SanDisk has attempted to dominate three related downstream markets: (i) flash memory chips ("chips"), (ii) USB flash memory systems (a combination of a chip and a

controller[1]), and (iii) USB flash memory system products. SAC ¶ 1. PNY is a competitor of SanDisk in the systems and system products markets, and a customer of SanDisk in the chips and flash memory technology markets. SAC ¶ 1. PNY and other companies called "aggregators" purchase chips in bulk to create systems and products that are later sold to consumers. SAC ¶ 3.

SanDisk has also attempted to monopolize the related flash memory systems product market for Secure Digital cards ("SD cards").[2] SAC ¶ 2. Only SD cards are relevant to this motion to dismiss.

PNY alleges a relevant antitrust market for the sale of SD cards to United States consumers. SAC ¶ 94. Participants in this market include vertically integrated firms, aggregators, and relabelers. SAC ¶ 94. Relabelers purchase finished products and affix their labels to the product prior to resale. SAC ¶ 43. But while relabelers compete to sell SD cards, they do not compete in manufacturing them and have relatively little effect on pricing. SAC ¶ 94.

SanDisk "has surged recently to a dominant position in the market for SD cards" through an "extensive effort to secure exclusive dealing arrangements with key retail outlets." SAC ¶ 2. SanDisk's SD cards comprised approximately 45 percent of retail sales in the United States in 2010, and 52 percent in 2012. SAC ¶ 95. SanDisk uses its market power in the flash memory technology market to "force" all significant manufacturers of SD cards into a worldwide royalty-bearing license. SAC ¶ 96. Doing so allows SanDisk to exclude competitors in the SD card market. SAC ¶ 96.

"On information and belief, SanDisk has required retailers to enter into exclusive dealing arrangements with it for USB flash memory system products and other removable memory products." SAC ¶ 149. These arrangements prevent retailers from carrying products made by PNY and other competitors. SAC ¶ 149. SanDisk's power in the SD card market has been

---

[1] A controller is a separate chip that manages the data stored on the flash memory chip and communicates with the attached computer or electronic device. SAC ¶ 3.

[2] Like USB products, SD cards use chips and a comparable flash memory system configuration, but have a different form factor, different connection interface, and tend to connect with different devices than the ones with which USB products connect. SAC ¶ 2. To convert a chip into a usable product, it has to be combined with a controller, thereby creating a USB or SD flash memory system. In addition, "housing" and a USB plug or SD connection interface can be added to create a USB or SD flash memory system product.

increasing in recent years as it pursues exclusive dealing arrangements with key retailers, such as ▮▮▮. SAC ¶ 97. These arrangements "cut off" competitors from nearly half of the retail store distribution of SD cards. SAC ¶ 97. "On information and belief, at least some of the exclusive dealing arrangements are greater than a year in duration . . . ." SAC ¶ 250.

"In internal emails, SanDisk has expressed its goal of stifling competition through its exclusive arrangements." SAC ¶ 151. In a March 2010 email, SanDisk employees and a marketing firm discussed how SanDisk's "category exclusive programs can help block out [one manufacturer's] voice" at ▮▮▮ stores. SAC ¶ 151. In other emails, although acknowledging that PNY's presence would keep SanDisk "honest" in pricing SD cards, SanDisk discussed tactics to block PNY from ▮▮▮ and the consequences in pricing if ▮▮▮ "backed out." SAC ¶ 151. "On information and belief, SanDisk's efforts at ▮▮▮ have resulted in all competition in the relevant markets being foreclosed at ▮▮▮ stores in return for a substantial ▮▮▮ from SanDisk to the retailer." SAC ¶ 151.

SanDisk emails from 2011 and 2012 show its efforts to maintain its exclusive dealing arrangement with ▮▮▮, including the involvement of SanDisk's president to aid in SanDisk's strategy of "[r]ather than competing solely on price ▮▮▮ we need to understand what will keep ▮▮▮ out." SAC ¶ 152. In the same email thread, SanDisk employees discussed plans of reneging on "the 'gentlemen's agreement' that existed between ▮▮▮ and SanDisk not to sell ▮▮▮ maintained an exclusive posture with SanDisk." SAC ¶ 152.

SanDisk became the exclusive provider of ▮▮▮ SD cards for ▮▮▮. SAC ¶ 150. SanDisk also became the exclusive provider of SD cards in ▮▮▮. SAC ¶ 150.

Although there are "limited alternative channels of distribution that (for now) remain open to SanDisk's competitors," SanDisk's exclusive dealing arrangements deny its competitors

---

[3] SanDisk states that it was unable to identify any agreement between it and ▮▮▮. However, it identified an agreement between it and ▮▮▮ of which ▮▮▮ is a division. Mot. 3 n.2.

3

meaningful market access and the opportunity to achieve economies of scale. SAC ¶¶ 153, 252. There are no procompetitive benefits to the exclusive dealing arrangements and consumers face higher prices for SD cards as a result. SAC ¶¶ 153, 251. SanDisk's attempted monopolization of the SD card market has injured PNY. SAC ¶ 244.

There are high barriers to entry in the market for SD flash memory system products. SanDisk and SD-3C (an entity that combines certain SanDisk, Panasonic, and Toshiba intellectual property) assert that a firm entering the market requires a license from SD-3C. SAC ¶¶ 46, 98, 250. The necessary distribution network, brand recognition, and relationships to be a meaningful competitor may take many years to develop. SAC ¶ 98. Because retail distribution outlets are highly concentrated and SanDisk has erected an "exclusive dealing barrier," opportunities for distribution are limited. SAC ¶ 98. Direct sales to consumers have always been small, and no manufacturer has been successful in building a direct sales presence that successfully competes with established retail distribution outlets, including SanDisk itself. SAC ¶ 98.

## II.   RETAILER AGREEMENTS[4]

---

[4] Along with its motion to dismiss, SanDisk submitted a Request for Judicial Notice ("RJN") consisting of a number of agreements between it and retailers. SanDisk justifies its RJN based on the "incorporation by reference" doctrine, which holds that "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.").

PNY filed a separate objection to SanDisk's RJN, to which SanDisk filed a separate reply. The objection and reply to the RJN do not comply with Civil Local Rules 7-3(a) and 7-3(c), which require objections to evidence to be incorporated in the parties' opposition or reply brief. Accordingly, they are STRUCK.

However, PNY has also objected to the RJN in its opposition brief, arguing that "although SanDisk's exclusive dealing contracts certainly relate to PNY's exclusive dealing claim, the claim is not based on the contents of any particular contract." Opp'n 15. It asserts that it could not have based any claims on "most" of these documents because it did not have access to them before SanDisk filed the RJN. Opp'n 15.

PNY's objection is unpersuasive. As an initial matter, PNY's assertion that it "never had access" to these documents appears to be in tension with its statements on page 4 of its brief, in which it

4

The following chart summarizes the retailer agreements attached to SanDisk's Request for Judicial Notice:

| Retailer | Most Recent Agreement Date | Agreement Terminability | Agreement Term | Exclusivity |
|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ |
| █ | ███ | ███ | █ | █ |
| ██ | ███ | ███ | █ | █ |
| ██ | ██ | ███ | ██ | ██ |
| ███ | ███ | ███ | █ | █ |
| ██ | ███ | ██ | ██ | █ |
| █ | ██ | ██ | ██ | █ |

The following are additional details about the agreements in addition to the ones above:

████ SanDisk's agreement with ████ only applies to SD cards sold at ████ ████████████████. RJN Ex. 1. The agreement provides for marketing funding, a merchandise allowance, and "markdown funds" or, effectively, a discount.

██: SanDisk's agreement with ██ provides for ██ in "markdown funds"; should the agreement be terminated prematurely, ██ must reimburse PNY ████. RJN Ex. 2.

████████ standard terms with vendors explicitly disclaim any exclusive relationship. RJN Ex. 3, ¶ F.

████ SanDisk's agreement with ██ continues ██████. RJN Ex. 9, ¶ 12. ██ receives ████ for signing the agreement, but must refund a prorated amount if it

---

said that the parties had completed their respective document products relating to flash memory systems products, including SD cards, by the end of 2013 and that "[i]n the event PNY confirms that SanDisk failed to produce these documents in a timely fashion and that its representation that it had completed its documents production was false, PNY will bring the matter before the Court." The RJN was filed in February 2014. PNY has not yet alleged that SanDisk's representation that it completed document production is false. At the motion hearing, SanDisk also represented that it has produced to PNY complete versions of all relevant agreements in its possession. There is, therefore, no evidence before me that PNY did not have access to these documents well before this motion was made.

More importantly, regardless of whether PNY explicitly discusses the language of these agreements in its SAC, the agreements and their effect are the foundation for PNY's claims, and PNY has not questioned their authenticity. SanDisk's RJN is GRANTED.

1  prematurely terminates the exclusivity provisions. RJN Ex. 10 ¶¶ 15-18.

2  ▇▇▇: SanDisk's agreement with ▇▇▇ continues ▇▇▇. RJN Ex. 11.

3  SanDisk will provide up to ▇▇▇ for marketing support. RJN Ex. 17.

4  ▇▇▇: SanDisk's agreement with ▇▇▇ continues ▇▇▇. RJN Ex. 19 ¶ 18.

5  ▇▇▇: SanDisk committed to being ▇▇▇ exclusive supplier for memory cards

6  for both ▇▇▇ and branded memory cards. RJN Ex. 26. SanDisk would provide ▇▇▇ in

7  funding in 2012. RJN Ex. 27. In 2013, SanDisk promised ▇▇▇ for keeping the same

8  contract.

9  ▇▇▇ There are no benefits to ▇▇▇ for buying exclusively from SanDisk.

## PROCEDURAL BACKGROUND

PNY filed this action on September 21, 2011. Dkt. No. 1. On April 20, 2012, Judge Yvonne Gonzales Rogers dismissed the complaint with leave to amend. Dkt. No. 50. On July 10, 2012, PNY filed an amended complaint, Dkt. No. 65, and on October 14, 2012, Judge Gonzales Rogers denied SanDisk's motion to dismiss, Dkt. No. 75.

On June 27, 2013, this action was transferred to me. On January 27, 2014, I granted PNY leave to supplement and amend its complaint by adding the two causes of action at issue in this motion and facts supporting them. Dkt. No. 189. PNY's Fifth Cause of Action charges attempted monopolization of the SD card market in violation of Section 2 of the Sherman Act and its Sixth Cause of Action charges exclusive dealing in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. On February 28, 2014, SanDisk filed this motion to dismiss the Fifth and Sixth Causes of Action. Dkt. No. 195. I held a hearing on the motion on April 23, 2014.

## LEGAL STANDARD

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint

6

may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and brackets omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

**DISCUSSION**

## I. EXCLUSIVE DEALING[5]

### A. Legal Standard For Exclusive Dealing

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. Section 3 of the Clayton Act makes it unlawful to "make a sale or contract for sale of goods . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor . . . where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 4.

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). Because there are "well-recognized benefits to exclusive dealing arrangements," they are not per se illegal but rather must

---

[5] SanDisk notes that the SAC's Prayer for Relief requests that I declare that SanDisk's "exclusive dealing arrangements" violate Section 16720 of California's Cartwright Act, but the SAC does not contain a cause of action alleging that the challenged agreements violate the Cartwright Act. SanDisk argues that I should therefore disregard that portion of the Prayer for Relief. Mot. 8 n.4. PNY does not respond to this argument. I agree with SanDisk and will disregard PNY's request that I declare that SanDisk's "exclusive dealing arrangements" violate the Cartwright Act.

United States District Court
Northern District of California

be analyzed under the antitrust rule of reason, which provides that "an exclusive dealing arrangement violates Section 1 [of the Sherman Act] only if its effect is to foreclose competition in a substantial share of the line of commerce affected." *Id.* (citations and internal punctuation omitted); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3 [of the Clayton Act].").

There appears to be little Ninth Circuit authority concerning the sufficiency of pleading exclusive dealing. However, in reviewing orders on summary judgment, the Ninth Circuit has articulated two principles for determining whether foreclosure is sufficiently shown. First, "the short duration and easy terminability of [ ] agreements negate substantially their potential to foreclose competition." *Omega Envtl.*, 127 F.3d at 1163. Second, "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition *any* part of the relevant market." *Id.* at 1163.

**B.  PNY Fails To Plead That The Contract Terms Unlawfully Foreclose Competition.**

SanDisk argues that, as an initial matter, none of its agreements with retailers are exclusive dealing arrangements because they do not obligate retailers to purchase SD cards exclusively from SanDisk or prevent retailers from buying them from any other supplier.[6] Mot. 9. While some of the contracts promise certain benefits to the retailers if they choose to be exclusive, that is insufficient to make the agreements "exclusive," SanDisk urges.

SanDisk is wrong. Actual exclusivity is not a prerequisite to finding unlawful exclusive dealing under the rule of reason. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir. 1982). The issue is whether the restraint in question "is one that promotes competition or one that suppresses competition." *Id.* at 1304. The proper inquiry, therefore, is on the practical effect of the contract. *See Tampa Elec. Co. v. Nashville Coal Co.*,

---

[6] While this statement is literally true insofar as certain retailers are not obligated to purchase any SD cards at all, if those retailers purchase any SD cards, they have committed to purchasing exclusively from SanDisk.

8

365 U.S. 320, 324, 326-37 (1961); *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457 (1922) ("While the clauses enjoined do not contain specific agreements not to use the machinery of a competitor [ ], the practical effect of these drastic provisions is to prevent such use. We can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the Clayton Act . . . ."). Accordingly, it does not matter that SanDisk characterizes its agreements as merely providing "incentives." Mot. 9. If the effect of the agreement is to suppress competition, the fact that the agreement does not explicitly mandate exclusivity is of no moment.

    SanDisk argues that even if its contracts are properly characterized as "exclusive," they are not anticompetitive because they are short-term agreements that can be easily terminated with ▆ days' notice. Mot. 10 (citing *Omega Envtl.*, 127 F.3d at 1164; *Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 44 (7th Cir. 1996); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-cv-2102, 2013 WL 3936394 (C.D. Cal. July 30, 2013); *SPX Corp. v. Mastercool U.S.A., Inc.*, No. 10-cv-1266, 2011 WL 2532889, at *4 (N.D. Ohio June 24, 2011)). Only two of its ▆ agreements have terms longer than ▆ agreement with ▆ and a ▆ agreement with ▆. But all of these contracts are mutually terminable with ▆ notice for any reason. Accordingly, nothing prevents PNY or any other seller of SD cards from competing to win these retailers' business after the agreements expire or from offering more competitive terms to entice retailers to terminate their agreements with SanDisk. Mot. 11.

    SanDisk's argument is persuasive: PNY fails to plead adequate facts showing that SanDisk's agreements unlawfully foreclose competition. As SanDisk correctly argues, nearly all of its contracts have short terms: more than half are ▆ long and only two are more than ▆ long, with the longest one being ▆. In *Omega Environmental, Inc. v. Gilbraco, Inc.*, the Ninth Circuit found one-year contracts to be acceptable against an exclusive-dealing challenge and cited a case in support involving two-year contracts. 127 F.3d at 1163-64 (citing *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (two-year contracts reasonable)). Similarly, one judge on this Court has characterized a contract term of three years as having a "relatively short duration." *See, e.g., W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) (Legge, J.), *aff'd*, 190 F.3d 974 (9th Cir. 1999). And

9

at least one other district court in this circuit granted a motion to dismiss an exclusive-dealing challenge against five contracts, three of which had terms of three years and one of which had a term of five years. *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-cv-2102, 2013 WL 3936394, at *2-5 (C.D. Cal. July 30, 2013). SanDisk's contracts are much shorter in comparison.

That certain SanDisk contracts are ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ does not thereby render them unlawful because the relative ease of terminating them "negate[s] substantially their potential to foreclose competition." *Omega Envtl.*, 127 F.3d at 1163. At least two of the contracts are ▇▇▇▇▇▇▇▇ and none requires more than ▇▇▇▇ notice to cancel the agreement. In *Omega Environmental*, the Ninth Circuit upheld agreements containing a 60-day notice requirement for termination. 127 F.3d at 1164. Likewise, in *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, a district court granted a motion to dismiss a challenge of a contract with a one-year cancellation notice requirement. 2013 WL 3936394, at *2. PNY argues that although SanDisk's agreements are of short duration, "such provisions do not necessarily reflect the true nature of the relationship among the parties." Opp'n 17. But given that any of the customers can simply cancel its contract with no more than ▇▇▇▇▇▇▇▇, a delay of that length does not plausibly foreclose competition. The contracts at issue here easily pass muster.

PNY contends that foreclosure is a fact issue inappropriate for resolution at the motion to dismiss stage. Opp'n 7. In support of this proposition, PNY cites several in-circuit district court opinions.[7] It cites *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, No. 10-cv-4429-EMC, 2011 WL 1225912, at *14 (N.D. Cal. Apr. 1, 2011), for the proposition that "a number of factors [ ] may ultimately inform the question of substantial foreclosure." That case is distinguishable, though, because the judge concluded that "the extensive allegations establish anticompetitive conduct and the foreclosure of competition in a substantial share of the [ ] market and resulting antitrust injury." There, the plaintiff complained of exclusive conduct with regard to retailer

---

[7] PNY string cites 10 opinions without adequately explaining how each is applicable to this case. While PNY has provided parentheticals for each one, it is not apparent from some of PNY's explanations how those cases even relate to the exact issue at hand. Further, a number of these citations do not have pincites. It is not the Court's job to dig through each of these cases to discern and craft an argument for PNY. Nonetheless, I will examine the in-circuit cases cited.

10

display space. Among other things, the plaintiff pleaded "with great specificity" at least two plausible and detailed mechanisms for causing foreclosure, as well as allegations about actual foreclosure, which PNY has not done here. *Id.* And nowhere did the judge say that foreclosure was inappropriate to address on a motion to dismiss. Indeed, the judge continues on to say regarding another claim, "Without allegations as to the portion of the relevant market foreclosed by the exclusive agreement, the length of the agreements, etc., this claim standing alone does not adequately state a plausible exclusive dealing claim under the Sherman Act." *Id.* at \*15.

The other cases PNY cites do not help it either. In *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, No. 10-cv-2175, 2010 WL 4366849 (C.D. Cal. Sept. 23, 2010), which PNY cites for the proposition that it is "addressing *de facto* exclusive dealing claims," nowhere does the court say that foreclosure is a factual question appropriate for later resolution—indeed, the court directly decided the issue of the adequacy of the pleadings. Another case, *Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 02-cv-4770, 2004 WL 5907538 (C.D. Cal. June 10, 2004), dealt with a motion for summary judgment and whether there was an issue of fact sufficient to defeat judgment as a matter of law, not the sufficiency of pleading. *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1230 (C.D. Cal. 2012), which PNY cites for the proposition that it is "sufficient at [the] motion to dismiss stage to show that [the agreements] had the potential to limit market access . . . without proving the agreements were actually having that effect," Opp'n 9, is similarly inapposite because the point here is that PNY has failed to plead "the potential to limit market access" since "the short duration and easy terminability" of SanDisk's agreements "negate substantially their potential to foreclose competition," *Omega Envtl.*, 127 F.3d at 1163. At this juncture, there is no expectation that PNY *prove* anything. But PNY needs to sufficiently *allege* facts supporting its claims.

PNY argues that its SAC alleges that SanDisk engaged in de facto exclusive dealing and "reaches beyond the express terms of SanDisk's written agreements." Opp'n 9. It claims that SanDisk "required" retailers to sign agreements to deal exclusively with it; SanDisk has market power; PNY's attempts to make offers to retailers were denied; SanDisk used its market power to cause at least two retailers to deal exclusively with it; and there has been substantial foreclosure of

11

competition. Opp'n 9. PNY points out that the SAC refers to SanDisk's exclusive dealings as "arrangements" and did not limit its allegations to contracts. Thus, even if the agreements are limited in duration, SanDisk's motion to dismiss fails to address the "practical effect" of PNY's de facto exclusive dealing claims, which must be considered as a whole.[8] Opp'n 9-10. PNY says that the cases cited by SanDisk—*Omega*, *SPX Corp.*, and *Pro Search Plus*—do not address de facto exclusive dealing or look to the "practical effect" of the exclusive arrangements at issue. Opp'n 10-11.

PNY's theory based on de facto exclusive dealing is unavailing because all of its allegations purporting to show the "practical effect" of foreclosure are conclusory and unaccompanied by supporting facts. For example, PNY alleges, "[o]n information and belief," that "SanDisk has required retailers to enter into exclusive dealing arrangements" that "precluded the affected retailers from carrying USB flash memory system products made by PNY and other competitors." SAC ¶ 149; *see* Opp'n 9 (citing SAC ¶ 149). This allegation is nothing more than a bare assertion. PNY does not allege any factual support explaining how SanDisk "required" anyone to enter into exclusive contracts with it or why "affected retailers" could not carry other manufacturers' products if they wanted to do so.

Similarly, PNY argues that its "attempts to make bids and offers were denied." Opp'n 9 (*citing* SAC ¶ 151). But paragraph 151 of the SAC, which states that "[o]n information and belief, SanDisk's efforts at ▊▊▊ have resulted in all competition in the relevant markets being foreclosed at ▊▊▊ stores in return for a substantial ▊▊▊ payment from SanDisk," fails to provide any facts about how competition was "foreclosed" at ▊▊▊. That paragraph alleges much scheming by SanDisk, but contains no facts about any actions resulting from such scheming or its practical effect. The same is true of PNY's allegation that SanDisk's "arrangements cut off competitors from nearly half of the retail store distribution of SD cards." Opp'n 13 (quoting SAC ¶ 97). Foreclosure is a legal conclusion—PNY's task is to provide the facts supporting it. It has

---

[8] *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing.").

not done so.

PNY contends that it has alleged "that there has been substantial foreclosure of competition." Opp'n 9 (citing SAC ¶ 251). The entire portion of the SAC cited in support simply states, "The effect of SanDisk's exclusive dealing arrangements has been the foreclosure of the SD card market for SanDisk's competitors, and—with reduced competition—the raising of prices for consumers." SAC ¶ 251. This is exactly what *Twombly* and *Iqbal* warned against. Providing "[t]hreadbare recitals of the elements of a cause of action," which is what PNY has done in its SAC, is insufficient. *Iqbal*, 556 U.S. at 678 (2009). In sum, "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (Section 1 case). It therefore fails to adequately plead unlawful foreclosure.

### C. PNY Fails To Plead The Lack Of Alternative Channels Of Distribution.

The Ninth Circuit has said, "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition *any* part of the relevant market." *Omega Envtl.*, 127 F.3d at 1163.

SanDisk argues that the SAC fails to plead the requisite foreclosure based on PNY's allegation that there are "limited alternative channels of distribution that (for now) remain open to SanDisk's competitors," SAC ¶ 252, because PNY expressly acknowledges that there are alternative channels of distribution besides retailers. Because PNY concedes that "some manufacturers of SD flash memory system products have attempted to sell directly to consumers (*e.g.*, via company web sites)," which can earn greater margins than sales to retailers, SAC ¶ 98, SanDisk says that there is no reason why SD card suppliers cannot establish a direct sales presence now since SanDisk is allegedly causing prices to rise. Mot. 12.

PNY points out that SanDisk selectively quotes from the SAC. The SAC states, "The limited alternative channels of distribution that (for now) remain open to SanDisk's competitors *are not sufficient to provide those competitors with the opportunity to achieve economies of scale*." SAC ¶ 252 (emphasis added). PNY cites two cases in opposition. The first dealt with

1 exclusive dealing in the Section 2 context, in which the Third Circuit held, "That some
2 manufacturers resort to direct sales and are even able to stay in business by selling directly is
3 insufficient proof that direct selling is an effective means of competition." Opp'n 13 (quoting
4 *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005)). PNY also quotes the D.C.
5 Circuit as stating, in the Section 2 context, that "although [the defendant] did not bar its rivals
6 from all means of distribution, it did bar them from the cost-efficient ones," and thus the defendant
7 could not be shielded from liability for that reason. *United States v. Microsoft Corp.*, 253 F.3d 34,
8 64 (D.C. Cir. 2001). Accordingly, PNY asserts that the mere existence of direct sales as an
9 alternative channel of distribution does not mean that there is a viable alternative. Opp'n 14.

10 SanDisk replies that PNY's allegations and argument that suppliers cannot achieve
11 economies of scale through direct sales are unsupported by any factual allegations. SanDisk
12 distinguishes *Denstply* by pointing out that there, "long-entrenched" dealers had "a controlling
13 degree of access" to the customers, making it "impracticable for a manufacturer to rely on direct
14 distribution" since customers were "driven by the realities of the marketplace to buy far more
15 heavily from dealers than manufacturers" due to "the beneficial services, credit function,
16 economics of scale and convenience that dealers provide to [customers], benefits which are
17 otherwise unavailable to them when they buy direct." *Dentsply Int'l*, 399 F.3d at 192-93. In
18 contrast, SanDisk points out, PNY has not articulated any reason why consumers would prefer to
19 purchase SD cards from retailers rather than directly from manufacturers. Reply 10. Similarly, in
20 arguing that *Microsoft* is inapplicable, SanDisk says that PNY has not alleged facts showing that
21 retail distribution of SD cards is more cost efficient than direct sales. Reply 10 n.12.

22 PNY's allegations again fail because they are nothing but bare assertions. In support of the
23 proposition that due to SanDisk's conduct competitors cannot employ existing or potential
24 alternative channels of distribution to reach consumers, PNY simply alleges that the existing
25 channels are insufficient to provide "competitors with the opportunity to achieve economies of
26 scale." SAC ¶ 252. But PNY does not explain why that is the case. PNY simply says that it is.
27 Similarly, PNY alleges that "no manufacturer has been successful in building a direct sales
28 presence that successfully competes with established retail distribution outlets," SAC ¶ 98, but it

has not pointed to any facts to support that claim, including who has made such attempts, when, or to what extent any manufacturer tried. While PNY is not required to plead with specificity in this context, it still must provide more facts than it has so that its SAC does not only contain naked contentions. PNY has failed to carry its burden of pleading that SanDisk's conduct foreclosed all channels of distribution.

## II.     ATTEMPTED MONOPOLIZATION

### A.  Legal Standard For Attempted Monopolization

Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize. "To establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995). The requirements for monopolization and attempted monopolization are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). "[W]hile the [ ] elements are discrete, they are often interdependent; i.e., proof of one of the three elements may provide circumstantial evidence or permissible inferences of the other elements." *Twin City Sportservice*, 676 F.2d at 1308 (9th Cir. 1982).

"[A] specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953). Such an intent may be "shown indirectly by proof of illegal conduct and, where necessary, market power." *Calif. Computer Prods. v. Int'l Bus. Machs.*, 613 F.2d 727, 737 (9th Cir. 1979). Demonstrating a dangerous probability of monopolization "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Market power can be shown by actual harm to competition inflicted by the defendant, such as restricted output or supracompetitive prices, or by the defendant's dominant market share and barriers to entry in the relevant market. *Rebel Oil*, 51 F.3d

at 1434.

**B. PNY Fails To Plead Anticompetitive Conduct.**

SanDisk argues that SAC does not allege that SanDisk has engaged in any anticompetitive conduct in the SD card market. PNY's attempted-monopolization claim is principally based on SanDisk's alleged exclusive dealing arrangements with retailers, *see* SAC ¶¶ 239, 240, but because those agreements are of limited duration and are easily terminated on short notice, they cannot sustain PNY's Section 2 claim. Mot. 13 (citing *Pro Search Plus*, 2013 WL 3936394, at *4 ("[The] Sherman Act claims are predicated only upon [defendant's] exclusivity agreements . . . . Because those contracts are of relatively short duration and, crucially, can be terminated upon short notice, they do not—by themselves—sustain the Sherman Act claims."); *SPX Corp.*, 2011 WL 2532889, at *4).

PNY argues that its allegation that "SanDisk has threatened retailers" and "has committed exclusionary, predatory, or anticompetitive acts including the deployment of its substantial market power in the flash memory technology market to control the downstream SD card market" is sufficient to plead anticompetitive conduct. Opp'n 18 (quoting SAC ¶¶ 146, 238). The threatened retailers are told that they might "be left holding large quantities of unusable flash memory products" or "be made to purchase flash memory at disadvantageous prices and terms if they are later forced to turn to SanDisk." Opp'n 19 (quoting SAC ¶ 146). But Paragraph 146, on which PNY relies, does not relate to the SD card market. Reply 6. The allegations there concerning threats only relate to "unlicensed" flash memory chips manufactured by Micron, or approximately 8-15 percent of the worldwide chip market. SD Cards containing chips manufactured by the five major chip producers (Samsung, Toshiba, SanDisk, Hynix, and Intel) are not implicated. Reply 6. As Sandisk points out, the allegations are devoid of factual support concerning which retailer was threatened, who made the threats, or where and when these threats occurred. Reply 11.

PNY fails to plead anticompetitive conduct sufficiently and therefore cannot sustain a claim for attempted monopolization. While it claims that its "exclusive dealing allegations plausibly reflect anticompetitive conduct," Opp'n 18, as explained above, PNY fails to adequately allege actionable exclusive dealing.

SanDisk also argues that PNY's allegations that SanDisk has "leveraged" its putative monopoly power in the flash memory technology market to exert power in the SD card market similarly fail to plead any anticompetitive conduct because monopoly leveraging does not constitute anticompetitive conduct. Mot. 13-14. PNY does not respond to this legal point.

The Ninth Circuit has said, "Monopoly leveraging is just one of a number of ways that a monopolist can permissibly benefit from its position. This does not mean, however, that such conduct is anticompetitive." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991) (citations omitted); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("leveraging presupposes anticompetitive conduct"). "[M]onopoly leveraging, on its own, is not proscribed under Section 2." *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 895 (N.D. Cal. 2011). There must be some other conduct that is actionable for PNY's claim to be cognizable. *Alaska Airlines*, 948 F.2d at 549.

PNY weakly argues that its bare allegations are "plausible and sufficient to support PNY's claim" for attempted monopolization. Opp'n 19. To the contrary, the two allegations supporting its monopoly leveraging theory are conclusory. *See* SAC ¶¶ 96 ("SanDisk has leveraged its substantial market power in the flash technology market to force all significant companies who manufacture SD cards into a worldwide royalty-bearing license"), 97 (stating that Sandisk is "leveraging its power in the technology market"). Because PNY has identified no other anticompetitive conduct, its monopoly-leveraging theory fails.

**C. PNY Fails To Plead Barriers To Entry Or Expansion.**

To establish market power, "[t]he plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Rebel Oil*, 51 F.3d at 1439 (citation omitted). Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants" or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Id.* "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some

17

1    situations, (5) economies of scale." *Id.* "Entry barriers pertain not to those already in the market,

2    but to those who would enter but are prevented from doing so." *United States v. Syufy Enters.*,

3    903 F.2d 659, 671 n.21 (9th Cir. 1990). Barriers to expansion constrain "the ability of existing

4    firms to quickly increase their own output in response to a contraction by the defendant." *Rebel*

5    *Oil*, 51 F.3d at 1441. Where the defendant's contract may be terminated for any reason with little

6    notice, that does not qualify as a barrier to entry. *W. Parcel Exp. v. United Parcel Serv. of Am.,*

7    *Inc.*, 190 F.3d 974, 975-76 (9th Cir. 1999).

8        PNY states that because SanDisk's exclusive arrangements "cut off" competitors from

9    entering about half of all retail outlets, and remaining alternative channels are inadequate to

10   support meaningful competition, it has plausibly alleged that neither a new entrant nor an existing

11   competitor can rely on such channels to compete with SanDisk and, thus, there are "very

12   substantial barriers to entry." Opp'n 20 (citing SAC ¶¶ 240, 241).

13       SanDisk argues that the claim must be dismissed because while PNY purports to identify

14   barriers to entry, none of them are plausibly alleged.[9] Mot. 15. SanDisk's agreements are short-

15   term and easily terminable. Mot. 15. In addition, the SAC provides no factual basis for its

16   assertion that entry or expansion depends upon sales to retail outlets—PNY acknowledges

17   alternative and more profitable channels of distribution, i.e., direct sales to consumers, and PNY's

18   argument that remaining alternative channels of distribution are inadequate is factually

19   unsupported. Reply 13. PNY also has not alleged that "new entrants face long-run costs that were

20   not or will not be incurred by incumbent providers." *E. Portland Imaging Ctr., P.C. v. Providence*

21   *Health Sys.-Or.*, 280 F. App'x 584, 586 (9th Cir. 2008). Indeed, PNY alleges that it and "other

22   aggregators have recognized brand names and robust distribution systems, built up over many

23   years." SAC ¶ 155. Finally, while PNY argues that a license from SD-3C is a requirement to sell

24   SD cards, it does not allege that SD-3C licensees are prevented from entering or expanding in the

25   SD card market. Reply 13. Nor does it explain how SanDisk could control Panasonic's or

---

[9] SanDisk argues that because PNY has failed to allege high barriers to entry or expansion, PNY also fails to allege that SanDisk has a dangerous probability of obtaining monopoly power. Mot. 16. PNY responds that its allegations about SanDisk's market share are sufficient to show a dangerous probability. Opp'n 19 (citing ¶¶ 95, 249).

18

1  Toshiba's output or pricing of SD cards.

2  I conclude that PNY fails to plausibly allege that there are high barriers to entry or expansion.  As explained above, SanDisk's short-term and easily terminable contracts do not constitute a high barrier to entry.  *W. Parcel Exp.*, 190 F.3d at 975-76.  PNY also has not explained why a license is a barrier to entry—PNY has not argued that the SD-3C wrongfully refuses to license its technology to third parties.  Finally, as explained earlier, PNY's allegation that manufacturers are unable to successfully sell directly to consumers is not adequately pleaded.  In short, PNY's allegations on this point are lacking.

## CONCLUSION

For the reasons above, SanDisk's motion to dismiss is GRANTED.  PNY will have one opportunity to amend its complaint to further support its claims of exclusive dealing and attempted monopolization in the market for SD cards.  Any amended complaint shall be filed within ten days from the date of this Order.  PNY shall highlight all amendments to the complaint.

Because there is no need for the parties to reargue any issues on a subsequent motion to dismiss that were already raised on this motion, any brief in support and opposition to a motion to dismiss the third amended complaint shall be limited to 15 pages.  Any reply shall be limited to 10 pages.

**IT IS SO ORDERED.**

Dated: April 25, 2014

_____
WILLIAM H. ORRICK
United States District Judge

19