MICHAEL S. ELKIN (admitted *pro hac vice*)
melkin@winston.com
THOMAS P. LANE (admitted *pro hac vice*)
tlane@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:     212.294.6700
Facsimile:     212.294.4700

ERIN R. RANAHAN (No. 235286)
eranahan@winston.com
DREW A. ROBERTSON (No. 266317)
darobertson@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071-1543
Telephone:     213.615.1700
Facsimile:     213.615.1750

DANIEL B. ASIMOW (No. 165661)
daniel.asimow@aporter.com
ROBERT D. HALLMAN (No. 239949)
robert.hallman@aporter.com
ARNOLD & PORTER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:     415.471.3100
Facsimile:     415.471.3400

Attorneys for Plaintiff
PNY TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PNY TECHNOLOGIES, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>SANDISK CORPORATION,<br><br>            Defendant. | Case No.: 11-cv-04689 WHO<br><br>**THIRD AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS; DECLARATORY RELIEF; AND UNFAIR COMPETITION**<br><br>DEMAND FOR JURY TRIAL |

REDACTED PUBLIC VERSION

LA:355215.1

1    Plaintiff PNY Technologies, Inc. ("PNY"), by and through its attorneys, Winston & Strawn

2  LLP and Arnold & Porter LLP, files this Third Amended Complaint against Defendant SanDisk

3  Corporation ("SanDisk") to secure damages, declaratory relief and injunctive relief, and demanding

4  trial by jury, claims and alleges as follows:

5                                **NATURE OF ACTION**

6    1.    SanDisk is the dominant firm in the United States, and indeed worldwide, in the

7  flash memory technology market.  Flash memory is a ubiquitous product, found inside many

8  consumer electronic devices as well as in consumer memory products such as Universal Serial Bus

9  ("USB") flash memory drives.  Through its overwhelming share of the flash memory technology

10  market, SanDisk attempts to dominate three related downstream markets for (i) flash memory chips

11  (also referred to herein as "chips"), (ii) USB flash memory systems (*i.e.*, the combination of a

12  memory chip and a controller, also referred to herein as "systems"), and (iii) USB flash memory

13  system products (*i.e.*, the end product sold to consumers, also referred to herein as "USB

14  products").  PNY is a competitor of SanDisk in the systems and products markets, as well as a

15  customer of SanDisk in the markets for flash memory technology and chips.  PNY brings this action

16  to redress SanDisk's abuse of its monopoly power in flash memory technology to improperly

17  maintain and expand its power in that market and to suppress competition in each of the

18  downstream markets.

19    2.    SanDisk has also attempted to monopolize a related but separate flash memory

20  system products market for SD cards ("SD flash memory system products" or "SD cards").  Like

21  USB products, SD cards use flash memory chips and a comparable flash memory system

22  configuration, but they have a different form factor, different connection interface, and tend to be

23  used in connection with different devices from USB products.  SanDisk has surged recently to a

24  dominant position in the market for SD cards. One of the ways in which SanDisk has obtained and

25  maintained market power in the SD Cards market is through an extensive effort to secure exclusive

26  dealing arrangements with key retail outlets—a practice that has in of itself harmed competition as

27  detailed below.

28    3.    In order to convert a flash memory chip to a usable product—whether USB or SD—

it is first necessary to combine the chip with a controller (a separate chip that manages the data stored on a flash memory chip and communicates with a computer or electronic device), thereby creating a USB or SD flash memory system, and, second, to add housing and a USB plug or SD connection interface, thereby creating a USB or SD flash memory system product. PNY and other specialized firms, referred to as "aggregators," purchase chips in bulk to create systems and products that are subsequently sold to consumers.

4. Other than SanDisk, there are only five firms in the world which manufacture flash memory chips. SanDisk has extracted licenses from four of its five potential chip competitors and receives royalties or other consideration from these firms when they manufacture chips, together with SanDisk comprising approximately 90% of the market. However, the fifth firm, Micron Technology, Inc. ("Micron"), refuses to license flash memory technology from SanDisk, and retains a toehold in the chip marketplace, with an approximately 10% market share. PNY wishes to purchase chips from Micron for use in its systems and products, but SanDisk, through abuse of its monopoly power, has attempted to render it economically impossible for PNY to purchase from Micron and instead to force PNY to purchase chips from SanDisk and its licensees.

5. SanDisk's attempt to prevent PNY from purchasing chips from Micron is part of a broader scheme to monopolize the chip market. SanDisk has tried and failed to force Micron to license SanDisk's flash memory technology. Unable to directly exclude Micron from the chip marketplace, SanDisk instead indirectly excluded Micron through (a) eliminating aggregators, who are among the most significant customers in the chip market, and (b) increasing the cost for chip customers to purchase from Micron so that it could not be competitive with SanDisk and its licensees in the sale of chips.

6. The primary mechanism of this unlawful scheme to exclude was a uniform, non-negotiable "system license" that SanDisk imposed on aggregators' (including PNY's) manufacture and sale of USB products, through the threat of financially draining, serial patent infringement litigation. SanDisk takes the position that no firm can aggregate—combine a chip with a controller to make a system—without a system license from SanDisk. However, SanDisk is not content to merely extract a royalty for the use of its patents related to systems. Rather, as a condition of this

LA:355215.1

1    system license, SanDisk imposes a discriminatory royalty structure that effectively forces its

2    licensees to purchase chips only from SanDisk or one of its chip licensees.  The effect is a tying

3    arrangement: in order to obtain the system license, an aggregator must, as a practical matter,

4    purchase its chip supplies from SanDisk or chip manufacturers who operate pursuant to a license

5    agreement with SanDisk.

6            7.      In addition, SanDisk's uniform, non-negotiable USB system license contains a range

7    of other overreaching, anticompetitive terms.  These include, among other things:  (a) licensing only

8    a broad and unspecified patent portfolio (instead of specific individual patents); (b) requiring

9    royalties to be paid on worldwide sales, as opposed to only on products manufactured and/or sold in

10   countries where SanDisk has patent rights; (c) requiring competitors to pay multiple royalties on the

11   same item as it is resold downstream; (d) requiring licensees to share their future technological

12   innovations with SanDisk on a worldwide, royalty-free basis; (e) requiring licensees to pay royalties

13   on expired patents; (f) requiring licensees to pay royalties on invalid patents; and (g) requiring

14   licensees to pay royalties on patents that the licensee does not practice or that, as a matter of law,

15   the licensee does not infringe.  Through these terms, as well as the tying arrangement described

16   above, SanDisk has engaged in patent misuse and has unlawfully extended and leveraged any

17   legitimate patent monopoly it may have to suppress and eliminate competition in other markets.

18           8.      SanDisk's anticompetitive licensing scheme imposes restraints on its competitors

19   that raise their costs of doing business, obstruct entry and lessen the incentives to innovate in each

20   of the markets for flash memory technology, chips, systems, and products.  This ultimately results

21   in higher prices and less choice for all U.S. consumers of flash memory-related products.

22           9.      PNY seeks a declaration from this Court that:  (a) SanDisk has violated federal and

23   California antitrust laws; (b) SanDisk has engaged in patent misuse; (c) SanDisk has engaged in

24   unfair competition in violation of California state law; and (d) the royalty provisions and other

25   anticompetitive terms of the uniform license entered into by SanDisk with PNY violate federal and

26   California antitrust and/or unfair competition laws and are unenforceable.

27           10.     PNY also asks this Court to enjoin SanDisk under 15 U.S.C. § 26 from enforcing the

28   royalty provisions and other anticompetitive terms of the uniform license entered into by SanDisk

LA:355215.1

1   with PNY.

2         11.     PNY also seeks treble damages, attorneys' fees, costs, expenses, and such further

3   relief as the Court deems just and proper in connection with SanDisk's anticompetitive licensing

4   scheme.

5   **THE PARTIES**

6         12.     Plaintiff PNY Technologies, Inc. is a corporation organized and existing under the

7   laws of the State of Delaware, with its principal place of business at 100 Jefferson Road,

8   Parsippany, New Jersey 07054.  PNY assembles products in its Parsippany facilities and maintains

9   additional facilities and/or offices in San Jose, California, Irvine, California, and Miami, Florida.

10   PNY employs approximately 535 people worldwide, including in the United States.

11         13.     Defendant SanDisk Corporation is a corporation organized and existing under the

12   laws of the State of Delaware, with its principal place of business at 601 McCarthy Boulevard,

13   Milpitas, California 95035.

14   **JURISDICTION AND VENUE**

15         14.     This Complaint is filed and this action is instituted under Sections 4 and 16 of the

16   Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive and

17   declaratory relief against, SanDisk for its past and continuing violations of Sections 1 and 2 of the

18   Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 2 and 3 of the Clayton Act (15 U.S.C. §§ 13 and

19   14), as alleged herein.

20         15.     This Court has original and exclusive jurisdiction over the subject matter of this civil

21   action under 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.  This Court may exercise

22   supplemental jurisdiction over the state law based claims pursuant to 28 U.S.C. § 1367.

23         16.     This Court has personal jurisdiction over SanDisk because, upon information and

24   belief, SanDisk maintains its principal place of business, and transacts business on a systematic and

25   continuous basis, within this District, and may be found here, within the meaning of 15 U.S.C. §§

26   15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and

27   occurred in material part within this District, and the PNY-SanDisk License at issue states that the

28   parties submit to the jurisdiction of this Court for any action brought pursuant thereto.

17.     Venue is proper in this Court pursuant to 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b) because SanDisk resides in this judicial district, transacts business, is found and/or has agents in this district and the PNY-SanDisk License at issue states that the parties waive any objection to venue in this Court.

18.     This Court may declare the rights and other legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because this is a case of actual controversy within the Court's jurisdiction.

## INTRADISTRICT ASSIGNMENT (Civil L.R. 3-5(b))

19.     Because this action is an Intellectual Property Action as specified in Civil L.R. 3-2(c), it is to be assigned on a district-wide basis.

## INTERSTATE COMMERCE

20.     SanDisk sells its products and services across state lines.

21.     SanDisk purchases goods and supplies in interstate commerce.

22.     SanDisk's actions complained of herein have restrained and adversely affected interstate commerce, and will continue to do so absent this Court's intervention.

## FACTUAL ALLEGATIONS

### Flash Memory Technology

23.     The products at issue in this case are all part of a segment of the electronics industry that is known as removable solid-state storage flash memory technology (hereinafter "flash memory technology").

24.     Flash memory is a type of non-volatile computer memory that can be electrically erased and reprogrammed.  It is "non-volatile" because it retains the information stored in it even when the electric power is off.  It is a current mainstream technology for mass data storage and data transfer applications, and is used as embedded and removable data storage in a wide variety of products, including Universal Serial Bus (USB) drives, CompactFlash (CF) cards, solid-state drives (SSD), and Secure Digital card (SD), which in turn are used in connection with a variety of other products such as computers, tablets, mobile phones, digital cameras and camcorders, and GPS devices.

25.     In 2011, $21.2 billion of flash memory products were sold worldwide.  Such products are widely purchased and used by U.S. consumers and are considered one of the most important forms of data storage in the marketplace.  Flash memory technology is anticipated to remain in widespread use for years to come.

26.     Presently, and for the foreseeable future, there are no other data storage products that are reasonably interchangeable with products based on flash memory technology.  No other type of data storage product offers the same combination of non-volatile storage, speed, and price as flash memory.

27.     A **flash memory chip** consists of one or more integrated circuits.  These chips are incorporated into flash memory systems.  A flash memory chip may be in the form of a "die," which is a unit of flash memory suitable for incorporation into a flash memory system, or it may be in form of a larger "wafer," which consists of multiple flash memory dies that must be cut into individual dies to be incorporated into flash memory systems.  Flash memory chips are sometimes also referred to as "flash memory devices."  The technology primarily used in flash memory chips today is what is known as a "NAND" architecture, and some market participants refer to flash memory chips as NAND flash memory.

28.     A **flash memory system** includes a flash memory chip and a "controller," which acts as an interface between the chip and a host (such as a computer).  These systems are incorporated into flash memory system products.

29.     A **flash memory system product** includes a flash memory system as well as the other housing and component parts that comprise the products that end users purchase in retail locations or on the internet.  Examples of flash memory system products include USB drives, SD cards, CF cards, and Solid State Drives.  Among these various types of products, this complaint is primarily focused on (a) the market for USB flash memory system products, and (b) the market for SD flash memory system products.

LA:355215.1

1

### TABLE 1:  FLASH MEMORY CHIPS, SYSTEMS & PRODUCTS

2

3



4

5

6

7

8

9

**Flash Memory Chips** showing wafer (left), die (center) and chip (right) (credit: Micron)

10

11



12

13

14

15

16

17

18

19

**Flash Memory System** showing **flash memory chip** (left) on circuit board with controller
(right)     within     **USB     flash     memory     system     product**     casing     (credit:
http://upload.wikimedia.org/wikipedia/commons/8/8c/USB_Drive_Open.jpg)

20

21

22

23

24

25

26

27

28

PNY'S THIRD AMENDED COMPLAINT                    11-cv-04689-WHO

LA:355215.1

**[TABLE 1, CONTINUED]**



**USB Flash Memory System Product** (credit: PNY)





**SD Flash Memory System** (left) showing two flash memory chips on circuit board above a controller chip; MicroSD and **SD flash memory system products** (right) (credit: http://en.wikipedia.org/wiki/File:SD-extreMEmory_2GB_alt_innen.jpg; SanDisk; PNY)

30.     In the case of both USB and SD flash memory system products, the chip is by far the largest portion of the overall cost of the product. The controller, circuit board, packaging, and other component parts tend to account for a small proportion of the overall cost.

31.     Some companies, including SanDisk, are "vertically integrated," manufacturing chips, systems, and products both to sell directly to consumers (*e.g.*, SanDisk-branded products) and for sale to third parties who will then assemble systems and/or products to be sold to consumers under a variety of different brand names.

32.     Vertically integrated manufacturers have extremely high fixed costs and overhead as a result of the fabrication facilities that cost up to $8 billion to build, and which must constantly be

updated and operated to produce flash memory chips.  On February 26, 2010 at SanDisk's Investor Day, SanDisk's founder and then Chief Executive Officer, Dr. Eli Harari stated that "[y]ou have to build a mega-fab because otherwise you are not going to make much difference.  First of all, but more importantly, you are not going to be competitive.  Small fabs don't cut it. OK, it's really a mega-fab or stay at home.  That's the magnitude. . . . Now I would say that those mega-fabs don't necessarily ramp overnight. This is not like a 6 month exercise.  A mega-fab could easily take two to three years to ramp [up]."  In order to recoup the large fixed costs of building the fabrication facilities, vertically integrated manufacturers typically produce at near maximum output.  This at times creates an oversupply of chips in the market, driving down the purchase price of such chips.

33.    Among the third party purchasers of chips are "**aggregators**" who assemble such materials with other component parts to create systems and products.  PNY is an aggregator that, among other things, sells USB and SD flash memory system products to end users throughout the world.

34.    Aggregators are nimble market participants with greater flexibility, lower fixed costs, and less overhead than vertically integrated companies.  When prices for chips drop, aggregators can take advantage of the price drop to produce and/or sell lower-cost systems or products.

35.    Aggregators function as mavericks in the marketplace and can pursue aggressive and independent pricing strategies, all to the benefit of consumers.  SanDisk's internal documents are replete with statements about PNY's disruptive low pricing, including the following: (a) PNY's low prices are "off the charts"; (b) PNY's pricing is "so much lower" than SanDisk; (c) PNY's pricing is "ugly and crazy"; (d) "This will be especially dicey if we are forced to be competitive with such a price in the market"; (e) "PNY pricing being extended to Costco – ouch!"; (f) "These guys are driving us crazy.  We need to ensure they do not get a toe hold"; (g) PNY are "jerks" who are "not interested in building a brand just getting sales!"; and (h) "PNY has taken the position of having better everyday pricing with a lower delta when on promotion.  This is a good strategy and a pricing strategy I spoke about a few weeks back!  We may want to follow a similar strategy.  We should review!"

36.   SanDisk has recognized the role of and major competitive threat posed by aggregators.  For example, in a 2006 internal email regarding Kingston Technology Company ("Kingston")—a major aggregator in that timeframe—SanDisk stated "Kingston is very aggressive in pricing in US distribution channel, and we (SanDisk) currently decided not to compete to their level of pricing.  (don't want to trash US market price)."  SanDisk has also referred to Kingston's pricing as "insanity."

37.   In an October 2006 email, SanDisk recognized that the "premium prices [SanDisk] has in the US distribution above Kingston and others . . . is between ██ and ██!  This is just ugly (compared to the competition) and to no surprise we are loosing [sic] share."

38.   In a November 2006 email, SanDisk stated that "the market is ugly for these USB drives in which most buyers believe are to [sic] much of a commodity to carry higher pricing" and that "now that we have Lexar, PNY, Verbatim and Memorex all going to these ugly price points, I do not think we can change a buyers perspective."

39.   In a December 2006 email, SanDisk also admitted that "Verbatim and Kingston products are typically much lower priced than our equivalents" and that SanDisk is "very uncompetitive in general distribution."  During that same time SanDisk observed that "our data from the last year and a half is that we see double digit declines in sales when we are higher than Lexar or PNY at WM [Wal-Mart].  Even ██higher makes a difference."

40.   In a 2008 competitive analysis of Kingston, SanDisk observed that Kingston was "able to control costs" by, among other things, "keeping the overhead costs low" and "buying opportunistically rather than manufacturing flash memory and controller chips."  It also noted that Kingston was able to buy flash memory chips "at lower rates than the spot market" and had the capacity to purchase in large quantities when chip manufacturers wanted to sell off excess inventory.  Kingston was thus able to offer prices in the U.S. market that "undercut SanDisk pricing structure."

41.   In a 2008 competitive analysis of Samsung Electronics Co., Ltd. ("Samsung")—a vertically integrated manufacturer of flash memory—SanDisk observed that "to reduce excess inventory Samsung supplies low cost memory to our competitors—Kingston, Adata, Transcend.

This can in turn put pressure on SanDisk's profit margins."  Kingston, Adata and Transcend were all aggregators at the time.

42.    In a 2008 email, SanDisk stated that "Kingston and others are still priced very aggressive.  We need to decide the 'bottom price' that we will walk away from the business.  For example, is ▉▉▉net-net for a 2GB at QVC (the TV shopping show) the lowest we will go?  Kingston and PNY are closer to ▉▉▉net-net no price protection.  We need to set the boundaries."

43.    In addition to aggregators, the USB flash memory products market includes "**relabelers**," who purchase and resell products.  As the name implies, a relabeler purchases finished products and affixes its label to the product prior to resale.  Because relabelers do not source their own chips or systems, they do not exert nearly as much pricing pressure on vertically integrated firms (like SanDisk) as do aggregators.

## Relevant Markets

44.    SanDisk's anticompetitive conduct has affected and continues to affect at least five relevant markets: (1) the flash memory technology market; (2) the downstream market for flash memory chips; (3) the downstream market for flash memory systems; (4) the downstream market for USB flash memory system products; and (5) the downstream market for SD flash memory system products.  PNY is a customer in the first two markets—for flash memory technology and chips; both a customer and a competitor in the third market—for systems; and a competitor in the fourth and fifth markets—for products.  As elaborated below, PNY alleges that SanDisk has monopoly power in the flash memory technology market, and at least a dangerous probability of gaining monopoly power in the flash memory chip, systems, and products markets.

### Flash Memory Technology Market

45.    SanDisk has substantial market power, and indeed monopoly power, in the flash memory technology market, which includes the technology and associated intellectual property rights needed to manufacture, import, and sell flash memory chips, systems, and products in the United States.  There are no reasonably interchangeable economic substitutes for flash memory technology.

46.    On information and belief, SanDisk owns more than 1,700 United States patents

PNY'S THIRD AMENDED COMPLAINT                           11-cv-04689-WHO

LA:355215.1

related to flash memory technology, which SanDisk claims cover all feasible flash memory technologies in the United States.  SanDisk claims that there is no commercially viable flash memory system product that does not practice its technology and that there is no manufacturer of flash memory chips, systems, or products that does not use its technology.  SanDisk takes the position that anyone selling flash memory chips, systems or products in the United States needs a license from it (or, in the case of SD cards, from SD-3C—an entity combining certain SanDisk, Panasonic and Toshiba intellectual property) and it sedulously enforces this position with patent infringement litigation.

47.     SanDisk claims to have a one hundred percent (100%) share of the market for flash memory technology in the United States.  As discussed below, at least one other party competes in the flash memory technology market and disputes SanDisk's claim to a 100% share of the flash memory technology market, but SanDisk has been successful in obtaining licenses from (and preventing its flash memory technology competitors from obtaining licenses from) the overwhelming majority of market participants.

48.     SanDisk's claim to 100% of the market for flash memory technology in the United States was confirmed by the 2007 statement of its co-founder and then President, Sanjay Mehrotra, to attendees at a Morgan Stanley technology conference that SanDisk has "strong IP fundamentally that cover the broad spectrum of all competitors and products that are out there" and that "anybody who participants [sic] in the NAND flash business or NAND flash products business needs a licensed contender [sic]."

49.     SanDisk receives hundreds of millions of dollars of revenue each year in royalty payments related to its flash memory technology licensing—both for flash memory chips and systems.  In its 2011 Annual Report, SanDisk reports that as a result of its "extensive patent portfolio that has been licensed by several leading semiconductor companies and other companies in the flash memory business [its] cumulative license and royalty revenues over the last three fiscal years were approximately $1.28 billion."

50.     SanDisk's licensing strategy was publicly described by Mr. Mehrotra in 2007 as "monetizing our IP in terms of royalties" and also "leveraging our IP in terms of getting access to

PNY'S THIRD AMENDED COMPLAINT                    11-cv-04689-WHO

LA:355215.1

capacity, getting access to the card format . . . which ultimately doubled our revenue and gross margins."

51.     On information and belief, SanDisk receives royalties from flash memory chip manufacturers consisting of a percentage of the sales price or value of the chips sold on a worldwide basis.   In other cases, SanDisk receives consideration for such sales in other forms, such as a royalty-free cross-license to use intellectual property of the licensee.  (*See* Table 2, below.)

52.     For example, on information and belief, on October 12, 1995, SanDisk and <u>Intel</u> Corporation ("Intel") entered into a Patent Cross License Agreement, obligating Intel to pay SanDisk the following: (a) royalties of ███ on ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ (*See* Table 2, below.)

53.     On information and belief, on August 14, 2002, SanDisk and <u>Samsung</u> executed a Second Settlement and Patent Cross License Agreement, obligating Samsung to pay SanDisk the following: (a) a license fee of ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ and (d) royalties of between ████ ████████████████████████████████████████

54.     On information and belief, upon the expiration of the cross-license agreement referenced above, in August of 2009, SanDisk and Samsung entered into: (i) a second cross-license agreement whereby Samsung is reported to be paying SanDisk a 2.5% royalty on the sales price of its flash memory chips; and (ii) a ██████████████████████████████████ ████████████████████████. (*See* Table 2, below.)

55.     On information and belief, on March 20, 2007, SanDisk and <u>Hynix</u> Semiconductor, Inc. ("Hynix") executed a Patent Cross License Agreement, obligating Hynix to pay SanDisk the following: (a) a license fee of ████████████ and (b) royalties of between ██████████ ████████████████████████████████████████████████ ████████████ (*See* Table 2, below.)  On information and belief, the Patent Cross License Agreement

1   also referenced the simultaneous execution of a memorandum of understanding to establish a joint

2   venture between SanDisk and Hynix.

3        56.    On information and belief, SanDisk and <u>Toshiba</u> Corporation ("Toshiba") executed a

4   Patent Cross License Agreement on July 30, 1997, obligating Toshiba to pay SanDisk the

5   following: (a) a license fee of ███████████ (b) an additional license fee of ███████████ per quarter; and

6   (c) royalties of between ████████████████████████████████████████████████████████

7   ████████████████████████████

8        57.    On information and belief, in 2002, SanDisk and Toshiba amended their Patent

9   Cross License Agreement to become royalty-free as part of the decision to enter into a joint-venture

10  to design, manufacture and sell flash memory chips, systems and products known as Flash Vision.

11  (*See* Table 2, below.) ███████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████████████████████

15  ████████

16       58.    On information and belief, since May 2000, SanDisk and Toshiba have been

17  engaged in series of joint ventures known as Flash Vision, Flash Partners, Flash Alliance and Flash

18  Forward (collectively, "Flash Venture Entities") for the manufacture of flash memory chips to be

19  used in each company's respective flash memory systems and products and for sale to third parties.

20  SanDisk owns 49.9% of each of the Flash Venture Entities.  Each Flash Venture Entity purchases

21  flash memory chips (in wafer form) from Toshiba at cost and then resells those wafers to SanDisk

22  and Toshiba at a cost plus a mark-up.  SanDisk is contractually required to purchase half of the

23  Flash Venture Entities NAND wafer supply or pay for half of the Flash Venture Entities' fixed costs

24  regardless of the output SanDisk chooses to purchase.  SanDisk is also contractually required to

25  fund 49.9% of the Flash Venture Entities' costs to the extent that the Flash Venture Entities'

26  revenues from wafer sales to SanDisk and Toshiba are insufficient to cover those costs.   The

27  investments in the Flash Venture Entities are equally shared between SanDisk and Toshiba.  In

28  addition, SanDisk has the right to purchase a certain amount of wafers from Toshiba on a

- 14 -

preferential "foundry" basis. SanDisk refers to the flash memory chips that it purchases from these joint ventures with Toshiba as its "captive supply" which SanDisk claims provide it with low-cost flash memory.

59. In a July 2007 earnings call, SanDisk's then Chairman and Chief Executive Officer, Dr. Eli Harari, was asked to respond to the following question: "It seems like you've locked up the bulk of the NAND manufacturing marketplace in terms of the licensing opportunity, you are now diversifying and going into sort of ancillary and related opportunities. And could you just talk a little bit about the potential for licensing outside of the manufacturers and into the other NAND market area and how you look at that opportunity versus the magnitude of the opportunity you've got with the manufacturers?" Dr. Harari responded as follows: "We've said that we think we have most of the NAND manufacturers and NAND, NOC manufacturers covered and we of course have by virtue of SD, many of the microSD being a very large part of the card business. We have that covered through the SD association. We don't have the other card manufacturers and USB flash drive covered in this. This is a target area that we are pursuing through this licensing program."

60. In addition to the royalties received from flash memory chip manufacturers, SanDisk also receives royalties from those making systems and/or products (*i.e.*, aggregators) consisting of a percentage of the sales price of the finished products and the purchase price of the chip. PNY's license, for example, provides for a 4% royalty on the sales price of the finished product, as long as it uses chips purchased from SanDisk or its licensees. If it uses an "unlicensed" MLC flash memory chip (*i.e.*, purchased from Micron), PNY must also pay SanDisk an **additional** 8% royalty on the purchase price of the "unlicensed" chip to enjoy the protection of the license. (*See* Table 2, below.) This 8% penalty in some instances exceeds an aggregator's gross margins. As an additional example, SanDisk also receives royalties through the SD-3C entity from all the companies selling SD cards in the United States, with the exception of Toshiba and Panasonic – the other two members of the SD-3C consortium.



1

2

**TABLE 2: SANDISK TECHNOLOGY ROYALTIES (EXCLUDING SD)**

3

4

5

6

7

8

9

10

11

12

13

14

15



16    61.    In addition to its licensing scheme, SanDisk exerts its power in the flash memory

17  technology market through partnerships and joint ventures, including the SD-3C entity described

18  above.   Relatedly, PNY and a number of other entities were recently sued for alleged patent

19  infringement relating to SSD flash memory system products by a SanDisk-related company in *Solid*

20  *State Storage Solutions, Inc. v. Stec, Inc. et al.*, Civil Action No. 2:11-cv-391 (E.D. Tex.).

21  According to the corporate disclosure statement filed by plaintiff Solid State Storage Solutions, Inc.

22  ("S4"), SanDisk owns more than 10% of the stock in S4.  S4 claims to be the owner of all rights,

23  title, and interest in and to the patents-in-suit in the S4 case.  However, SanDisk's ownership

24  interest in S4 demonstrates that SanDisk has a stake in patents related to flash memory technology

25  other than those patents listing SanDisk as the owner of record.

26    62.    SanDisk's monopoly power in the flash memory technology market gives SanDisk

27  the ability to exclude competition, obstruct entry, raise prices, restrict output and restrict innovation

28  in the downstream applications of flash memory technology—namely, the use of that technology in

LA:355215.1

flash memory chips, systems, and products.

63.     There are high barriers to entry in this technology market that would prevent new competition from entering for at least two years at a level sufficient to deter or counteract SanDisk's exercise of market power.  SanDisk's patents present a formidable barrier to any potential entrant. In addition to the enormous research, development and capital expenditures such entry would involve, the entrenched form factors, interfaces and industry standards present substantial obstacles to any effort to shift away from the flash memory technology that SanDisk dominates.

64.     On information and belief, other companies, such as Micron, do have alternative flash memory technology and related intellectual property portfolios.  Nevertheless, on information and belief, approximately 90% of worldwide revenue for flash memory chips comes from chips that use, or at least are licensed to use, SanDisk's technology.  Moreover, SanDisk claims that 100% of USB flash memory systems and products sold in the United States practice its patents.

65.     In the same July 2007 earnings call referred to in paragraph 58, Dr. Harari was asked to comment on the fact that "Micron seems pretty adamant that they're never going to have to pay you guys a license – a royalty fee."  He responded that "with regards to Micron, nothing has changed as far as our thinking, which is, of course, not the same as their thinking.  And we will continue to work on that one."

66.     By way of the conduct described in this Amended Complaint, SanDisk has prevented manufacturers of flash memory systems and products (*i.e.*, aggregators) from being able to use the technology offered by Micron or any other company.  Third party flash memory technology and related intellectual property rights have not prevented, and appear unable to prevent, the exercise of monopoly power by SanDisk in the flash memory technology market.

### *Flash Memory Chip Market*

67.     The flash memory chip market includes the manufacture and sale of chips that are developed from flash memory technology for incorporation into systems, which, in turn, are used in a wide variety of products (*i.e.*, consumer applications including USB drives, SD cards, CF cards, and SSDs).  (*See* Table 1.)

68.     As the core element of flash memory, there are no reasonably interchangeable

economic substitutes for flash memory chips.

69.     SanDisk has market power in the flash memory chip market that amounts to monopoly power, or at least the dangerous possibility of gaining such monopoly power.   On information and belief, the flash memory chip output of SanDisk (in its joint venture with Toshiba) accounts for approximately 46% or more of the worldwide market for flash memory chips, in terms of unit sales.  SanDisk recently reported in a 2013 annual stockholder meeting presentation that it is responsible for "close to half of industry bit output (together with manufacturing partner Toshiba)."

70.     In addition, on information and belief, SanDisk, together with its licensees, accounted for close to 90% of worldwide revenue for flash memory chips in 2010 and 2011.

**TABLE 3:  2011 MARKET SHARE OF NAND FLASH MEMORY CHIPS**



Source: Jefferies Analyst Report

71.     On information and belief, Micron is the only major participant in the flash memory chip market that is not a SanDisk licensee, and it has a market share ranging from 8% to 15%.

72.     There are high barriers to entry into the flash memory chip market that would prevent new competition from entering for at least two years at a level sufficient to deter or counteract SanDisk's exercise of market power.  In order to develop a product that is a viable alternative to flash memory chips incorporating the technology over which SanDisk claims patent protection and has monopoly power, a firm would have to invest in significant research and development, make a product that could fit into end-use products (*e.g.*, the CF or USB form factors)

LA:355215.1

1    without substantial modification to those products and find appropriate manufacturing, distribution,

2    and sales facilities to bring the new flash memory chips to market.

3        73.    In addition to the technological barriers, the enormous capital investments required

4    to manufacture chips is an additional barrier to both new entry and expansion by existing

5    manufacturers.  Establishing the facilities for manufacturing chips—a fabrication plant or "fab"—

6    can cost billions of dollars.  According to analysts, fabs to manufacture flash memory chips cost

7    anywhere from $3 billion to $8 billion, and can take years to build.  A new entrant would not only

8    need to establish such manufacturing facilities, but would need to make substantial investments to

9    ramp up production to a volume sufficient to keep its costs competitive with existing manufacturers

10   of flash memory chips.  As a result, no new entrants have emerged as competitors in the flash

11   memory chip market for many years.

12       74.    In addition, expanding production in existing facilities itself is an extremely

13   expensive endeavor.  In 2011, SanDisk reported investing over a billion dollars on tools for the

14   expansion of two existing fab facilities, and projected spending between $650 million and $1.15

15   billion in 2012 for additional fab investments.  Existing competitors in the flash memory chip

16   market produce at or near their capacity, and it would require vast investment and a significant

17   period of time for them to expand existing facilities and ramp up production.

18       75.    SanDisk itself has repeatedly acknowledged that there are high barriers to entry and

19   expansion in the flash memory chip market.  For example, in March 2007, SanDisk's co-founder

20   and then President Sanjay Mehrotra publicly stated that it is "pretty bloody for other new entrants to

21   get in" and supply flash memory chips.

22       76.    In July 2007, Dr. Harari, was asked the following question on an earnings call: "You

23   have the advantage now where you have the captive suppliers [*i.e.*, SanDisk-Toshiba joint venture],

24   your competitors, you (sic) card competitors' costs are going higher.  How will you strategically

25   think about the decision of increasing market share versus increasing margin?"  Dr. Harari

26   responded as follows: "I think we should try to maximize our margins, of course, but keep our

27   output at 100 utilization.  And at this stage, it's a little bit academic.  It's very difficult to, frankly, --

28   non-captive supply today is very, very expensive and definitely at this stage be [sic] difficult to

justify.  To bring additional captive capacity on board to gain market share at depressed or close to zero, maybe even negative margins, is not what we would want to do at this time."

77.     On the same earnings call, Dr. Harari was asked if analysts "should get comfortable that now that pricing's looking better, that everything's not just going to come flying back online?  Your competitors aren't going to just turn on the spickets again and that you guys, along with Toshiba aren't just going to increase the CapEx again?"  Dr. Harari responded that "we're talking about 220% increasing megabyte, tripling our megabyte shipments year-to-year.  So we have the large numbers, the tier of large numbers actually working in our favor.  And it's becoming more and more difficult to double megabyte output because the basic numbers are now becoming very large, it's very difficult for new players to come in and make a dent."

78.     On information and belief, Micron—a U.S. company based in Boise, Idaho—makes and sells alternative flash memory chips that do not incorporate the technology over which SanDisk claims patent protection and has monopoly power.  Flash memory chips made by Micron compete in the same market as flash memory chips made by SanDisk and its licensees.

### *USB Flash Memory System Market*

79.     The second downstream market is the USB flash memory system market, which includes the assembly and sale of a combined chip and a controller that acts as an interface between the chip and the host computer, camera, etc.  (*See* Table 1.)  Although there are a variety of flash memory systems, the allegations herein are directed at the USB flash memory system market.

80.     USB flash memory systems are an integral element of USB flash memory system products, and there are no reasonably interchangeable economic substitutes.

81.     Participants in this market consist of (a) vertically-integrated flash memory firms, who make flash memory chips and controllers, and (b) aggregators, who purchase flash memory chips and controllers from others.  In both cases, the system market participant combines the chip and the controller, either for use in its own products, or for sale to a third party.

82.     The aggregators that compete in the system market are among the largest and most significant consumers of flash memory chips.  For example, PNY purchased approximately $187 million of flash memory chips in 2011.

LA:355215.1

83.     Although it does not control the system market in terms of market share, SanDisk has leveraged its substantial market power in the flash memory technology market to force all companies who buy or sell in the system market in the United States to license SanDisk's technology or leave the market altogether.  SanDisk thus has the power to exclude competitors in the market for systems.

84.     In December 2006, Dr. Harari wrote an email to SanDisk employees expressing his belief that "over the next 10 years the balance of valuable IP will shift dramatically to system level IP" which "will become far more powerful as it will become impossible to sell Flash components without a systems solution."  Dr. Harari referred to Hynix "buying access" to this system level IP as a "huge insurance policy for them."

85.     There are substantial barriers to entry into the system market that would prevent new competition from entering for at least two years at a level sufficient to deter or counteract SanDisk's exercise of market power.  This is because SanDisk has taken the position that all existing systems practice its technology and associated patents.  In order to develop a viable alternative to systems that incorporate the technology over which SanDisk claims patent protection and has monopoly power, a firm would have to invest in significant research and development to devise a system that still meets industry standards and fits into end-use products (*e.g.*, the USB form factor) without substantial modification to those products.  In addition, a firm would need to develop appropriate assembly, distribution, and sales facilities to bring its systems to market.

### USB Flash Memory System Products Market

86.     The third downstream market is the USB flash memory system product market, which includes the sale of USB drives to U.S. consumers, typically through retailers.  (*See* Table 1.) The participants in this market include vertically-integrated firms, aggregators, and relabelers. However, while relabelers compete in the sale of products, they do not compete in manufacturing them, and accordingly exert relatively little effect on pricing in the products market.

87.     SanDisk has substantial market power in the USB flash memory system products downstream market.  Upon information and belief, SanDisk-branded USB flash memory system products accounted for approximately 34 - 40% of retail sales in the United States in recent years.

LA:355215.1

88.     As with systems, SanDisk's power in the USB products market is greater than that which is indicated by its market share because SanDisk has leveraged its substantial market power in the flash memory technology market to force all the significant companies who buy or sell in the products market in the United States to enter into a license with SanDisk or leave the market altogether.  SanDisk thus has the power to exclude competitors in the market for USB flash memory system products.

89.     In addition, SanDisk's power in the market for USB flash memory system products is greater than that which is indicated by its market share because it either sells directly or collects a royalty on the purchase and sale of components (flash memory chips and systems) by its licensed manufacturers to companies like PNY, and a second royalty on the purchase and sale of the same components from aggregators such as PNY who purchase and integrate the components into products that are sold to consumers.  Accordingly, by leveraging its monopoly power in the flash technology market and by its anticompetitive licensing scheme, SanDisk is able to collect a percentage of every sale made by its licensed manufacturers as well as a percentage of every sale made by its competitors, in addition to the revenue it derives from its own sale of SanDisk-branded products.

90.     The market for USB flash memory system products at retail is price point driven and consumers are highly price sensitive.  The margins for manufacturers of products are small.  The multiple royalties that SanDisk demands from manufacturers and sellers of flash memory chips, systems, and products makes it harder for those manufacturers and sellers to be price competitive against SanDisk when selling products to consumers.

91.     On information and belief, SanDisk has asserted that forcing aggregators to accept its license terms would raise the prices of aggregators' USB flash memory system products and, in turn, would allow SanDisk to sell its own products at a higher price.

92.     There are high barriers to entry in the market for USB flash memory system products.  For example, SanDisk takes the position that a license from it is required before a firm can enter this market.  In addition, it may take a firm many years to develop the necessary distribution network, relationships and brand recognition to be a meaningful competitor in the

1      market for products.

2            93.     No reasonably interchangeable economic substitutes for USB flash memory system

3      products exist.  Although there are other portable technologies available for storing and transferring

4      data, such as CDs, DVDs, floppy disks, and external hard drives, none of these are reasonably

5      interchangeable economic substitutes for USB flash memory system products and are declining

6      rapidly in market share.  The small size, relative durability, high storage capacity, and low cost of

7      USB flash memory system products makes other types of more expensive, bulkier, less durable

8      memory products poor economic substitutes.  While SD and CF cards offer comparable size and

9      capacity, they are used for different purposes and different host devices (*e.g.*, digital cameras,

10     tablets and smart phones, rather than computers), and pricing changes do not appear to influence the

11     pricing of USB flash memory system products.

12                        ***SD Flash Memory System Products Market***

13           94.     The fourth downstream market is the SD flash memory system product market,

14     which includes the sale of SD cards and MicroSD cards[1] to U.S. consumers, typically through

15     retailers.   (*See* Table 1.)   The participants in this market include vertically-integrated firms,

16     aggregators, and relabelers.  However, while relabelers compete in the sale of products, they do not

17     compete in manufacturing them, and accordingly exert relatively little effect on pricing in the

18     products market.

19           95.     SanDisk has substantial market power in the SD flash memory system products

20     downstream market.   Upon information and belief, SanDisk-branded SD flash memory system

21     products accounted for approximately 45% of retail sales in the United States in 2010, 47% of sales

22     in 2011, and over 52% of sales in 2012.  More recent data show that SanDisk's share continues to

23     grow.  In March of 2014, according to industry data, SanDisk accounted for over 60% of SD card

24     sales.

25

26

27

28
       _____
       [1] Unless otherwise noted, "SD cards" refers to both SD cards and MicroSD cards.

**TABLE 4: SANDISK SD CARD AND USB MARKET SHARE (IN DOLLARS)**



(Source: NPD)

96.    As with systems, SanDisk's power in the SD card market is greater than that which is indicated by its market share because SanDisk has leveraged its substantial market power in the flash memory technology market to force all the significant companies who manufacture SD cards into a worldwide royalty-bearing license. SanDisk thus has the power to exclude competitors in the market for SD flash memory system products.

97.    SanDisk has not merely used its power in the flash memory technology market to obtain an advantage in the SD card market. It has used it to maintain a monopoly position in the SD card market, or at a minimum, to create a dangerous probability of obtaining a monopoly position in that market.

98.    SanDisk's power in the market for SD flash memory system products has grown swiftly in recent years, and appears likely to continue to grow. In addition to leveraging its power in the technology market, SanDisk has been increasing its power in the SD card market by aggressively pursuing exclusive dealing arrangements with key retailers. On information and belief, SanDisk has entered into such arrangements with RadioShack, Costco, Sam's Club, BJ's, CVS, and Walgreen's, and recently expanded its dominant position in the market by entering into exclusive arrangements with Best Buy, Staples, and Walmart. Such arrangements cut off

- 24 -

LA:355215.1

competitors from more than 60% of the retail store distribution of SD cards, and reinforce SanDisk's power in the SD card market. Indeed, on information and belief SanDisk has never lost an exclusive arrangement once it has been established.

99.   There are high barriers to entry in the market for SD flash memory system products. For example, SanDisk and its SD-3C partners take the position that a license from SD-3C is required somewhere in the manufacturing/distribution chain before a firm can enter this market. This creates an enormous barrier to entry that SanDisk may deploy at any time by refusing to grant additional licenses.

100.   In addition, it may take a firm many years to develop the necessary distribution network, relationships, and brand recognition to be a meaningful competitor in the market for flash memory system products, including SD cards. On information and belief, it would be considerably more expensive and difficult for a new entrant to build up these assets—a distribution network, relationships, and brand recognition—than it was in the past when the incumbent firms obtained their position. This is borne out by the actual behavior of the market. While SanDisk's market share in SD cards has increased sharply in the last several years, PNY's share of the market has declined rapidly as a result of SanDisk's illegal conduct.

101.   More significantly, opportunities for distribution are limited because of the high concentration levels among retail distribution outlets and the exclusive dealing barrier erected by SanDisk. While some manufacturers of SD flash memory system products have attempted to sell directly to consumers (*e.g.*, via company websites), this has always accounted for a small percentage of total sales and no manufacturer has been successful in building a direct sales presence that successfully competes with established retail distribution outlets. For instance, SanDisk, despite its greater than 60% market share, does not even attempt to sell directly to consumers, notwithstanding the greater margins it could earn if it did so.

102.   PNY's experience with direct sales confirms that the direct sales channel is not a viable alternative to the retail channel. PNY has invested considerably in attempting to establish a direct sales channel. It offers its products on its website, promotes them, and has invested in fulfillment facilities that allow it to ship products quickly to consumers. PNY routinely offers better

prices through its direct channel—certainly better than the inflated prices consumers must pay at retailers that have entered into exclusive dealing arrangements with SanDisk.   Yet despite significant financial and business investment PNY has had very little success with its direct sales channel.  Its total sales through the direct channel of SD cards in 2013 were under $30,000.00 — less than one part in a thousand of PNY's total SD sales.

103.   On information and belief, no other major manufacturer of SD cards — including giants like Toshiba, Samsung, and Micron — has had any meaningful success in building a direct sales channel.  One likely reason, discussed further below, is that SD cards are often purchased at the point of sale along with devices like cameras and cell phones.  Consumers prefer to purchase SD cards at the same time so they can start using their new devices, rather than waiting for two or three days for an SD card to be delivered through the mail.  Because of the need for personalized service and product demonstrations, established brick and mortar retailers have a substantial advantage over internet sales.

104.   SD cards are often sold as add-on sales for higher priced items like SD cameras or cell phones.  For instance, SanDisk bragged in its July 17, 2013, remarks to investors that over 90% of purchasers of non-iOS phones purchase an SD card for their phone ("the attach rate").  Because so many SD cards are purchased at retail as part of a bundle, customers are often insensitive to the price of SD cards, do not consider alternative sources for SD cards, and are willing to pay an inflated price at retail for their SD card.  This "attach rate" is borne out by largely stagnant online sales of SD cards.

105.   Overall, the entire "e-tail" channel, which includes direct sales by manufacturers as well sales by large retailers like Amazon.com remains very small.  According to industry statistics from NPD, traditional "brick and mortar" retailers accounted for 81% to 87% of SD card sales in 2011.  Perhaps because the "e-tail" side was not significant, NPD stopped tracking the breakdown between e-tail and brick and mortar retailers at the end of 2011.

1

**TABLE 5:  SDHC BRICK & MORTAR VS. E-TAIL SALES MIX**



(Source: NPD)

106.    There are also barriers to expansion by existing firms in the SD card market.  As discussed, SanDisk has the ability to deprive a firm of its license from SD-3C, forcing that firm (at least according to SanDisk) to halt all manufacturing of SD cards.  In addition, at certain times the components needed to make SD cards may be in short supply, as the (very limited) number of flash chip manufacturers fulfill commitments to companies like Apple that consume massive quantities of flash memory for solid state devices.  Finally, the severe constraints on the distribution network imposed by SanDisk make it unrealistic for any other firm to expand its output in response to supra-competitive prices charged by SanDisk.

107.    No reasonably interchangeable economic substitutes for SD flash memory system products exist.  Although there are other portable technologies available for storing and transferring data, such as CDs, DVDs, floppy disks, and external hard drives, none of these are reasonably interchangeable economic substitutes for SD flash memory system products and are declining rapidly in market share.  Their form factor is specifically matched to connect with the majority of digital cameras, and no other flash memory system products fit the SD card slots on such devices without adapters.  Micro-SD cards are often sold with such adapters, but no other types of flash memory system products are.  Micro-SD cards, without an adapter, fit a smaller device card slot than traditional SD cards, and tend to be used with tablets and smart phones, or with an adapter in digital cameras and other devices.  While it is possible to use adapters that integrate an SD card or

- 27 -

Micro-SD card with a USB plug, it is not a typical practice among consumers, who do not consider SD (or Micro-SD) cards substitutes for USB products.

### *Geographic Market*

108.     The relevant geographic market is the United States.   For the flash memory technology market, by definition, United States patents extend patent protection only to the geographic United States.  For the downstream markets, the relevant geographic market includes the flash memory chips, systems, and products that are available for sale in the United States, because, upon information and belief, this is the geographic area within which U.S. consumers can practicably turn for supply of such chips, systems, and products.

109.     As to all of the relevant markets described herein, SanDisk's acquisition, maintenance, or extension of monopoly power or lessening of competition (or attempts to do so) is not due to growth or development as a consequence of a superior product, business acumen, historical accident, or a lawful patent grant, but rather is the direct consequence of SanDisk's unlawful conduct.

### **SanDisk's Anticompetitive USB Licensing Scheme**

### *The Patent Infringement Lawsuits*

110.     SanDisk has filed several lawsuits and other proceedings relating to accusations of patent infringement for the primary purpose of extorting anticompetitive and uniform licenses from its flash memory competitors.

111.     SanDisk claims to control rights to patents necessary to manufacture and sell all products that incorporate flash memory technology that are sold in the United States.   Although alternative designs exist that do not infringe some or all of SanDisk's patents, SanDisk has repeatedly taken the position that any competitor manufacturing or selling products in the United States containing flash memory technology must be practicing SanDisk's patents and thus should enter into its standard license or face oppressive patent infringement litigation.   That is the position SanDisk has taken with PNY.

112.     On October 24, 2007, SanDisk filed two complaints against PNY and dozens of other competitors in the Western District of Wisconsin.  *SanDisk Corp. v. Phison Electronics Corp.*

*et al.*, Civil Action No. 07-cv-0605 (W.D. Wis.); *SanDisk Corp. v. Phison Electronics Corp. et al.*, Civil Action No. 07-cv-0607 (W.D. Wis.) (collectively, the "Wisconsin Actions").   Kingston Technology Co., Inc. and Kingston Technology Corp. (collectively, "Kingston") are the last remaining defendants in the Wisconsin Actions.

113.    In the Wisconsin Actions collectively, SanDisk alleged that PNY infringed U.S. Patent Nos. 5,719,808 (the "'808 Patent"), 6,149,316 (the "'316 Patent"), 6,426,893 (the "'893 Patent"), 6,757,842 (the "'842 Patent"), 6,763,424 (the "'424 Patent"), 6,947,332 (the "'332 Patent"), and 7,137,011 (the "'011 Patent").

114.    Additionally, on December 6, 2007, and at the request of SanDisk, the United States International Trade Commission initiated an investigation entitled *In the Matter of Certain MLC Flash Memory Device Controllers, Drives, Memory Cards, and Media Players and Products Containing Same*, Inv. No. 337-TA-619 against PNY, Kingston, and dozens of other entities (the "ITC Investigation").

115.    In the ITC Investigation SanDisk alleged that PNY infringed the '808, '893, '424, '332, and '011 Patents.

116.    The parties sued in the Wisconsin Action and named in the ITC Investigation included essentially all of the significant USB flash memory companies in the United States, including : A-Data Technology Co., Ltd.;  A-Data Technology (USA) Co., Ltd.; Acer, Inc.; Add-On Computer Peripherals, Inc. (d/b/a EP Memory); Add-On Computer Peripherals, LLC (d/b/a ACP-EP Memory); Add-On Technology Co.; Apacer Memory America, Inc.; Apacer Technology Inc.; Behavior Tech Computer Corp.; Behavior Tech Computer USA Corp. (d/b/a BTC USA);  Buffalo, Inc.;  Buffalo Technology (USA), Inc.; Chipsbank Microelectronics Co., Ltd.; Chipsbank Technology (Shenzhen) Co., Ltd; Chipsbrand Microelectroncis (HK) Co., Ltd; Corsair Memory, Inc.; Dane-Elec Corp. USA; Dane-Elec Memory S.A.; Deantusaiocht Dane-Elec TEO (d/b/a Intervalle Corporation and d/b/a Dane-Elec Manufacturing USA); Edge Tech Corp. (d/b/a Peripheral Enhancements Corporation); Emprex Technologies Corp.; Imation Corp.; Imation Enterprises Corp.; Infotech Logistic; Infotech Logistic, LLC (d/b/a Supertron Memory); Interactive Media Corp. (d/b/a Kanguru Solutions); ITE Technologies, Inc.; Kaser Corp.; Kingston Technology

Co., Inc.; Kingston Technology Corp.; LG Electronics, Inc.; LG Electronics U.S.A., Inc.; Melco Holdings Inc.; Memorex Products, Inc.; MemoSun, Inc.; Payton Technology Corp.; Phison Electronics Corp.; PNY Technologies, Inc.; Power Quotient International Co., Ltd.; Power Quotient International (HK) Co., Ltd.; PQI Corp.; Silicon Motion Inc. (California); Silicon Motion Inc. (Taiwan); Silicon Motion International, Inc.; Silicon Motion Technology Corp.; Skymedi Corp.; Synergistic Sales, Inc.; Syscom Development Co., Ltd.; Synergistic Sales, Inc.; Transcend Information Inc. (California, U.S.A.), Transcend Information Maryland, Inc., Transcend Information, Inc. (Taiwan); Trek 2000 International, Ltd.; TSR Silicon Resources, Inc.; USBest Technology, Inc.; Verbatim Americas; Verbatim Corp.; Welldone Co.; Zotek Electronic Co., Ltd. (d/b/a Zodata Technology Ltd.).

117. Upon initiating the Wisconsin Action and requesting the ITC Investigation, SanDisk advised PNY and, on information and belief, the other parties named in the Wisconsin Action and ITC Investigation, that the only way SanDisk would settle the actions was through a "standard" and non-negotiable license agreement with each defendant. For instance, Dr. Eli Harari, the founder and then Chief Executive Officer of SanDisk told PNY that it would need to sign a "standard license" and that SanDisk does not "have the room to customize agreements for each licensee." PNY understood that SanDisk would pursue PNY in litigation for as long as necessary to compel PNY to sign the standard license.

118. Just days after initiating the Wisconsin Action and requesting the ITC Investigation, SanDisk received an email from Silicon Systems stating "congrats to you and the team for filing this action. It is great news for your licensees and for the industry as a whole." Richard Chernicoff, then SanDisk's Senior Vice President of Business Development, forwarded this email to Sanjay Mehrotra, the current President and Chief Executive Officer of SanDisk, and to other SanDisk employees commenting "I will not answer of course – but this is more evidence as to why we have to execute this program across the board."

119. SanDisk repeatedly threatened its flash memory competitors with patent infringement litigation to force them to sign its standard license. For example, during 2007 settlement negotiations with Memorex-Imation, SanDisk presented a powerpoint slide stating that

1     "SanDisk protects its investment in intellectual property through licensing and, when necessary

2     litigation," and provided the following list of patent infringement actions it has filed against its

3     competitors: "1996 – SanDisk v. Samsung (ITC, NDCA); <u>1998</u>: SanDisk v. Lexar Media (NDCA);

4     <u>2001</u>: SanDisk v. Micron (NDCA); <u>2001</u>: SanDisk v. Viking et al. (NDCA); <u>2001</u>: SanDisk v. PQI-

5     USA (NDCA); <u>2001</u>: SanDisk v. Memorex, Protec, PQI, Ritek (NDCA); <u>2002</u>: SanDisk v.

6     Samsung; <u>2004</u>: SanDisk v. STMicro (ITC, NDCA, EDTX); <u>2007</u>: SanDisk v. Imation (NDCA)."

7          120.   SanDisk's threat of expensive and continual patent infringement litigation to extract

8     coercive and anticompetitive licenses was highly credible.  SanDisk claims to have a portfolio of

9     over 1,700 patents (containing well over 10,000 claims), but sued PNY on only a limited number of

10    claims from seven patents.  SanDisk signaled it could break up cases into an arbitrary and large

11    number by bringing two separate cases, Nos. 07-cv-0605 and 07-cv-0607 in Wisconsin, as well as

12    requesting the ITC Investigation.  PNY faced the prospect of a stream of financially debilitating

13    lawsuits brought against it anywhere in the country by an extremely well-heeled adversary.  For

14    instance, when Kingston did not accede to SanDisk's threats, SanDisk brought an additional lawsuit

15    against Kingston entitled *SanDisk Corp. v. Kingston Technology Co., Inc. et al.*, Civil Action No.

16    10-cv-00243 (W.D. Wis.) (the "Kingston Action").  In the Kingston Action, SanDisk alleged that

17    Kingston infringed five more patents: U.S. Patent Nos. 7,397,713 (the "'713 Patent"), 7,492,660

18    (the "'660 Patent"), 7,532,511 (the "'511 Patent"), 7,646,666 (the "'666 Patent"), and 7,657,702

19    (the "'702 Patent").  Upon information and belief, SanDisk would have brought a lawsuit against

20    PNY alleging infringement of the patents in the Kingston Action had PNY not entered into the

21    License.

22          121.   SanDisk failed in its attempts to enforce any of the seven patents asserted in the

23    Wisconsin Actions and ITC Investigation.  One defendant, Kingston, opposed SanDisk through

24    summary judgment.  The Wisconsin District Court and/or the ITC found that the '424 Patent was

25    not infringed, that the '011 Patent was invalid for obviousness, that the '316 Patent was not

26    infringed, and that the '842 Patent was not infringed.  SanDisk withdrew the '893, '808, and '332

27    Patents prior to the hearing.

28          122.   SanDisk's strategy of filing abusive patent infringement litigation was evidenced in

1   December 2006 when a SanDisk employee seeking to negotiate a partnership with Hynix (and

2   discourage Hynix from partnering with Toshiba) told Hynix employees that Toshiba "does not

3   know how the (sic) fight IP at (sic) US courts while we are expert on that. It is not what you have

4   but how you use it!"

5          123.   In December 2007, PNY's CEO Gadi Cohen met with SanDisk's then-CEO, Dr. Eli

6   Harari, to discuss entering into a license to resolve patent infringement litigation filed by SanDisk

7   against PNY. Although competitors, Dr. Harari and Mr. Cohen had known each other for many

8   years and enjoyed a generally cordial relationship. Dr. Harari was anxious to lock PNY into the

9   License before the Consumer Electronics Show (CES) in January 2008. SanDisk's plan was to

10  publicize and use the License with PNY (its largest aggregator competitor) as an exemplar to

11  pressure other smaller competitors to enter into similar anticompetitive and uniform licenses.

12  Dr. Harari asked Mr. Cohen to "do him a favor" and sign the License.

13         124.   SanDisk's intent to quickly execute and publicize the PNY License is evidenced by a

14  December 19, 2007 email from SanDisk's outside counsel, Michael Ladra, to PNY's then outside

15  counsel, William J. Heller, stating that "I can confirm agreement on the [settlement] terms you set

16  forth with one clarification. While the agreement will be confidential, it is critical to SanDisk to

17  have an agreed press release. I have attached the proposed license agreement and a draft press

18  release. I trust that you will find both acceptable. . . . We are prepared to move quickly to get this

19  signed."

20         125.   PNY attempted to negotiate the terms of the License with SanDisk. While some

21  minor changes were accepted, all requests for changes to material terms such as licensed products,

22  royalties, royalty base, and royalty structure were summarily rejected by SanDisk. For instance,

23  PNY objected to paying royalties in countries where SanDisk had no patents and requested a list of

24  countries in which SanDisk had patents. SanDisk refused to provide the list and responded that

25  "SanDisk cannot accept a change to this paragraph" requiring a worldwide royalty. The License

26  was effectively presented to PNY on a take-it-or-leave-it basis. Faced with this dire economic

27  threat, PNY acceded to the License and its mandatory terms on January 2, 2008. A true and correct

28  copy of the License is attached hereto as Exhibit A.

LA:355215.1

126.    SanDisk's intent to quickly publicize the License was further demonstrated by an email the next day (January 2, 2008), from Sanjay Mehrotra, the current President and Chief Executive Officer of SanDisk, to several SanDisk employees stating "Very Nice.  Congratulations. When is the press release?"

127.    The next day, January 3, 2008, SanDisk's outside counsel sent the following email and attachment to all of the remaining defendants/respondents in the Wisconsin Action and the ITC Investigation: "As many of you are aware, SanDisk and PNY have successfully concluded their licensing negotiations.    The link to the press release is http://www.sandisk.com/Corporate/ PressRoom/PressReleases/PressRelease.aspx?ID=4070.   This follows the recent settlement with Trek.  SanDisk believes that these recent settlements confirm that licensing SanDisk's patents if far wiser than exposure to the significant risk and cost of litigation.  SanDisk is willing, for a limited time, to offer a standard card license without the normal requirement of a license fee or payment for past infringement.  **The only conditions on this offer are that this standard license be executed with no changes to the terms** and that the offer be accepted prior to January 22, 2008.  A copy of the standard license agreement is attached.  This offer will be withdrawn after the 22nd.  Please let me know if you wish to take advantage of this proposal" (emphasis added).

128.    On January 15, 2008, the court entered a stipulation of dismissal of PNY, with prejudice, in both the Wisconsin Actions.  PNY also was dismissed from the ITC Investigation in March 2008.

129.    Many of the defendants/respondents in the Wisconsin Action and the ITC Investigation similarly settled with SanDisk on what have turned out to be anticompetitive terms. On information and belief, many, if not all, of the other defendants/respondents were forced to enter licenses with the same or substantially the same substantive terms.  In a press release dated April 10, 2009, SanDisk boasted that of the 25 companies against whom it asserted patents in the ITC, "the following companies entered into settlement and license agreements with SanDisk: Trek 2000 International, Ltd., PNY Technologies, Inc., Verbatim Corp., Verbatim Americas, Add-On Computer Peripherals, Inc. and Add-On Computer Peripherals, LLC (collectively, Add-On USA), Edge Tech Corporation, Infotech Logistic, Interactive Media Corp. (Kanguru), Kaser Corporation,

TSR Silicon Resources Inc., and Welldone Company" and that "the following companies entered into settlement agreements that included consent orders where the companies agreed to limit their imports of specified products to the United States to SanDisk licensed products: A-DATA Technology Co., Ltd. and A-DATA Technology (USA) Co., Ltd. (collectively, A-DATA entities), Melco Holdings Inc., Buffalo Inc., and Buffalo Technology (USA), Inc. (collectively, Buffalo entities) and Corsair Memory, Inc."  SanDisk also stated that it "obtained judgments against the following companies: Zotek Electronic Co., Ltd. dba Zodata Technology Limited; Infotech Logistic, LLC dba Supertron Memory; Add-On Technology Co.; Behavior Tech Computer Corp.; Emprex Technologies Corp.; and Behavior Tech Computer USA Corp. dba BTC USA."

130.   In addition, on information and belief, SanDisk either has or has had license agreements related to flash memory technology, chips, systems, and/or products with other companies, including but not limited to, Hitachi Semiconductor and Integrated Circuits Group, Lead Data, Inc., Lexar Media, Inc., Renesas Technology Corp., Sharp Corporation, Silicon Storage Technology, Inc., Silicon Systems, Inc., SmartDisk Corporation, Sony Corporation, TDK Corporation, Methode Electronics, Matsushita, Invox, China Movtek, M-Systems, SMART Modular Technologies, Western Digital and AT&T.

131.   The uniform License that SanDisk forced PNY and others to sign contains a number of anticompetitive terms — indeed, a virtual catalogue of every known form of patent misuse and overreaching provision that can harm competition.   This scheme has no pro-competitive justification, or at least no pro-competitive justification that outweighs the harm to competition and consumers.

### *Tying Arrangement*

132.   On its face, the PNY License purports to license only a limited set of patent claims, which are defined as the subset of SanDisk's patent claims directed to the creation of USB flash memory **systems***, i.e.,* the combination of a flash memory **chip** and controller.  The License does not purport to license to PNY the subset of SanDisk's patent claims directed toward flash memory chips, and indeed purports to expressly exclude such claims.

133.   Under the License, PNY is required to pay a ▮ royalty (capped at ▮ per unit)

1    for the privilege of connecting a controller to a flash memory chip and thereby creating a USB flash

2    memory system.  The royalty is assessed on PNY's worldwide net sales.

3         134.    However, the financial terms of the license also have the effect of requiring PNY to

4    purchase flash memory chips from SanDisk or from another seller licensed by SanDisk to make

5    them.  This is because if PNY purchases flash memory chips from someone other than SanDisk or

6    one its licensees, it must pay an additional 8% uncapped royalty on the cost of the unlicensed

7    memory chips.  (The ▮ incremental royalty applies to MLC flash memory chips, which are the

8    primary form of flash memory chips used in USB flash memory systems.  There is also a ▮

9    incremental royalty applicable to the less commonly used SLC flash memory chips).  Because the

10   only unlicensed flash memory chip manufacturer is Micron, this means that PNY must pay the

11   incremental royalty if and only if it buys flash memory chips from Micron.

12        135.    Because of the magnitude of this additional 8% uncapped royalty, essentially tripling

13   its royalty costs, the only viable economic option for PNY or any other aggregator forced to sign

14   SanDisk's uniform license is to purchase flash memory chips from SanDisk or from a manufacturer

15   licensed by SanDisk.  In fact, in some instances the 8% penalty exceeds the gross margins of an

16   aggregator like PNY.

17        136.    The requirement that a licensee purchase a staple good (flash memory chips) from

18   the licensor (or from entities in which the licensor has an economic interest) as a condition of

19   licensing a patent constitutes a classic tying arrangement.

20              ***Collection of Multiple Royalties In Violation Of Patent Exhaustion Doctrine***

21        137.    SanDisk refuses to specify what patents are included in the License with PNY and

22   other aggregators, and instead relies only on general language purporting to describe a "field of

23   use."

24        138.    Likewise, when SanDisk licenses flash memory chip manufacturers, it refuses to

25   specify what patents in their 1,700 patent portfolio are included in their license, and instead relies

26   only on general language purporting to describe a field of use.  The field of use described in

27   SanDisk's licenses with flash memory chip manufacturers overlaps the field of use described in

28   aggregators' licenses.  For example, similar to PNY's license, SanDisk's licenses with Intel and

Toshiba both license SanDisk's patents pertaining to the manufacture and sale of USB flash memory systems and products.

139.    SanDisk accordingly is attempting to license the same patents to both chip manufacturers and to aggregators like PNY.

140.    As a result of licensing the same patents to both chip manufacturers and aggregators, SanDisk receives double royalties on the sale of the same component parts from the license of the same patent—one royalty from its licensed manufacturers on their sales of flash memory chips, and a second royalty from aggregators like PNY for their sale of flash memory chips in the form of USB flash memory system products.

141.    As discussed herein, a USB flash memory system is comprised of a flash memory chip, controller, and other component parts.  A flash memory chip by itself has no economic value to an end user.  The economic value of a flash memory chip is necessarily related to and dependent upon its incorporation into a USB flash memory system (or other flash memory system), which, in turn, is then incorporated into a USB flash memory system product.

142.    SanDisk is entitled to receive a royalty for the purchase and use of a flash memory chip in a system and/or product only once.

143.    The double royalty that SanDisk imposes on its two levels of licensees (chip manufacturers and aggregators) violates the patent exhaustion doctrine, which provides that the first authorized sale of a patented product in commerce exhausts the patentee's patent protection as to that technology.  The patent exhaustion doctrine prevents SanDisk from collecting both:  (1) a "first" royalty on the sale by a licensed manufacturer to an aggregator of a component part covered by a patent; and (2) a "second" royalty on the subsequent resale of the same component part covered by the same patent that the aggregator has integrated into a finished USB flash memory system product.

### Mandatory Portfolio Licensing

144.    SanDisk licenses its patents only on a portfolio basis.  SanDisk refuses to license its patents individually or to license to an aggregator only those specific patents needed to aggregate flash memory chips with a controller.

LA:355215.1

*Collection of Royalties Whether Or Not Patents Are Practiced*

145. SanDisk imposes a royalty on all of an aggregators' net sales, whether or not any licensed patents are practiced. SanDisk refuses to modify its license to assess a royalty only to the extent patents are actually practiced.

*Collection of Royalties in Territories Where SanDisk Does Not Have Patent Rights*

146. SanDisk's patent portfolio includes patents related to flash memory technology in the United States and in a handful of foreign jurisdictions. However, SanDisk does not have such patents in the majority of jurisdictions around the world.

147. Under the terms of SanDisk's licensing program, licensees must pay a royalty on all flash memory-related products sold worldwide, even on sales in those jurisdictions where SanDisk has no patent rights. The practical effect of this licensing scheme is that any company seeking to sell in the United States market must pay royalties to SanDisk on its worldwide sales of flash memory-related products.

148. Patent rights in each jurisdiction in which those rights are granted constitute separate relevant products because they are not reasonably interchangeable economic substitutes. A patent right gives the holder of that patent the exclusive right to use (or to decide who can use through licensing) a specific technology for a specified amount of time in the jurisdiction that issued the patent and does not provide any rights to the patent holder outside the granting jurisdiction. In the jurisdictions in which SanDisk does not have patents related to flash memory technology, it does not have any right to claim any royalty from PNY at all.

*Collection of Royalty After Patent Expiration*

149. By forcing licensees to license its entire portfolio of patents, instead of specific patents, SanDisk is able to and does charge post-expiration royalties. For example, three of the patents on which SanDisk sued PNY in the Wisconsin Action have now expired. The '316 Patent and the '842 Patent both expired on April 13, 2009, and the '332 Patent expired on April 11, 2011. Many other patents that were in force at the time the parties entered into the License likely also expired. However, there was no reduction in the royalty charged by SanDisk after the expiration of certain patents, and no opportunity for PNY at any time to license SanDisk's patents only for the

1    term of the patents.

2                    *Collection of Royalty On Invalid Patents*

3            150.    By forcing licensees to license a broad portfolio of patents, instead of specific

4    patents, SanDisk is able to charge royalties on invalid patents.  For instance, the only claim in the

5    '011 Patent asserted by SanDisk against Kingston was found to be invalid.  However, there was no

6    reduction in the royalty charged by SanDisk after one of its patents was held invalid, and no

7    opportunity for PNY at any time to license only SanDisk's valid patents.

8               *Collection of Royalty On Patents That Are Not Infringed*

9            151.    By forcing licensees to license a broad portfolio of patents, instead of specific

10   patents, SanDisk is able to charge royalties on patents that have been adjudicated not to be

11   infringed.  For instance, in the Wisconsin Action and/or the ITC Investigation, Kingston's practices

12   as an aggregator of combining a controller with a flash memory chip was found not to infringe the

13   '424 Patent, the '316 Patent, or the '605 Patent as a matter of law.  PNY as an aggregator also does

14   not infringe these patents.  However, SanDisk refuses to license to PNY only the patents required

15   by PNY and refuses to reduce the royalty charged to PNY to account for patents that are not

16   infringed as a matter of law.

17
     ***SanDisk Requires Licensees to Cross-License Their Future Innovations on a Worldwide Royalty-***
18                                  ***Free Basis***

19           152.    SanDisk also requires licensees to grant back a cross-license covering any new

20   technology developed by the licensee if the technology is covered by the scope of the portfolio

21   license on a worldwide, royalty-free basis.  Thus, even if a licensee develops or obtains access to an

22   alternative technology that it could use to achieve patent independence from SanDisk, the licensee

23   would still be required to pay a royalty to SanDisk on any sales of the new product and SanDisk

24   would have the right to use the new technology on a worldwide, royalty-free basis.

25           153.    The effect of the cross-license provision is to maintain and reinforce SanDisk's

26   monopoly in the flash memory technology market by reducing the incentive for licensees to develop

27   their own technological solutions and patent portfolios.

28

PNY'S THIRD AMENDED COMPLAINT                                11-cv-04689-WHO
LA:355215.1

**Other Exclusionary Acts by SanDisk**

*Threats to Retailers*

154.   On information and belief, SanDisk has threatened retailers carrying products containing flash memory chips not licensed or manufactured by SanDisk.  For instance, in another case pending in this district, *Ritz Camera & Image, LLC v. SanDisk Corp., et al.,* Case No. CV 10-02787 HRL, the plaintiffs allege that "SanDisk has threatened" direct purchasers of flash memory system products "with the prospect they will be left holding large quantities of unusable flash memory products" and that if they purchase flash memory system products from SanDisk's unlicensed competitors "they will be made to purchase flash memory at disadvantageous prices and terms if they are later forced to turn to SanDisk to receive the necessary flash memory for their products."

155.   On information and belief, anticompetitive communications with retailers were part of a broader SanDisk strategy "to leverage the fact we are suing companies to increasing market share of the retail."

156.   On information and belief, SanDisk has also threatened customers of controller manufacturers and has stated that its filing of an infringement action against various controller manufacturers in 2007 was "sending not only the manufacturers of the controllers but some of the customers a message," as those customers "may be responsible for damages if they use what we consider to be infringing IP and we have now notified them."

*Exclusive Dealing*

157.   On information and belief, SanDisk has required retailers to enter into exclusive dealing arrangements with it for USB flash memory system products, SD flash memory system products, and other removable memory products.  These exclusive dealing arrangements preclude the affected retailers from carrying USB flash memory system products and SD flash memory system products made by PNY and other competitors.  Such exclusive dealing arrangements have, at relevant times, precluded RadioShack (with over 4,000 United States locations), CVS (with over 7,000 United States locations), and Walgreens (with over 8,000 United States locations) from carrying PNY's products.  Each of these retailers has expressly communicated to PNY that it is

1   precluded from even *entertaining* a proposal from PNY because of its exclusive arrangement with

2   SanDisk.  This is exactly SanDisk's strategy.

3        158.   SanDisk's goal is clear and succinctly stated in its internal communications:  keep

4   competition out; secure all pegs (all retail displays); raise pricing; and become an *exclusive* provider

5   and remain as such.

6        159.   In fact, although SanDisk now represents to the Court that it is not an exclusive

7   provider, internal documents show that as early as 2007 SanDisk considered itself to be exclusive at

8   Costco and RadioShack.  SanDisk has remained exclusive at those retailers through today, and has

9   continued to amass more exclusive agreements and market control.  In short, although SanDisk

10  claimed it did not have a single exclusive arrangement, that is simply not true.  As PNY has

11  demonstrated here and will demonstrate at trial, SanDisk is engaged in multiple exclusive dealing

12  arrangements with retailers—a fact confirmed by many of the retailers themselves.  Indeed, the

13  word "exclusive" appears 92,429 times in SanDisk's document production to date, and a search for

14  words beginning with "exclusiv" returns 17,528 documents.

15       160.   SanDisk, through its high level executives including but not limited to Judy Bruner

16  (chief financial officer, executive vice president of administration, and member of executive

17  committee) and Sanjay Mehrotra (president, chief executive officer, co-founder, and director) has

18  said the following about retail since it began to employ this strategy to control markets and destroy

19  competition in retail:

20  •   "Our 2013 retail revenue has a new annual record with our retail products achieving

21      substantial share gains in key markets globally." -Sanjay Mehrotra, January 22, 2014.

22  •   "And our retail business, even though I didn't have time in my presentation to spend a lot of

23      time on that, you'll hear more about that from Shuki, our retail business is a very important

24      business as well to SanDisk.  It really is the face of the company to the consumer.  We have

25      a brand that is a household name across the world.  And we have very strong profit

26      contribution from that business.  So growing share in retail continues to be an important

27      priority for us, And we have been doing that very well across most geographies over the past

28      few years." -Sanjay Mehrotra, January 22, 2014.

PNY'S THIRD AMENDED COMPLAINT                    11-cv-04689-WHO

LA:355215.1

- "I would say our retail products actually command a very strong price per gigabyte. So I think when you are talking about these big divergences and you mention retail, I think you're talking more about what's being sold on the spot market in terms of components or cards sold to a white-label provider or wafer prices sold on the spot market. And actually, we, as I mentioned, have pulled away somewhat and we've reduced our supply allocation to those markets in order to prioritize our supply to market, such as embedded products and SSD products, as well as our branded retail where we command a strong price premium." –Judy Bruner, January 22, 2014.

- "In this presentation today, I'm going to focus on the retail business, and I'd like to share 3 things with you. The first thing is how strong our business is, how well we have done; the second one is how big an opportunity we see in the retail market for us; and the third one, and most important, how we are going to leverage on the strong business that we have in order to gain more share and to grow our business profitably as well." –Shuki Nir, January 22, 2014.

- "Our strong first quarter results reflect the benefit of our broadening product portfolio and our disciplined capacity management. The key highlights of the quarter included our SSD product revenue, which grew over 200% on a year-over-year basis, and the continued strengthening of our global retail channels which produced year-over-year revenue growth of 34%." -Judy Bruner, January 22, 2014.

161. Additionally, as evidenced by SanDisk's internal meeting agendas and other internal SanDisk documents, SanDisk places an emphasis on driving the retail business. A 2008 internal SanDisk email states, "Where possible we need to leverage the fact we are suing companies to increasing [sic] market share of the retail." SanDisk is laser-focused on accomplishing and accelerating exclusivity in retail as a method of keeping PNY out of the SD flash memory products market.

162. SanDisk's market share in U.S. retail channels was 32% in 2007 for SD and MicroSD. SanDisk's stated primary goal was to increase this market share.

163. As early as 2008, SanDisk set upon a path to destroy all SD competition in the U.S.

1    retail SD market.

2         164.   SanDisk's efforts at exclusivity and market control began to reap benefits almost

3    immediately.   According to internal documents SanDisk was able to notch increases in share by

4    over ███ to ████ in flash cards by ██████████ – and selling at a higher average retail sale

5    price than the market.  The elimination of competition was beginning to increase consumer cost and

6    decrease market entry.

7         165.   While seeking to establish (and establishing) exclusive contracts, SanDisk also began

8    controlling ad shares (percentage of ads retailers run regarding a company's product).

9         166.   By the fourth quarter of 2009, SanDisk's ad share at Staples grew from ███ in Q4

10   2008 to █████   PNY had dropped from ███ to ██, and Hewlett Packard had dropped from ██ to

11   ██

12        167.   By April 2012, SanDisk internal documents show that SanDisk had gained share in

13   SD and MicroSD cards to ███, and suffered only a decline in USB sales where it had not yet been

14   able to prevent market entry.

15        168.   SanDisk accomplished this explosive growth in market share through exclusivity –

16   deals it offered with massive hard dollar incentives, corresponding penalties for non-exclusivity,

17   and economic investments that make no sense for any rational economic action except to create a

18   monopoly.  For example, an internal SanDisk email from September 2012 shows that SanDisk was

19   prepared to offer Rite Aid nearly █████████ in marketing development funds and markdown

20   funding in exchange for exclusivity, which presented a █████████ "incremental opportunity" for

21   SanDisk.  In other words, SanDisk was prepared to pay Rite Aid nearly █████████ in exchange

22   for █████████ in business.

23        169.   Indeed, despite losing over a billion dollars in 2009, SanDisk elected to increase

24   pricing and provide exclusive contract incentives that were equal to or higher than the resulting

25   increase in revenue that SanDisk expected to gain – all in a transparent attempt to control the market

26   and pricing.

27        170.   Contrary to statements to the Court, SanDisk repeatedly characterized its efforts with

28   retailers as a drive to establish exclusivity.  Many of the SanDisk internal documents discussing

1    exclusivity at retailers specifically single out PNY as the target of SanDisk's single vendor strategy.

2        171.   More recently, SanDisk has drastically expanded the proportion of the market

3    encompassed by its exclusive dealing arrangements.   In June 2013, PNY learned that SanDisk

4    would be the exclusive provider of Best Buy's SD cards for its Digital Imaging category as of

5    August 2013.   In November 2013, PNY learned that SanDisk would be the exclusive provider of

6    SD cards in Staples stores beginning in February 2014.   Upon information and belief, in addition to

7    the arrangements continuing in place with RadioShack and CVS, SanDisk has exclusive dealing

8    arrangements in place with Costco, Sam's Club, BJ's, and Walgreens as well.   Collectively,

9    SanDisk has thus made itself the exclusive provider for SD cards in stores accounting for

10   approximately half of all U.S. retail SD card sales.

11       172.   In July 2011, SanDisk had a dollar market share of 47% in the SD and MicroSD

12   markets according to industry data.   By December 2013, after SanDisk had implemented exclusive

13   dealing arrangements with Best Buy, CVS, Walgreens, and BJ's—in addition to the exclusive

14   relationships it already had with Costco and RadioShack—SanDisk's market share jumped sharply

15   to 66.1%.   PNY is SanDisk's primary competitor for retail sales of SD and MicroSD.   However,

16   once certain retailers—including CVS, Walgreens, and RadioShack—entered into exclusive dealing

17   arrangements with SanDisk, they refused to even entertain offers from PNY.   As a result, during

18   this same time period, PNY's dollar market share dropped from 22.3% to 11.0%.

19                    **TABLE 6: JULY 2011 VS. DECEMBER 2013 SDHC/MICROSDHC**

20                                    **DOLLAR MARKET SHARE**



Before Exclusivity          After Exclusivity

LA:355215.1

(Source: NPD)

173.    The U.S. retail channel typically includes six different categories dominated by a limited number of retailers:   (1) consumer electronics (Best Buy, RadioShack); (2) club stores (Costco, Sam's Club, BJ's); (3) wireless providers (Verizon, AT&T, Sprint); (4) drug store chains (CVS, Walgreens, Rite Aid); (5) office product stores (Staples, Office Max/Office Depot); and (6) mass retail (Walmart, Target, Kmart/Sears).

174.    SanDisk has systematically targeted category upon category through exclusive dealing to remove competition.

175.    Indeed, as this chart shows, SanDisk has exclusive contracts with the entire consumer electronics, club, and wireless channels and has been moving to acquire exclusivity in the remaining three.

### TABLE 7: SANDISK US RETAIL FLASH CARD DISTRIBUTION



X = SANDISK EXCLUSIVE
✓ = SANDISK IN ASSORTMENT  (ONE OF ONLY TWO)

(Source: NPD)

176.    As a result, SanDisk has more than *doubled* its market share to over 70% in targeting retailers at one end with exclusive contracts while attempt to push aggregators and competitors out at the other end.

LA:355215.1

1

**TABLE 8: SANDISK MONTHLY DOLLAR MARKET SHARE**



(Source: NPD)

177.   Internal SanDisk documents show a concerted effort to attack and remove competition – whether it is Memorex, Kingston, Sony, Lexar, or as alleged here PNY.

178.   SanDisk's exclusive arrangements with retailers are reflected in written agreements but may also be based on oral or informal understandings, not found in the written agreements, whereby retailers understand that if they wish to carry SanDisk SD cards they may not stock competing brands.   Accordingly, the terms and conditions of SanDisk's exclusive arrangements may not be determined solely from SanDisk's written agreements.

179.   SanDisk's exclusive arrangements, in practice and effect, are long-term.   SanDisk has had exclusive arrangements in place with certain retailers for years.   For instance, SanDisk's exclusive relationship with Costco dates to 2001 and has never been open to competition.   On information and belief, none of SanDisk's exclusive arrangements—once established—have ever been terminated.

180.   Some of SanDisk's written exclusive dealing agreements have provisions that make it very difficult or expensive for retailers to terminate the arrangement.   For example, in co-op funding, a retailer generally accrues funds over time based on its purchases from a particular manufacturer.   Then that fund becomes available for reimbursing the retailer when it runs advertisements featuring the manufacturer's product.   Because funds continue to accrue through the

- 45 -

term of a retailer-manufacturer agreement, a retailer is likely to be leaving unused funding on the table if it does not extend the arrangement for another term.

181.   There are many practical impediments to a retailer terminating an exclusive arrangement for SD cards.  For instance, retailers operate on what are known as "planogram cycles," where the retailer lays out a part of the store for a six-month or longer period.  Product manufacturers like PNY generally find that it is not possible to place a product with a retailer unless it is included in the planogram, and the opportunity to introduce new products to a planogram comes up only at pre-planned intervals.  To the extent the end of an exclusive dealing agreement and the end of the planogram cycle do not align, it may not be possible for a competing seller of SD cards to persuade a retailer to terminate the exclusive arrangement.

182.   Through its exclusive dealing, SanDisk for many years has been the largest seller of SD and MicroSD cards and has marketed its cards heavily.  It is perceived by many retailers and consumers as a market leader.  For that reason, many retailers believe they must stock SanDisk's SD cards.  Such retailers may be willing or even prefer to stock other brands as well, but when SanDisk takes the position that it will sell its cards to a retailer *only* on an exclusive basis, the retailer is likely to accept SanDisk's demand and exclude all other brands of SD cards.  This brand preference for SanDisk means that even if other brands attempt to compete and offer better pricing or terms, the retailer will not carry their products.

183.   Indeed, multiple retailers, including RadioShack, CVS, and Walgreens, have explicitly told PNY that as a result of their exclusive contract with SanDisk, the retailers simply *cannot* consider PNY as a supplier.

184.   In addition to the practical and economic difficulties inherent in terminating an exclusive dealing arrangement with SanDisk, on information and belief, SanDisk has been known to threaten retaliation in the event they terminate their arrangements.

185.   PNY has made numerous attempts to compete with SanDisk at retailers at which SanDisk has established an exclusive arrangement.  These attempts have been unavailing.  For instance, PNY offered Costco pricing on SD cards that was below PNY's cost on a special promotion, in order to attempt to obtain a foothold at Costco and demonstrate to the Costco buyer

1  that it would benefit Costco to carry a competing SD card or to replace SanDisk as the exclusive

2  provider of SD cards.  Costco declined this offer.

3      186.   Moreover, PNY's attempts to present proposals for SD cards with retailers that are

4  exclusive with SanDisk have been rejected out of hand.  Specifically, RadioShack, CVS, and

5  Walgreens have all told PNY that they could not even *entertain* a proposal from PNY because of

6  their exclusive arrangements with SanDisk.

7                **SanDisk's Exclusive Arrangements With Specific Retailers**

8                                    ***Best Buy***

9      187.   Best Buy is a multi-national, multi-channel retailer of technology products, including

10  tablets and computers, televisions, mobile phones, large and small appliances, entertainment

11  products, digital imaging, and related accessories.  Best Buy operates more than 1,000 stores in the

12  United States, with a presence in all fifty states as well as the District of Columbia and Puerto Rico.

13  Consumer electronics, computing, and mobile phones accounted for 78% of Best Buy's revenue in

14  its most recent fiscal year.

15      188.   An internal SanDisk email chain from November 2012 regarding Best Buy shows

16  SanDisk's intent to push PNY out of the SD market.  At the time, SanDisk was negotiating an

17  exclusive arrangement with Best Buy.  Best Buy "reminded [SanDisk] that while [SanDisk] sell[s]

18  more, PNY provides more margins."  In response, SanDisk prepared an excel spreadsheet showing

19  the benefit to Best Buy of going with SanDisk exclusively.   The spreadsheet describes an

20  approximately ████████ "exclusivity benefit" for Best Buy, but it is based entirely on

21  eliminating PNY's lower-priced products and replacing them with higher-priced SanDisk products.

22  In essence, by going with SanDisk exclusively, Best Buy is able to charge a higher price to the

23  consumer, and thereby earns a higher net revenue.  However, the cost to the consumer is great:  the

24  result of SanDisk's exclusive arrangement with Best Buy and other retailers is that the consumer

25  loses the option of purchasing PNY's lower-priced SD card.

26      189.   SanDisk and Best Buy also discussed selling SanDisk products under a second brand

27  name—that way "one vendor manages the entire category, but the consumer would not really know

28  it."  SanDisk masks exclusivity in this manner in several major retailers, giving consumers the

illusion of competition.

190.   On June 11, 2013, SanDisk presented Best Buy with a "███████████████ ███████████████████████ with starting date July 28, 2013." Assuming Best Buy accepted the terms of this proposal, Best Buy is contractually obligated to sell SanDisk products exclusively in its ██████████████ through February 28, 2015.

191.   To induce Best Buy to enter into an exclusive arrangement, SanDisk offered Best Buy large payments to spend on marketing and merchandising. Notably, Best Buy is to receive ██████████ in fiscal 2014 (pro-rated to the date that the exclusivity started) and ████████ in fiscal 2015 for a total of ████████ in funding over the period of exclusivity.

192.   Best Buy also receives a ███ merchandising allowance on gross sales, volume incentive rebate ("VIR") funding of ████ on net sales over ████████ in fiscal 20114 and on net sales over ██ ███ in fiscal 2015, in addition to markdown funding of ██████████ to push out competitors' products.

193.   The marketing funding, markdown funding, and merchandising allowance offered under this agreement represents a drastic increase in the amount of funding from SanDisk. According to an internal SanDisk email dated January 24, 2011, before Best Buy agreed to exclusivity, SanDisk offered Best Buy "Total MDF support" of ████████ for its fiscal 2012 program.

194.   The large payments offered under the most recent program are contingent on Best Buy carrying SanDisk products exclusively. According to the proposal, "In the event Best Buy modifies product and promotional plans to include non-SanDisk branded products, then the marketing funding and the markdown funding will be pro-rated to reflect the relative period of the exclusive program until such non-SanDisk branded products were added."

195.   Moreover, the proposed agreement does not appear to include any early termination provision, leaving Best Buy vulnerable not only to the loss of substantial marketing funds, but potentially subject to a breach of contract suit if it were to end SanDisk's exclusivity early.

196.   In other words, SanDisk has agreed to pay Best Buy nearly ██████████ in exchange for exclusivity.

LA:355215.1

197.    Both the amount of the funding and the nature of the funding—with its ongoing accrual of allowances and its volume-based incentives—strongly disincentivize ending the exclusivity program even when the ████████ has run its course.

198.    On information and belief, SanDisk continues to be Best Buy's sole supplier of SD cards for its Digital Imaging department.

**TABLE 9: BEST BUY STORE MAY 2, 2014**



*RadioShack*

199.    RadioShack carries a broad assortment of both name brand and private brand consumer electronics products.   As of the end of 2013, RadioShack operated 4,297 stores throughout the United States, including locations in all 49 states as well as in Puerto Rico and the U.S. Virgin Islands.

200.    SanDisk has had an exclusive arrangement with RadioShack for nearly a decade. SanDisk and RadioShack entered into an exclusive arrangement on August 11, 2006.   That

LA:355215.1

agreement had a ███████ term and was ultimately extended through June 30, 2010.

201.   In exchange for selling SanDisk products exclusively, RadioShack received ████████ in marketing development funds ("MDF").  It also received a "co-op fund of ██" on all net sales.  Additionally, SanDisk agreed to provide VIR funding of ██ at ████████ in net sales, ██ at ████████ in net sales, and ██ at ████████ in net sales.  The accumulation of co-op funds and substantial volume incentive rebates strongly disincentivize termination.

202.   Under the terms of the 2006 exclusive arrangement between SanDisk and RadioShack, "Neither party [could] choose to sever the agreement without the consent of the other." In fact, the terms specifically provide that even "SanDisk becoming uncompetitive" would not allow RadioShack to terminate the exclusivity program, although it "could lead to [a] conversation" about termination of the agreement.

203.   A 2007 SanDisk power point notes that SanDisk is the "[e]xclusive provider to RadioShack even though "Kingston [is] constantly trying to win [the] account."

204.   RadioShack and SanDisk agreed to extend SanDisk's exclusivity on March 8, 2010, and May 27, 2010, (extending program through December 31, 2010), November 23, 2010, (extending program through December 31, 2011), November 23, 2011, (extending program through December 31, 2012), and April 23, 2013 (extending program through December 31, 2013).

205.   Under the 2013 calendar year program, RadioShack agreed to SanDisk exclusivity in both SD cards and USB drives.  In exchange, SanDisk agreed to pay RadioShack ████████ in MDF in addition to a ██ co-op accrual on net sales.

206.   Under the 2013 agreement, if RadioShack terminated the agreement or ceased exclusivity, it would not be able to make any further claims for MDF from SanDisk.  In other words, SanDisk's ████████ payment to RadioShack for MDF is contingent upon RadioShack carrying SanDisk exclusively.

207.   When PNY approached RadioShack with a proposal for PNY's SD cards, RadioShack responded that it could not even entertain an offer from PNY as a result of its exclusive arrangement with SanDisk.

208.   On information and belief, for the duration of each exclusive dealing agreement

between SanDisk and RadioShack, RadioShack never terminated any of the agreements.

### Costco

209.   Costco operates membership warehouses throughout the United States.   As of September 1, 2013, Costco had 451 stores in the United States and Puerto Rico.

210.   A 2007 SanDisk power point notes that SanDisk is Costco's "[e]xclusive provider."

211.   A 2010 SanDisk email discussing Kingston's efforts to win Costco's business states, "This boils down to trying to keep a competitor off the shelf . . . ."

212.   Likewise, SanDisk emails in 2011 and 2012 reveal its efforts to maintain its exclusive dealing arrangement with Costco, including the involvement of Mr. Mehrotra to aid in SanDisk's strategy of "[r]ather than competing solely on price [at Costco], we need to understand what will keep Kingston out."   In the same email thread, SanDisk personnel discussed plans of reneging on "the 'gentlemen's agreement' that existed between Costco and SanDisk not to sell Sam's [Club] if Costco maintained an exclusive posture with SanDisk."

213.   An internal SanDisk email dated September 10, 2012 confirms SanDisk's exclusivity at Costco:   "We are exclusive at Costco for USB, Imaging and Mobile cards, so the 100% figure below is correct."

214.   Although SanDisk competitors have attempted to sell to Costco, SanDisk has responded by temporarily lowering its cost to induce Costco not to go forward with testing of competitors' products.   Aside from a single Kingston test, which never proceeded past the testing stage, SanDisk successfully prevented competitors from testing their products at Costco through 2013.   During that time, SanDisk remained Costco's exclusive provider of SD cards and USB drives.   Costco is currently testing Lexar product.

215.   Outside of the Kingston and Lexar tests, SanDisk has been Costco's exclusive provider of SD cards and USB drives since 2006, and, on information and belief, SanDisk has been Costco's exclusive flash media vendor for over a decade.

### Sam's Club

216.   Sam's Club, which is owned by Walmart, is a membership club warehouse with 632 clubs throughout the United States and Puerto Rico.   In fiscal 2014, Sam's Club had net sales of

$57.2 billion and an operating income of $2.0 billion.

217.    On information and belief, SanDisk became the sole supplier of SD cards to Sam's Club in 2011.  On information and belief, SanDisk and Sam's Club have agreed to continue their exclusive arrangement through 2014.

218.    SanDisk has not produced any written agreement with Sam's Club.

*BJ's*

219.    BJ's is a leading operator of membership warehouse clubs in the Eastern United States, operating 201 stores in 15 states.

220.    Under SanDisk's program with BJ's, BJ's has agreed to carry SanDisk USB drives and SD cards exclusively for a two-year period, March 31, 2013 to March 31, 2015.

221.    In exchange for exclusivity, SanDisk agreed to pay BJ's ████████ in "markdown funds."

222.    BJ's cannot terminate the contract or carry any competing products unless it pays ████████ to SanDisk.

223.    On information and belief, neither party has terminated the exclusive arrangement.

*CVS*

224.    CVS is the largest integrated pharmacy health care provider in the United States. CVS operates more than 7,600 retail stores in the United States.

225.    CVS has agreed to purchase USB drives, SD cards, and MicroSD cards exclusively from SanDisk.  CVS is obligated to purchase exclusively from SanDisk for a three-year period, from November 2, 2011 to November 2, 2014.

226.    There is no question that both CVS and SanDisk view this agreement as an exclusive dealing arrangement.  In a May 13, 2011 email to CVS, SanDisk stated that it was "pleased to present CVS a revised proposal ***for an exclusive 3-year program*** that solves the business requirements for selecting a sole supplier for SanDisk-branded and private label Flash Cards and USB Drives" (emphasis added).   In an internal email, SanDisk characterizes the program as follows:

-       Sandisk will be the sole provider of flash cards and USB drives to ████

LA:355215.1

1       -      Term of exclusive agreement: ███████████████

2        227.   In exchange for exclusivity, SanDisk agreed to pay CVS ███████████ in

3 "liquidation compensation."

4        228.   If CVS were to terminate the exclusivity period for any reason other than deficient

5 supply on SanDisk's part, it would be required to pay back a pro-rated amount of the liquidation

6 compensation. In other words, the ██████████ that SanDisk paid to CVS is contingent on

7 SanDisk's exclusivity for a three-year period.

8        229.   A September 2012 internal SanDisk email states that SanDisk is "100% for Imaging

9 and Mobile" (i.e. SD and MicroSD cards) at CVS. The email further notes that SanDisk "would be

10 100% [for USB drives] without a 3rd party Novelty USB offering."

11        230.   When PNY approached CVS with a proposal for PNY's SD cards, CVS responded

12 that it could not even entertain an offer from PNY as a result of its exclusive arrangement with

13 SanDisk.

14        231.   On information and belief, neither party has terminated the agreement and SanDisk

15 continues to be CVS's sole supplier of SD cards and USB drives.

16                                 ***Walgreens***

17        232.   Walgreens operates the largest drugstore chain in the United States with net sales of

18 $72.2 billion in the fiscal year ended August 31, 2013. As of its 2013 fiscal year end, Walgreens

19 operated 8,582 locations in 50 states, the District of Columbia, Guam, and Puerto Rico.

20        233.   As early as 2009, an internal SanDisk email reflects that SanDisk believed it had

21 secured a 100% "volume share assumption" at Walgreens with respect to SD and MicroSD. In

22 other words, SanDisk projected that it would be the sole vendor of SD Cards and MicroSD cards at

23 Walgreens.

24        234.   SanDisk negotiated with Walgreens for an exclusive relationship beginning in at

25 least April 2011. In an internal email dated April 29, 2011, SanDisk noted that "best case scenario

26 we will be exclusive for the whole line and PNY will be out."

27        235.   SanDisk entered into an exclusive arrangement for SD cards with Walgreens in

28 January 2012. The agreement had a one year term, ending December 31, 2012. A September 2012

internal SanDisk email states that SanDisk's share of "Imaging and Mobile" (i.e., SD and MicroSD cards) at Walgreens was 100%.

236.    In exchange for exclusivity, SanDisk agreed (among other things) to pay Walgreens ▇▇▇▇▇▇▇. This payment was expressly conditioned on SanDisk remaining Walgreens' exclusive supplier for SD cards.

237.    According to an internal SanDisk email, "winning this deal was very important."

238.    The exclusive dealing arrangement between SanDisk and Walgreens continued through 2013.  According to an email between SanDisk and Walgreens, SanDisk remained "[t]he exclusive supplier for branded memory cards, private label memory cards and private label USB drives."

239.    In exchange for exclusivity in ▇▇▇ SanDisk agreed to pay Walgreens ▇▇▇▇▇▇ to fund "metal fixtures."

240.    When PNY approached Walgreens with a proposal for PNY's SD cards, Walgreens responded that it could not even entertain an offer from PNY as a result of its exclusive arrangement with SanDisk.

241.    On information and belief, SanDisk continues to be Walgreens' sole supplier of SD cards.

### *Staples*

242.    Staples is an office products superstore that serves the needs of business customers and consumers.  Staples operated over 1,500 stores in the United States at the end of its fiscal year 2013.

243.    In internal emails, SanDisk has expressed its goal of stifling competition through its exclusive arrangements.  For example, in a March 2010 email, SanDisk personnel and an outside marketing firm discussed how at Staples stores its "category exclusive programs can help block out [Lexar's] voice," and in other emails discussed tactics to block PNY from Staples shelves and the consequences in terms of pricing if the retailer backed out.  SanDisk even acknowledged that PNY's presence in the retailer's assortment would keep SanDisk "honest" in its SD card pricing, while simultaneously working to get PNY off the shelves.  On information and belief, SanDisk's

efforts at Staples have resulted in all competition in the relevant markets being foreclosed at Staples stores in return for a substantial ███████ payment from SanDisk to the retailer.

244.    In 2011, according to an internal SanDisk email, SanDisk considered offering Staples $1,000,000.00 in exchange for Staples pulling PNY out of ads going forward.  According to the same email, Staples recognized that SanDisk was "essentially asking [Staples] to kick PNY out."  The email suggested that SanDisk was considering a payment of $5,000,000.00 to Staples in exchange for kicking out PNY.  The same email reflects Staples' belief that "losing the Staples business would put PNY out of business . . . ."

245.    In January 2012, Staples told SanDisk that "[t]he appeal of exclusivity is the ████ in margin $ upside."  Staples sought a "margin $ 'guarantee'" from SanDisk.

246.    SanDisk was able to convince Staples to enter into an exclusive dealing arrangement for SD cards in 2014.  The term of the agreement is January 1, 2014 to December 31, 2014.

247.    In exchange for exclusivity, SanDisk agreed to pay Staples a ████████████ "planogram fee."  SanDisk also provided ████████ for a "Funded Staples associate" and ████████ "for mutually agreed upon marketing activities."

248.    Although an exclusivity term, or termination provisions, are not described in the documentation, with quarterly funding accruing and a funded associate, Staples is economically motivated to maintain the exclusive arrangement.

LA:355215.1

## TABLE 10: STAPLES STORE MAY 2, 2014



### *Walmart*

249.    Walmart operates retail and other stores in various formats around the world.   In fiscal 2014, Walmart U.S. attracted nearly 140 million weekly shoppers and delivered net sales of more than $279 billion.  Walmart operates more than 4,000 superstores, discount stores, and other small format stores throughout the United States.

250.    An internal SanDisk email from September 2011 notes that Walmart "is pleased with the state of the SanDisk Mobile business overall for 2011 and [SanDisk's] ***category exclusivity*** will continue" (emphasis added).

251.    SanDisk recently enticed Walmart to adopt an exclusive program in 500 stores where SanDisk will be the only and exclusive provider of SD cards for those stores.  In the event SanDisk is successful in extending this exclusive arrangement with Walmart, SanDisk will control outlets constituting over 75% of the retail distribution channels for SD cards.

LA:355215.1

252.    The result of SanDisk's accumulation of exclusive dealing arrangements in the market for SD cards is that SanDisk's competitors are denied meaningful market access and deprived of the opportunity to achieve economies of scale, while consumers face higher prices for SD cards than they would if multiple brands were competing for sales at the same retail outlets. There are no procompetitive benefits to the exclusive dealing arrangements SanDisk has entered into.

## Harm to Competition and Consumers

253.    SanDisk's conduct harms not only PNY but harms the competitive process in at least two major respects.  First, SanDisk's conduct threatens to eliminate, and has already substantially eliminated, aggregators as a factor in the market, and threatens to eliminate all competition from the SD flash memory system product market in particular.  Second, SanDisk's conduct threatens competition in the flash memory chip market by foreclosing SanDisk's one significant, unlicensed competitor—Micron—from access to customers.  This injury to the competitive process will tend to result, and has already resulted in, higher prices to consumers.

### *Elimination of Aggregators*

254.    Aggregators play a significant role in the USB flash memory systems and products markets.  Because aggregators are able to purchase excess supplies of flash memory chips at reduced prices they are often more efficient than vertically integrated firms.  As alleged above, Aggregators function as mavericks in the marketplace, pursuing aggressive and independent pricing strategies.  Moreover, aggregators are significant customers for companies that manufacture flash memory chips.  PNY and other aggregators have recognized brand names and robust distribution systems, built up over many years.  The elimination of aggregators makes entry more difficult in the markets for flash memory chips, systems and products because a firm may need to enter all of these markets simultaneously.  In addition, the elimination of aggregators tends to raise prices to ultimate consumers because it removes a more efficient class of competitors.

255.    SanDisk regards aggregators as a threat and wishes to eliminate them or to convert them to mere purchasers of finished product from SanDisk and/or its licensees—*i.e.,* to remove them from the USB flash memory systems market and confine them to the USB flash memory

systems product market in which they would participate only as relabelers of products manufactured by other entities who pay SanDisk a royalty.

256.    In the Wisconsin Action and the ITC Investigation, SanDisk targeted approximately twenty-five companies that participated in the flash memory systems or products markets, including all significant aggregators.

257.    Between January 2008, and April 2008, in addition to PNY, Trek 2000 International, Ltd., Verbatim Corp., Verbatim Americas, Add-On Computer Peripherals, Inc. and Add-On Computer Peripherals, LLC (collectively, Add-On USA), Edge Tech Corporation, Infotech Logistic, Interactive Media Corp. (Kanguru), Kaser Corporation, TSR Silicon Resources Inc. and Welldone Company also signed coercive license agreements with SanDisk that are similar in all material respects to the PNY License and that render it essentially uneconomic to act as an aggregator.

258.    Other firms simply exited the market rather than fight SanDisk, including A-DATA Technology Co., Ltd., A-DATA Technology (USA) Co., Ltd. Melco Holdings Inc., Buffalo Inc., Buffalo Technology (USA), Inc. and Corsair Memory, Inc.

259.    In addition, while Kingston successfully fought off SanDisk's patent infringement lawsuit, during the pendency of the lawsuit and continuing as of today, Kingston has switched from acting as an aggregator to acting as a relabeler in order to reduce the potential damages it might be exposed to and/or to prevent SanDisk from filing another infringement suit to enforce additional system-level patents it claims to have.

260.    Such attacks on aggregators have fundamentally reshaped the market (or threaten to do so), to the detriment of consumers.

261.    SanDisk's specific consolidation of market power in the SD flash memory system product market—achieved, *inter alia*, through its aggressive exclusive dealing program, has decreased competition in the SD card market and threatens to further reduce competition to the detriment of consumers who pay higher prices for SD cards.

### Foreclosure of Competition In The Flash Memory Chip Market

262.    In addition to the direct effect on aggregators, SanDisk's conduct harms competition

in the flash memory chip market. As the court in the Kingston case found after trial, the flash memory chip market is highly concentrated, with six chip manufacturers—SanDisk, Intel, Toshiba, Samsung, Micron, and Hynix—earning 99% of worldwide revenue from the sale of flash memory chips in 2010. Only one flash memory chip manufacturer, Micron, has not accepted a license with SanDisk. Micron accounts for approximately 10% of flash memory chip manufacturing; SanDisk and its licensees for 89%.

263. Notwithstanding its patent portfolio, SanDisk has failed to enjoin Micron's manufacture of flash memory chips or to force it to take a license.

264. Unable to force Micron out of the market directly, SanDisk has instead adopted a strategy to indirectly force Micron out of the market by increasing its costs and choking-off Micron's access to major chip customers.

265. The effect of the uniform license imposed by SanDisk on all or nearly all aggregators in the market is that the aggregators must pay an 8% penalty if they buy MLC flash memory chips not licensed by SanDisk—which in effect means not buying from Micron.

266. The 8% penalty imposed on aggregators for purchases of unlicensed flash memory chips is much more than the royalty amounts that SanDisk collects from the flash memory chip manufacturers with whom it has a license. In other words, even if a licensed flash memory chip manufacturer passes on its entire SanDisk royalty fee to its customers, it will still have a significant price advantage over an unlicensed chip manufacturer, who will tend to have to discount to allow its customers to absorb the penalty imposed under the SanDisk system license. The tax acts as a penalty that tends to make it impossible for Micron to successfully compete for business.

267. On information and belief, SanDisk has from time to time told aggregators that if they purchase flash memory chips from SanDisk, they not only will avoid the ██ penalty for purchasing such chips from Micron, but SanDisk will also waive the ██ royalty assessed for interconnecting the flash memory chips with a controller. In this instance, the effective tax imposed on purchases from Micron is approximately ██

268. Aggregators making USB flash memory systems and products are significant consumers in the market for flash memory chips, and a reduction in chip sales to such aggregators

1    causes material harm to Micron.  If Micron were driven from the market, it would have a major,

2    adverse effect on consumers.

3         269.    The effects of SanDisk's anticompetitive foreclosure have already been seen in the

4    marketplace for flash memory chips.  As with all semiconductor based products, flash memory

5    chips have been characterized by steadily declining prices.  This well-known tendency is a result of

6    the observation credited to Intel founder Gordon Moore that the number of transistors

7    manufacturers could place on a semiconductor would double approximately every two years and the

8    performance of semiconductors would double approximately every 18 months.

9         270.    However, flash memory chips prices have not declined as quickly as Moore's law

10   would predict.  For instance, prior to SanDisk initiating the exclusionary activity described in this

11   complaint, the average price PNY paid for flash memory chips (MLC, SLC and TLC types)

12   declined over the period from the first quarter of 2006 through the fourth quarter of 2007 at a

13   compound rate of 17% per quarter.  But from the first quarter of 2008 through the first quarter of

14   2012 (*i.e.*, during the License period), the price paid by PNY declined at a compound rate of only

15   12% per quarter.  Indeed, over the 16 quarters in this period, the average price paid by PNY

16   increased in six quarters (relative to the previous quarter).

17        271.    This same effect—a dramatic change in the rate of price decline—is seen in both

18   MLC and SLC flash memory chips, the two types of flash memory chips in which SanDisk has

19   sought to foreclose competition from Micron.  As seen in the chart below, the logarithmic

20   regression lines for the prices paid by PNY for SLC flash memory chips before and after the

21   initiation of SanDisk's exclusionary conduct are dramatically different.  The pre-2008 regression

22   line shows prices declining at a rate of 18.3% per quarter.  The post-2008 regression line shows

23   prices declining at a rate of only 5.3% per quarter.

24

25

26

27

28

LA:355215.1

1

**TABLE 11:  PRICE PAID FOR SLC CHIPS**



Average Price of SLC Flash
*Excluding PNY transfers*

Source: PNY Purchase Data.

272.    The logarithmic regression lines for the prices paid by PNY for MLC flash memory chips before and after the initiation of SanDisk's exclusionary conduct are also dramatically different.  The pre-2008 regression line shows prices declining at a rate of 19.6% per quarter.  The post-2008 regression line shows prices declining at a rate of only 10.5% per quarter.

**TABLE 12:  PRICE PAID FOR MLC CHIPS**



Average Price of MLC Flash
*Excluding PNY transfers*

*Source*: PNY Purchase Data.

*Higher Prices Paid By Consumers As A Result Of SanDisk's Conduct*

273.    Similarly, the prices for USB flash memory system products have not declined as fast as predicted by Moore's law since the initiation of the exclusionary activity described in this complaint, nor declined as fast after the initiation of such acts as they did in prior periods.  For example, the chart below shows an industry average retail price for USB flash memory system products declining at a rate of 26.8% in the period from the first quarter of 2006 through the fourth quarter of 2007.  But from the first quarter of 2008 through the first quarter of 2012, the industry average retail price declined at a rate of only 9.4%.

LA:355215.1

**TABLE 13:  RETAIL PRICE FOR USB FLASH MEMORY SYSTEM PRODUCTS**

**Industry Average Price of Flash USB**



Source: NPD Flash USB Data.

274.    The primary reason for the change in pricing before and after the first quarter of 2008 is SanDisk's anticompetitive conduct, as described above.

275.    On information and belief, SanDisk itself has made the observation that forcing aggregators to abide by its licensing and royalties scheme drives up prices of USB flash memory system products.   Specifically, on information and belief, SanDisk has asserted that it suffered millions of dollars in losses due to its inability to raise prices because a particular aggregator, Kingston, had resisted adopting the standard license.

276.    On information and belief, SanDisk's consolidation of power in the SD flash memory system product market has likewise caused prices for such products to decrease at a slower pace than they should be decreasing.

277.    SanDisk's exclusive dealing arrangements in the SD flash memory system product market have had a significant anti-competitive effect on pricing for SD cards.

LA:355215.1

278.   At ▮▮▮▮▮, where SanDisk obtained an exclusive arrangement in ▮▮▮▮▮, the prices of SD cards have remained artificially high.   The key component in SD cards is flash memory, and the price of SD cards typically moves with the price of flash memory.   However, this pattern has been broken at ▮▮▮▮ since ▮▮▮▮.   During that time, the price of flash memory has decreased by 45-52%.   However, SanDisk has managed to keep its price on SD cards at ▮▮ ▮▮ nearly level and has not reduced them at all in 2014.   (The prices shown below are for 16 and 32 gigabyte SD cards and 64 and 128 gigabit flash memory chips.   One gigabyte is the same as 8 gigabits.   An SD card can contain more than one flash memory chip: a 32 gigabyte SD card requires 256 gigabits—consisting of four 64 gigabit chips or two 128 gigabit chips.)

279.   Thus, while the component costs of creating an SD card have dropped by 45–52%, SanDisk has artificially maintained retail prices by foreclosing competition through exclusive dealing.

280.   The result is massive; hundreds of millions of dollars in damages not only to PNY, but also to U.S. consumers.

**TABLE 14:  SANDISK 16GB SDHC PRICING AT ▮▮▮▮▮▮ VS. MARKET**



(Source:  Cl. 10 Ad)

LA:355215.1



(Source:  Class 10 Advertised Pricing)

281.    A similar trend is apparent in ███ stores, where SanDisk dropped its price for a short time when it had PNY competition, then raised prices upon reaching an exclusive deal, notwithstanding incredible drops in cost.



(Source:NPD)

LA:355215.1

1

**TABLE 17:  SANDISK 32GB SDHC PRICING AT ███████ VS. MARKET**



(Source:  Class 10 Advertised Pricing)

282.   The effect of exclusive dealing arrangements with SD cards is also shown by the contrast between the pricing of SD cards, where SanDisk now threatens to controls more than 75% of the market with exclusive dealing arrangements, and USB flash drives, where SanDisk has a significantly smaller portion of the market locked up with exclusive dealing arrangements.  The components of a USB flash drive and SD card are very similar, such that the cost of USB flash drives and SD cards of the same capacity are quite close (if anything, USB flash drives cost slightly more, because they require an additional outer housing).  Since July 2013, however, ██████ has charged more than 50% more for 16 GB SD cards—where SanDisk has en exclusive—than it has for 16 GB USB flash drives—where PNY continues to compete on the shelf with SanDisk.

LA:355215.1

**TABLE 18:  SANDISK 16GB SDHC PRICING AT ████████ VS. 16GB USB PRICING**



(Source: Weekly Ad Pricing)

### Antitrust Injury

283.    As a result of SanDisk's conduct, PNY has suffered antitrust injury, *i.e.,* injury of the type the antitrust laws are intended to prevent and that flows from that which makes SanDisk's acts unlawful.

284.    In particular, PNY has paid higher prices for flash memory chips, has been required to make payments under the License, has been forced to reduce its margin on USB flash memory system products, has been pushed out of a high proportion of retail outlets for SD cards, and has lost sales of both SD and USB flash memory system products, all as a result of SanDisk's conduct.  In each instance, PNY's injury stems not from any sort of heightened or increased competition, but rather from the lessening of competition caused by SanDisk.

285.    As a result of SanDisk's exclusionary conduct, and repeated misstatements and mischaracterizations to PNY, and more importantly, to this Court, PNY has been damaged, as have consumers and competition as a whole.

### The SanDisk Royalties Lawsuit

286.    On July 26, 2011, SanDisk filed a lawsuit in the Superior Court of the State of California for the County of Santa Clara, entitled *SanDisk Corporation v. PNY Technologies, Inc.*

LA:355215.1

*f/k/a P.N.Y. Electronics, Inc.*, Case No. 1-11-CV-205928 (the "SanDisk Lawsuit"), alleging that PNY breached the License by not paying royalties.

287.   SanDisk filed the SanDisk Lawsuit without first following the alternative dispute resolution provision set forth in the License.

288.   Following the License's alternative dispute resolution provision was a condition precedent to SanDisk's filing of its Lawsuit.

289.   The court in which SanDisk filed the SanDisk Lawsuit does not have subject matter jurisdiction over the case under 28 U.S.C. § 1338(a), which was amended with the enactment of the Leahy-Smith America Invents Act on September 16, 2011, to state, "No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents . . . ." PNY brings this more complete action to address all of the disputes between the parties relating to the License.

290.   SanDisk's actions in filing the SanDisk Lawsuit in violation of the terms of its own License further illustrates how unfairly SanDisk treats its competitors in this field.

## COUNT I

### (Sherman Act § 1: Tying)

291.   PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 270 as if fully set forth herein.

292.   SanDisk's unlawful acts create an unreasonable restraint of trade and commerce and threaten to extend SanDisk's monopoly in the flash memory technology market into the separate market for flash memory chips, without legitimate business or technological justification, in a manner which has caused harm to competition, and in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.

293.   SanDisk has substantial power in the market for flash memory technology—both the technology directed toward flash memory chips and the technology directed toward USB flash memory systems.  SanDisk claims that its patents are practiced in all flash memory chips and all USB flash memory systems, and, on information and belief, it controls or licenses close to 90% of the flash memory chip market and licenses nearly all of the aggregators operating in the United

LA:355215.1

1    States USB flash memory systems market.

2         294.   SanDisk ties its licensing of flash memory technology to sales of a separate product,

3    namely flash memory chips.  Specifically, through the royalty structure that SanDisk imposes on

4    PNY and other participants in the USB flash memory systems market, SanDisk severely penalizes

5    the use of flash memory chips that are not made or licensed by SanDisk (*i.e.*, in which SanDisk has

6    an economic interest), such that use of other flash memory chips (*i.e.*, Micron chips) is not

7    commercially viable.

8         295.   As alleged in greater detail above, the terms of the anticompetitive uniform license

9    agreement that SanDisk has imposed on PNY, for example, provide for a 4% royalty based on the

10   price of a finished USB flash memory systems product if PNY uses a flash memory chip made or

11   licensed by SanDisk.  It provides for a punitive additional 4% or 8% uncapped royalty if an

12   unlicensed flash memory chip is used.

13        296.   On information and belief, the same or similar licensing terms apply to other

14   participants in the USB flash memory systems market.

15        297.   PNY did not voluntarily agree to the royalty structure contained in the license

16   agreement for its own convenience.  Rather, PNY was given no choice but to except this royalty

17   structure if it wanted to be a licensed aggregator and to avoid the threat of never-ending, financially-

18   ruinous patent infringement litigation.

19        298.   Given the slim margins at which participants in the USB flash memory systems

20   market operate, the punitive royalty structure in SanDisk's uniform license renders it commercially

21   unviable to purchase Micron flash memory chips and forces market participants to purchase flash

22   memory chips in which SanDisk has an economic interest.

23        299.   SanDisk's tying arrangement affects a substantial volume of interstate commerce.

24        300.   Under well-established law, a tying arrangement is per se unlawful if four elements

25   are shown.  Each is present here: (a) there are two separate products: flash memory technology

26   (tying product) and flash memory chips (tied product); (b) SanDisk has market power in the tying

27   product; (c) SanDisk forces purchasers (licensees) of the tying product to also take their

28   requirements of the tied product from SanDisk or from firms in which SanDisk has an economic

LA:355215.1

interest; and (d) there is a not insubstantial effect in the market for the tied product. SanDisk's tying arrangement is accordingly *per se* unlawful.

301.    In addition, SanDisk's tying arrangement is unlawful under the rule of reason because it harms competition in the flash memory chips market in a variety of ways, including:

>    a.   decreasing competitors' ability to compete in the market for flash memory chips;
>
>    b.   enabling SanDisk and its licensees to extract higher, supra-competitive prices for their flash memory chips (which, in turn, raise the prices of USB flash memory systems and products); and
>
>    c.   facilitating SanDisk's acquisition of market power in the flash memory chip market.

302.    The anticompetitive effects of SanDisk's conduct outweigh any procompetitive benefits; indeed, there are no procompetitive benefits deriving from SanDisk's conduct at issue in this complaint.

303.    As a direct purchaser of flash memory technology and flash memory chips, and as a competitor in the USB flash memory systems and products markets, PNY has suffered, and will continue to suffer, damages as a direct and proximate result of SanDisk's tying practices.

304.    PNY has been, and continues to be, irreparably harmed by SanDisk's tying practices, for which there is no adequate remedy at law, and PNY is therefore entitled to an injunction preventing further harm to PNY as a result of this conduct.

305.    PNY is also entitled to treble damages.

## <u>COUNT II</u>

### (Sherman Act § 1: Agreement in Restraint of Trade)

306.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 291 as if fully set forth herein.

307.    The unlawful license agreement that SanDisk imposed on PNY and the comparable unlawful license agreements that SanDisk imposes on other aggregators effects an unreasonable restraint of trade and commerce in a manner prohibited by Section 1 of the Sherman Act. These agreements to restrain trade are ongoing and continuing.

- 70 -

308.   The unlawful license agreement that SanDisk imposed on PNY and the comparable unlawful license agreements that SanDisk imposes on other aggregators affects interstate commerce inasmuch as it affects competition and pricing in the markets for flash memory chips, systems and products, all move in interstate commerce.

309.   More specifically, in addition to the tying provision described above, the license agreement that SanDisk imposed on PNY and the comparable unlawful license agreements that SanDisk imposes on other aggregators contain the following anti-competitive terms or requirements:

a.   A requirement that PNY and other companies pay multiple royalties on the same patented technology after patent coverage has been exhausted.  Specifically, by licensing the same patents to both chip manufacturers and to aggregators like PNY, SanDisk receives double royalties on the sale of the same component parts from the license of the same patent—one royalty from its licensed manufacturers on their sales of flash memory chips, and a second royalty from aggregators like PNY for their sale of flash memory chips in the form of USB flash memory system products.

b.   A requirement that royalties be paid on worldwide sales, as opposed to only on products manufactured and sold in countries where SanDisk has patent rights.

c.   A requirement that royalties be paid on all of an aggregator's net sales, whether or not any of the licensed patents are practiced.

d.   A requirement that royalties be paid on patents that have expired, patents that are invalid, or patents that are not infringed.

e.   A requirement that licensees cross-license to SanDisk their future innovations on a royalty-free basis, such that even if a licensee develops or obtains access to an alternative technology that it could use to practice fewer or none of SanDisk's patents, the licensee would still be required to pay a royalty to SanDisk on any sales of the new product and SanDisk would have the right to use the new technology on a worldwide, royalty-free basis.

- 71 -

LA:355215.1

310.    The unlawful license agreements have caused and continue to cause anticompetitive effects in the flash memory technology market, chip market, systems market, and products market.

311.    The anticompetitive effects caused by the unlawful license agreements are not offset by any countervailing benefits.

312.    As a result of the unlawful license agreements, and SanDisk's acts in furtherance thereof, PNY has suffered and will continue to suffer irreparable injury to its business and property, for which there is no adequate remedy at law, and PNY is therefore entitled to an injunction preventing further harm to PNY.

313.    PNY is also entitled to treble damages.

## COUNT III

### (Sherman Act § 2: Monopolization and Attempted Monopolization — Flash Memory Technology Market)

314.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 299 as if fully set forth herein.

315.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade or commerce among the States, as well as attempts to monopolize any part of the trade or commerce among the States.

316.    SanDisk has substantial power in the relevant market for flash memory technology—both the technology directed toward flash memory chips and the technology directed toward flash memory systems—and its power is persistent and stable.

317.    SanDisk has imposed anticompetitive and uniform licenses—and charged customers supracompetitive royalty rates—under threat of patent infringement litigation, to acquire, enhance, and/or maintain its monopoly power in the relevant market for flash memory technology in violation of Section 2 of the Sherman Act.

318.    If for any reason SanDisk is not deemed to have monopoly power in the market for flash memory technology there exists a dangerous probability of SanDisk gaining such power.

319.    With the specific intent to acquire or the intent to maintain monopoly power in and over the flash memory technology market, SanDisk has committed exclusionary, predatory, or

anticompetitive acts including:

    a. Tying the licensing of its flash memory technology to the sale of flash memory chips in which it has an economic interest.  Specifically, through the royalty structure that SanDisk imposes on PNY and other companies, as a condition of licensing its flash memory technology, SanDisk penalizes the use of flash memory chips that are not made or licensed by SanDisk (*i.e.*, in which SanDisk has an economic interest), such that purchase and use of other flash memory chips (*i.e.*, Micron chips) is not commercially viable.

    b. Requiring PNY and other companies to pay multiple royalties on the same patented technology after patent coverage has been exhausted.  Specifically, by licensing the same patents to both chip manufacturers and to aggregators like PNY, SanDisk receives double royalties on the sale of the same component parts from the license of the same patent—one royalty from its licensed manufacturers on their sales of flash memory chips, and a second royalty from aggregators like PNY for their sale of flash memory chips in the form of USB flash memory system products.

    c. Licensing only a broad and unspecified patent portfolio (instead of specific individual patents).

    d. Requiring royalties to be paid on worldwide sales, as opposed to only on products manufactured and sold in countries where SanDisk has patent rights; requiring royalties to be paid on all of an aggregator's net sales, whether or not any of the licensed patents are practiced; requiring royalties to be paid on patents that have expired, patents that are invalid, or patents that are not infringed.

    e. Requiring licensees to cross-license to SanDisk their future innovations, such that even if a licensee develops or obtains access to an alternative technology that it could use to practice fewer or none of SanDisk's patents, the licensee would still be required to pay a royalty to SanDisk on any sales of the new product and SanDisk would have the right to use the new technology on a worldwide,

LA:355215.1

royalty-free basis. As a result, any competing flash memory technologies are nipped in the bud and SanDisk's power in flash memory technology is reinforced.

    f. Threatening retailers that they will not be able to use USB flash memory system products procured from SanDisk competitors who have not licensed SanDisk's flash memory technology, and that they will face disadvantageous prices and terms if they later seek flash memory system products from SanDisk.

320. SanDisk's anticompetitive licensing scheme and other anticompetitive conduct has given it the power to control prices and exclude competition in the relevant market.

321. Upon information and belief, there are high barriers to entry in the relevant market for flash memory technology that would prevent new competition from entering the market for at least two or more years at a level sufficient to deter or counteract SanDisk's exercise of its monopoly power in the flash memory technology market.

322. SanDisk's willful and wrongful acquisition, maintenance, and/or extension of its monopoly power (or its attempt to monopolize) is not the result of growth and development as a consequence of business acumen, or historical accident, or by virtue of offering a superior product or service, greater efficiency, or lower prices, but rather is the direct consequence of SanDisk's intentional exclusionary and predatory conduct in connection with its anticompetitive licensing scheme and as otherwise alleged herein.

323. There is no efficiency-enhancing procompetitive business justification for SanDisk's unfair, anticompetitive and predatory conduct.

324. SanDisk's anticompetitive licensing scheme and other anticompetitive conduct alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the relevant market through increased prices, decreased choice, reduced innovation, and other anticompetitive effects, including raising additional barriers to entry in the relevant market.

325. By reason of SanDisk's unlawful monopolization and/or attempted monopolization of the flash memory technology market, PNY—a customer in that market—has been injured in its business and property.

LA:355215.1

326.   Unless enjoined and declared illegal, SanDisk's unlawful conduct will continue, PNY will continue to sustain injury and damages, and competition will continue to decrease in the relevant market.

327.   The injuries to PNY, to other competitors and consumers, and to competition described herein are the types of injuries the antitrust laws were intended to prevent because they are a direct result of SanDisk's anticompetitive licensing scheme and other anticompetitive conduct alleged herein, which occurred in the United States, and has a substantial effect on competition in the relevant market.

328.   PNY is entitled to injunctive relief and to treble damages.

## COUNT IV

### (Sherman Act § 2: Attempted Monopolization — Flash Memory Chip Market)

329.   PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 314 as if fully set forth herein.

330.   Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, attempts to monopolize any part of the trade or commerce among the States.

331.   SanDisk has substantial power in the relevant market for flash memory chips, and if for any reason SanDisk is not deemed to have monopoly power in the market for flash memory chips there exists a dangerous probability of SanDisk gaining such power.

332.   With the specific intent to acquire monopoly power in and over the flash memory chip market, SanDisk has committed exclusionary, predatory, or anticompetitive acts including the deployment of its substantial market power in the flash memory technology market to control the downstream flash memory chip market.

333.   Specifically, SanDisk has used its power in the flash memory technology market to force aggregators (major consumers in the market for flash memory chips) to enter license agreements that impose punitive royalties on the use of flash memory chips that are not made or licensed by SanDisk (*i.e.*, in which SanDisk has an economic interest).  This scheme restricts competition in the flash memory chip market, erects substantial barriers to potential entrants to that market, and permits SanDisk and its licensees to charge supra-competitive prices for flash memory

LA:355215.1

chips.

334.   Upon information and belief, there are high barriers to entry in the relevant market for flash memory chips that would prevent new competition from entering the market for at least two or more years at a level sufficient to deter or counteract SanDisk's exercise of its monopoly power in the flash memory chip market.

335.   SanDisk's anticompetitive conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Instead, its purpose and effect is to establish its monopoly position, and to diminish competition in the relevant market.

336.   SanDisk's anticompetitive conduct alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the relevant market through increased prices, decreased choice, reduced innovation, and other anticompetitive effects, including raising additional barriers to entry in the relevant market.

337.   By reason of SanDisk's unlawful attempted monopolization of the flash memory chips market, PNY—a consumer in that market—has been injured in its business and property.

338.   Unless enjoined and declared illegal, SanDisk's unlawful conduct will continue, PNY will continue to sustain injury and damages, and competition will continue to decrease in the relevant market.

339.   The injuries to PNY, to other competitors and consumers, and to competition described herein are the types of injuries the antitrust laws were intended to prevent because they are a direct result of SanDisk's anticompetitive conduct alleged herein, which occurred in the United States, and has a substantial effect on competition in the relevant market.

340.   PNY is entitled to injunctive relief and to treble damages.

## COUNT V

### (Sherman Act § 2: Attempted Monopolization—SD Flash Memory System Product Market)

341.   PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 326 as if fully set forth herein.

342.   Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, attempts to monopolize any part of the trade or commerce among the States.

343.    SanDisk has substantial power in the relevant market for SD cards, and if for any reason SanDisk is not deemed to have monopoly power in the market for SD cards there exists a dangerous probability of SanDisk gaining such power.

344.    With the specific intent to acquire monopoly power in and over the SD flash memory system product market, SanDisk has committed exclusionary, predatory, or anticompetitive acts including the deployment of its substantial market power in the flash memory technology market to control the downstream SD card market.

345.    SanDisk has attempted to avoid price competition with PNY and other competitors in the SD card market by establishing exclusive dealing arrangements with key retail channels.  On information and belief, SanDisk has already established such arrangements with the retail stores comprising approximately 50% of all U.S. SD card sales, and—if unchecked—SanDisk will foreclose even more of the market to competition.

346.    On information and belief, SanDisk's exclusive dealing arrangements are having the effect of denying SanDisk's competitors meaningful market access and depriving them of the opportunity to achieve economies of scale, while consumers face higher prices for SD cards than they would if multiple brands were competing for sales at the same retail outlets.

347.    Upon information and belief, there are high barriers to entry in the relevant market for SD flash memory system products—including the SD licensing program, the relatively concentrated retail distribution market, and the exclusive dealing arrangements imposed by SanDisk—that would prevent new competition from entering the market for at least two or more years at a level sufficient to deter or counteract SanDisk's exercise of its monopoly power in the SD card market.

348.    SanDisk's anticompetitive conduct is not motivated by efficiency concerns and has no valid or legitimate business justification.  Instead, its purpose and effect is to establish its monopoly position, and to diminish competition in the relevant market.

349.    SanDisk's anticompetitive conduct alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the relevant market through increased prices, decreased choice, reduced innovation, and other anticompetitive effects, including raising additional

1   barriers to entry in the relevant market.

2        350.    By reason of SanDisk's unlawful attempted monopolization of the SD flash memory

3   system product market, PNY—a competitor in that market—has been injured in its business and

4   property.

5        351.    Unless enjoined and declared illegal, SanDisk's unlawful conduct will continue,

6   PNY will continue to sustain injury and damages, and competition will continue to decrease in the

7   relevant market.

8        352.    The injuries to PNY, to other competitors and consumers, and to competition

9   described herein are the types of injuries the antitrust laws were intended to prevent because they

10  are a direct result of SanDisk's anticompetitive conduct alleged herein, which occurred in the

11  United States, and has a substantial effect on competition in the relevant market.

12       353.    PNY is entitled to injunctive relief and to treble damages.

### COUNT VI

### (Sherman Act § 1 and Clayton Act §3: Exclusive Dealing)

15       354.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1

16  through 339 as if fully set forth herein.

17       355.    SanDisk has substantial power in the relevant market for SD cards, and has boasted

18  that approximately one out of every two memory cards sold in the United States is a SanDisk

19  memory card.

20       356.    SanDisk has pressured retail outlets for SD cards to enter into exclusive dealing

21  arrangements for SanDisk's SD cards. On information and belief, at least some of the exclusive

22  dealing arrangements are greater than a year in duration, and collectively they encompass the retail

23  channels accounting for approximately half of all U.S. SD card sales.

24       357.    The effect of SanDisk's exclusive dealing arrangements has been the foreclosure of

25  the SD card market for SanDisk's competitors, and—with reduced competition—the raising of

26  prices for consumers.

27       358.    The limited alternative channels of distribution that (for now) remain open to

28  SanDisk's competitors are not sufficient to provide those competitors with the opportunity to

1    achieve economies of scale.

2        359.    SanDisk's anticompetitive conduct is not motivated by efficiency concerns and has

3    no valid or legitimate business justification.  Instead, its purpose and effect is to establish its

4    monopoly position, and to diminish competition in the relevant market.

5        360.    SanDisk's anticompetitive conduct alleged herein has injured (and unless enjoined,

6    will continue to injure) consumers and competitors in the relevant market through increased prices,

7    decreased choice, and other anticompetitive effects, including raising additional barriers to entry in

8    the relevant market.

9        361.    By reason of SanDisk's unlawful exclusive dealing arrangements in the SD flash

10   memory system product market, PNY—a competitor in that market—has been injured in its

11   business and property.

12       362.    Unless enjoined and declared illegal, SanDisk's unlawful conduct will continue,

13   PNY will continue to sustain injury and damages, and competition will continue to decrease in the

14   relevant market.

15       363.    The above-described exclusive dealing arrangements imposed by SanDisk constitute

16   contracts in unreasonable restraint of trade in or affecting a substantial volume of interstate

17   commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton

18   Act.

19       364.    The injuries to PNY, to other competitors and consumers, and to competition

20   described herein are the types of injuries the antitrust laws were intended to prevent because they

21   are a direct result of SanDisk's anticompetitive conduct alleged herein, which occurred in the

22   United States, and has a substantial effect on competition in the relevant market.

23       365.    PNY is entitled to injunctive relief and to treble damages.

### COUNT VII

**(Declaratory Relief—Patent Misuse)**

26       366.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1

27   through 351 as if fully set forth herein.

28       367.    There is an actual controversy between PNY and SanDisk as to the enforceability of

the terms of the License described herein, of sufficient immediacy and reality to warrant declaratory relief. Pursuant to 28 U.S.C. Section 2201 and Federal Rule of Civil Procedure 57, PNY requests a declaration that the License is unenforceable due to SanDisk's patent misuse.

368. As alleged in more detail above, SanDisk has engaged in patent misuse by forcing PNY and others to enter into, and pay royalties under, the License described herein, which, among other things:

  a. Ties the licensing of SanDisk's flash memory technology to the sale of flash memory chips in which it has an economic interest. Specifically, through the royalty structure that SanDisk imposes on PNY and other companies, as a condition of licensing its flash memory technology, SanDisk penalizes the use of flash memory chips that are not made or licensed by SanDisk (*i.e.*, in which SanDisk has an economic interest), such that purchase and use of other flash memory chips (*i.e.*, Micron chips) is not commercially viable.

  b. Requires PNY and other companies to pay multiple royalties on the same patented technology after patent coverage has been exhausted. Specifically, by licensing the same patents to both chip manufacturers and to aggregators like PNY, SanDisk receives double royalties on the sale of the same component parts from the license of the same patent—one royalty from its licensed manufacturers on their sales of flash memory chips, and a second royalty from aggregators like PNY for their sale of flash memory chips in the form of USB flash memory system products.

  c. Licenses only a broad and unspecified patent portfolio, instead of specific individual patents.

  d. Requires royalties to be paid on worldwide sales, as opposed to only on products manufactured and sold in countries where SanDisk has patent rights; requires royalties to be paid on all of an aggregator's net sales, whether or not any of the licensed patents are practiced; requires royalties to be paid on patents that have expired, patents that are invalid, or patents that are not infringed.

  e. Requires licensees to cross-license to SanDisk their future innovations, such that

1    even if a licensee develops or obtains access to an alternative technology that it could

2    use to practice fewer or none of SanDisk's patents, the licensee would still be

3    required to pay a royalty to SanDisk on any sales of the new product and SanDisk

4    would have the right to use the new technology on a worldwide, royalty-free basis.

5    369.    PNY is entitled to a declaration that the License is unenforceable for patent misuse

6    and that PNY is not obligated to pay royalties under the License.

## COUNT VIII

### (Cartwright Act § 16720 *et seq.*:  Unlawful Tying Agreement)

370.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1

through 355 as if fully set forth herein

371.    SanDisk's unlawful acts described herein constitute an unreasonable restraint of

trade and commerce throughout California and the rest of the United States in violation of the

Cartwright Act, Sections 16720 et seq. of the California Business and Professions Code.

372.    SanDisk has substantial power in the market for flash memory technology—both the

technology directed toward flash memory chips and the technology directed toward USB flash

memory systems.

373.    SanDisk has tied its licensing of flash memory technology to sales of a separate

product, namely flash memory chips.  Specifically, through the royalty structure that SanDisk

imposes on PNY and other participants in the USB flash memory systems market, SanDisk has

penalized the use of flash memory chips that are not made or licensed by SanDisk (*i.e.*, in which

SanDisk has no economic interest), and has coerced a substantial number of consumers of flash

memory chips into purchasing SanDisk and SanDisk-licensed flash memory chips.

374.    On information and belief, the same or similar licensing terms apply to other

participants in the USB flash memory systems market.

375.    SanDisk's unlawful tying arrangement affects a substantial volume of commerce,

substantially lessens competition in the flash memory chips market, and allows SanDisk and its

licensees to charge supracompetitive prices for such chips.

376.    As a direct purchaser of flash memory technology and flash memory chips, and as a

LA:355215.1

competitor in the USB flash memory systems and products markets, PNY has suffered, and will continue to suffer, damages as a direct and proximate result of SanDisk's unlawful tying practices.

377.    PNY is entitled to injunctive relief and treble damages.

## COUNT IX

**(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 et seq.)**

378.    PNY repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 363 as if fully set forth herein.

379.    This Court has jurisdiction over this cause of action based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this cause of action arises from the same transactions and from a common nucleus of operative facts as alleged in the federal causes of action contained in this Complaint.

380.    PNY is a "person" within the meaning of California Business & Professions Code § 17201.

381.    As alleged herein, SanDisk's conduct constitutes "unfair" business practices.  A practice may be deemed unfair even if not specifically proscribed by some other law.  Conduct that significantly threatens or harms competition, or threatens an incipient violation of an antitrust law, may be deemed "unfair."

382.    As alleged herein, SanDisk's anticompetitive conduct is also "unlawful."  SanDisk's violations of the federal antitrust laws, or other laws as alleged herein, satisfy the "unlawful" prong of Section 17200.

383.    By reason of, and as a direct and proximate result of, SanDisk's unfair and unlawful practices and conduct, PNY has suffered and will continue to suffer financial injury to its business and property.

384.    SanDisk's unfair and unlawful conduct has caused harm to PNY, competition, and consumers.

385.    Pursuant to Section 17203, the entry of permanent and mandatory injunctive relief against SanDisk is necessary to enjoin SanDisk's ongoing wrongful business conduct.  An injunction is needed to enable and restore competition in the market for USB flash memory system

1  products.

2  <u>**PRAYER FOR RELIEF**</u>

3  WHEREFORE, PNY demands that judgment be entered in its favor and against SanDisk:

4  (a)  declaring that SanDisk has engaged in unlawful tying in violation of Section 1 of the

5  Sherman Act and Section 16720 *et seq.* of the Cartwright Act;

6  (b)  declaring that SanDisk has monopolized and/or has attempted to monopolize the

7  relevant markets in violation of Section 2 of the Sherman Act;

8  (c)  declaring that the royalty provisions and other anticompetitive terms of the license

9  entered into by SanDisk with PNY (and other competitors of SanDisk) violate Section 2 of the

10  Sherman Act and are unenforceable;

11  (d)  declaring that SanDisk's exclusive dealing arrangements violate Section 1 of the

12  Sherman Act, Section 3 of the Clayton Act, and Section 16720 *et seq.* of the Cartwright Act;

13  (e)  ordering restitution of all sums paid as royalties by PNY to SanDisk pursuant to

14  SanDisk's anticompetitive licensing scheme;

15  (f)  enjoining SanDisk from entering into licenses covering more than one jurisdiction or

16  covering jurisdictions in which SanDisk does not own patent rights;

17  (g)  enjoining SanDisk from requiring its competitors to pay more than one royalty on the

18  same patented technology under 15 U.S.C. § 26 pursuant to those licenses;

19  (h)  enjoining SanDisk from requiring its competitors to grant back to it royalty-free

20  worldwide licenses on all related future technological innovations made by them;

21  (i)  enjoining SanDisk from maintaining or entering into anticompetitive exclusive

22  dealing arrangements;

23  (j)  declaring that the conduct alleged in this Complaint is adjudged to be unfair and/or

24  unlawful in violation of Sections 17200 et seq. of the California Business & Professions Code;

25  (k)  permanently enjoining SanDisk's unfair and/or unlawful business practices pursuant

26  to Section 17203 of the California Business & Professions Code;

27  (l)  declaring the royalty provisions of the License to be invalid, void, or unenforceable

28  as to PNY; and

1        (m)      awarding PNY treble damages, reasonable attorneys' fees, costs, expenses, and such

2    further relief as the Court deems just and proper.

3

4    Dated:      May 5, 2014.                                    WINSTON & STRAWN LLP
                                                                 MICHAEL S. ELKIN
5                                                                THOMAS P. LANE
                                                                 ERIN R. RANAHAN
6                                                                DREW A. ROBERTSON

7                                                                ARNOLD & PORTER LLP
                                                                 DANIEL B. ASIMOW
8                                                                ROBERT D. HALLMAN

9

10                                                               By:/s/ *Drew A. Robertson*
                                                                     DREW A. ROBERTSON
11
                                                                 Attorneys for Plaintiff
12                                                               PNY TECHNOLOGIES, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA:355215.1

1

### DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff PNY Technologies, Inc. hereby

3    demands a trial by jury on all issues so triable.

4

5    Dated:      May 5, 2014.                          WINSTON & STRAWN LLP
                                                        MICHAEL S. ELKIN
6                                                       THOMAS P. LANE
                                                        ERIN R. RANAHAN
7                                                       DREW A. ROBERTSON

8                                                       ARNOLD & PORTER LLP
                                                        DANIEL B. ASIMOW
9                                                       ROBERT D. HALLMAN

10

11                                                      By:/s/ *Drew A. Robertson*
                                                            DREW A. ROBERTSON

12                                                          Attorneys for Plaintiff
                                                            PNY TECHNOLOGIES, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## LIMITED PATENT CROSS LICENSE AGREEMENT

LIMITED PATENT CROSS LICENSE AGREEMENT, dated as of January 2, 2008 (this "Agreement"), by and between SanDisk Corporation, a Delaware corporation (together with its Subsidiaries, "SanDisk"), and PNY Technologies, Inc., a Delaware corporation (together with its Subsidiaries, "Licensee").

### RECITALS

A.      SanDisk does, and Licensee may, own patents and patent applications pertinent to the design and manufacture of Non-Volatile Memory Products.

B.      SanDisk and Licensee are each engaged in their continuing programs of research and development of Non-Volatile Memory Product related technology, which will result in new discoveries and inventions, many of which will become the subject of new patent applications and patents.

C.      SanDisk and Licensee each want to respect the technology contributions of the other and want to increase their freedom to design and manufacture their own new products without infringing the rights of the other under patents or patent applications owned or controlled by the other.

D.      SanDisk and Licensee acknowledge and agree that SanDisk's license to Licensee is limited to Licensee Licensed Products that are Non-Volatile Memory Systems. Non-Volatile Memory Systems are combinations of Non-Volatile Memory Devices (which are not licensed in this Agreement except as used in Licensee Licensed Products as described in Section 1.12) and Non-Volatile Memory Controllers (which are licensed in this Agreement only as part of a Non-Volatile Memory System).

### AGREEMENT

In consideration of the foregoing and the promises of each party in this Agreement, the parties, intending to be legally bound, agree as follows:

### Article 1
### Definitions

The following terms have the meanings indicated:

1.1      "Card Adapter" means any device which permits a card to communicate with a Host Device through a card specification and/or format other than the specification and format specific to the card.

1.2      "Card Reader" means any device, including software, which permits a card to communicate with a Host Device through a communication interface protocol.

1.3      "Communication Interface Protocol" means any and all hardware, software and/or firmware in a Host Device and/or Card Reader that enables the Host Device or Card Reader to communicate with a Non-Volatile Memory System Product.

**1.4** "Computer System" means any general or special purpose electronic device having a processor and means for inputting data by a user and outputting data to a user, including personal computers, personal digital assistants, mobile phones, audio players, and video players, digital cameras, camcorders, GPS navigation systems, set-top boxes, time shifting consoles and video game consoles.

**1.5** "Customers" include all bona fide purchasing entities that purchase a product from a selling entity, and further include all of the purchasing entities' Customers who purchase the product.

**1.6** "Effective Date" means January 15, 2008.

**1.7** "Embedded Non-Volatile Memory Device," means a memory device which consists of one or more Non-Volatile Memory Integrated Circuits without dedicated housing/packaging and any supporting means therefor.

**1.8** "Embedded Non-Volatile Memory System" means one or more integrated circuits that together form a Non-Volatile Memory System residing on one or more semiconductor chips or circuit boards in a Computer System.

**1.9** "Have Made" means that Licensee may contract with one or more Third Party to make Licensee Licensed Products for supply to Licensee and for sale by Licensee pursuant to its ordinary course of business, but (a) Licensee is not licensed to sell or transfer (directly or indirectly) such have made Licensee Licensed Products to the Third Party that makes such Licensee Licensed Products for Licensee (or who are owned or controlled by such Third Party) unless such transaction is a bona fide arms-length transaction and (b) within twenty days from receipt of a written request from SanDisk, Licensee will confirm to SanDisk, in writing, whether any Third Party is making any Licensee Licensed Products for Licensee under its Have Made right.

**1.10** "Host Device" means any Computer System that is capable of receiving a Non-Volatile Memory System Product, including personal computers, personal digital assistants, mobile phones, audio players, television sets and video players.

**1.11** "Integrated Circuit" means a unitary electronic circuit, the active circuit elements of which are fabricated at least in part of semi-conductive material.

**1.12** "Licensee Licensed Products" are Licensee Non-Volatile Memory Systems using SLC Technology or MLC Technology, which systems are (a) manufactured with Non-Volatile Memory Devices provided by SanDisk or a SanDisk Licensed Non-Volatile Memory Device Manufacturer or otherwise accounted for under Sections 5.3 and 5.4, and (b) manufactured with, or configured to operate in coordination with, either (i) Non-Volatile Memory Controllers designed and/or manufactured by Licensee or (ii) Non-Volatile Memory Controllers supplied to Licensee by a Third Party. Examples include:

- CompactFlash cards;
- Card Readers;
- Card Adapters;
- PC (ATA) cards;

2

- IDE drives/cards or any other form of solid state drive designed to be a plug-compatible replacement for a rotating hard disk drive;

- USB based memory devices/cards; and

- Computer Systems comprising Embedded Non-Volatile Memory Systems, whether or not such Computer Systems are also Host Devices.

"Licensee Licensed Products" specifically exclude:

- xD picture cards and any and all versions and variants thereof;

- 3-Dimensional Memory and Associated Technology and Devices, Systems or Memory Cards of any type using 3-Dimensional Memory and Associated Technology

- MultiMediaCards and any and all versions and variants thereof, including RS MMC, MMC mobile, MMC micro, and secure MMC;

- Secure Digital ("SD") cards and any and all versions and variants thereof, including MicroSD and MiniSD;

- Subscriber interface modules with mass storage capabilities or otherwise analogous to SanDisk's megasim product family;

- Memory Stick and any and all versions and variants thereof, including Memory Stick Duo, Memory Stick Micro, Memory Stick PRO, and Memory Stick PRO Duo cards;

- Non-Volatile Memory Systems that include Non-Volatile Memory Devices which are not provided or manufactured by SanDisk, are not SanDisk Licensed Third Party Non-Volatile Memory Devices and for which Licensee has not paid a royalty, or otherwise accounted for, to SanDisk per Section 5.3 or 5.4;

- Non-Volatile Memory Controllers (except as used in Licensee Licensed Products as described above), designed or manufactured by Licensee or a Third Party for Licensee, including: (a) on a stand-alone basis, (b) as a chipset or (c) as an instantiation for integration by third parties into a Non-Volatile Memory Product;

- Non-Volatile Memory Devices (except as used in Licensee Licensed Products as described above);

- USB flash drives with codecs for video or otherwise analogous to SanDisk's USB TV product family; and

- Trusted Flash and all versions and variants thereof.

If there is a conflict between the inclusions and exclusions, the exclusions will control.

1.13   "Licensee Patent Claims" means all claims in all classes or types of patents, utility models and design patents (including originals or divisionals, continuations, continuations-in-part or reissues), in all countries or jurisdictions of the world now owned or controlled by Licensee or acquired by Licensee during the Term which (a) are issued before the expiration or termination of this Agreement, (b) except for consideration paid to employees, are not burdened by a requirement that Licensee pay consideration to another for the grant of a license under this Agreement (unless SanDisk offers to reimburse licensee for such consideration) and (c) cover the design, use or manufacture of Non-Volatile Memory Products.

3

**1.14**  "MLC Non-Volatile Memory Device" means a Non-Volatile Memory Device that contains MLC Technology.

**1.15**  "MLC Technology" means any technology that permits a Non-Volatile Memory Integrated Circuit in either wafer or chip form that is electrically programmable to store more than one bit of information on or in a single non-volatile memory cell.

**1.16**  "Net Sales" means, with respect to any Licensee Licensed Products which are first sold as individual items to a Customer, the invoice or sales price to the Customer multiplied by the number of units sold; except that, where such sales are to another Licensee Subsidiary, division or group, then Net Sales will mean the then current average selling price ("ASP") for such products to Third Party Customers (who are not Licensee subsidiaries, divisions, groups or affiliates of Licensee) in arms-length transactions, multiplied by the number of units sold. The invoice price will include the price of all components of said products, even if any components are not owned directly by Licensee (such as consigned goods). In no event will the price of those components not owned directly by Licensee (such as consigned goods) be less than the midpoint or higher of the spot price as of the date of procurement of those components as reported by a reputable tracking site such as DRAM Exchange (www.dramexchange.com) or as otherwise agreed upon in writing between the Parties. "Net Sales" shall not include, and Licensee may deduct, credits, rebates, advertising allowances, returns, price protection, and point of sale rebates (a) actually given to the customer that (b) are properly creditable under US GAAP against revenue.

**1.17**  "Non-Volatile Memory Controller" means any firmware, hardware and/or software that operates a Non-Volatile Memory Integrated Circuit, Non-Volatile Memory Device, Non-Volatile Memory System or Non-Volatile Memory System Product.

**1.18**  "Non-Volatile Memory Device" means a memory device which consists of one or more Non-Volatile Memory Integrated Circuits with or without the housing/packaging and any supporting means therefor.

**1.19**  "Non-Volatile Memory Integrated Circuit" means a non-volatile memory Integrated Circuit that is electrically programmable and electrically erasable, and consists of (a) non-volatile memory cells, each of which is electrically reprogrammable and utilizes two or more different charge states or conduction levels representing one or more bits of information, (b) a group of non-volatile memory cells, together comprising more than one byte of data, which is electrically erasable as a unit, and (c) any on-chip control, I/O, and other support circuitry necessary for the storage and retrieval of data in both wafer and die form.

**1.20**  "Non-Volatile Memory Product" means any Non-Volatile Memory Integrated Circuits; Removable and/or Embedded Non-Volatile Memory Devices; Non-Volatile Memory Systems and/or Embedded Non-Volatile Memory Systems; Computer Systems comprising Embedded Non-Volatile Memory Systems; Non-Volatile Memory System Products; and/or Non-Volatile Memory Controllers.

**1.21**  "Non-Volatile Memory System" means a system (including hardware, firmware, and/or software), which contains (a) one or more interconnected Non-Volatile Memory Devices or Non-Volatile Memory Integrated Circuits, and (b) in-system control (including the controller chips, firmware, software), I/O and other support circuits that are (i)

4

interconnected or configured to operate in coordination with the Non-Volatile Memory Devices or Non-Volatile Memory Integrated Circuits and (ii) necessary to the operation of the memory system, with or without the housing/packaging and supporting means therefor. A Non-Volatile Memory System can be integrated into a single die or formed as a multi-chip module, and can reside entirely on a Non-Volatile Memory System Product, or entirely on a Computer System, or can be distributed between a Non-Volatile Memory System Product and a Computer System.

1.22   "Non-Volatile Memory System Product" means a Non-Volatile Memory System on a card or other form factor, connectable to a Host Device, either temporarily by the user or permanently at the factory. Non-Volatile Memory System Products include ATA cards, Smart cards, Smart Media (SSFDC) cards, Compact Flash cards, PC cards, Linear Flash cards, Miniature cards, SD cards, xD cards, MMC cards, Memory Stick cards, Serial cards, including cards combining non-volatile storage with other functions such as communications, fax and modem, LAN, etc., and IDE, SCSI, USB or IEEE 1394 storage devices that utilize Non-Volatile Memory Integrated Circuits as the primary storage medium, and any other cards or USB flash drive or other form factors that utilize Non-Volatile Memory Integrated Circuits as the primary storage medium, such as hybrid hard disk drives, Mega-SIM cards, MP3 players and personal media players.

1.23   "Party" means each of SanDisk and Licensee.

1.24   "Person" means a corporation, company, limited liability company, partnership (general or limited), other form of business entity, individual or governmental entity.

1.25   "Related Party" means a Person that is not a Subsidiary of a signatory to this Agreement that (a) a Party has an ownership interest in the profits of such business (whether or not such interest is derived from shareholding), (b) that is under common control with a Party and/or (c) is engaged (whether or not by contract) in procurement, design or manufacturing for the benefit of or on behalf of a Party.

1.26   "Removable Non-Volatile Memory Device" means a memory device which consists of one or more Non-Volatile Memory Integrated Circuits with housing/packaging and any supporting means therefor, which device can be removed from a Host Device by at least one of a manufacturer or end user.

1.27   "SLC Non-Volatile Memory Device" means a Non-Volatile Memory Device that contains SLC Technology.

1.28   "Sale" means any transfer, assignment, consignment, lease, or other disposal of product to a Third Party which does not qualify as a Sample.

1.29   "Sample" means a product provided in low quantities to a Third Party for evaluation purposes only. Sample does not include any product where the Third Party who receives it is permitted to transfer, assign or sell it (alone, or as a component of another product).

1.30   "SanDisk Device Patent Claims" are the subset of SanDisk Patent Claims directed to Non-Volatile Memory Devices, and specifically exclude any and all claims that in whole or in part:

(a) are directed to enhanced functionality of Non-Volatile Memory Products such as security, encryption, authentication, Thin Client Computing, launching of applications, sensors, etc.;

(b) apply specifically to the design, use or manufacture of Non-Volatile Memory Systems, and/or Non-Volatile Memory Controllers; or

(c) relate to 3D Memory.

1.31 "SanDisk Licensed Patent Claims" are the subset of SanDisk Patent Claims directed to Non-Volatile Memory Systems, and specifically exclude any and all claims that in whole or in part:

(a) are directed to enhanced functionality of Non-Volatile Memory Products such as security, encryption, authentication, Thin Client Computing, launching of applications, sensors, etc.;

(b) apply specifically to the design, use or manufacture of Non-Volatile Memory Integrated Circuits, Non-Volatile Memory Devices, and/or Non-Volatile Memory Controllers as components, rather than to their combination in a Non-Volatile Memory System; or

(c) relate to 3D Memory.

1.32 "SanDisk Licensed Products" means any SanDisk product where SanDisk has added value to such product and such products are sold under SanDisk's trademarks or bona fide uses of trademarks of SanDisk's customers for the benefit of such customers.

1.33 "SanDisk Licensed Third Party Non-Volatile Memory Device" means Non-Volatile Memory Devices manufactured and/or sold under a SanDisk license by SanDisk Licensed Third Party Non-Volatile Memory Device Manufacturers.

1.34 "SanDisk Licensed Third Party Non-Volatile Memory Device Manufacturer" means a Third Party manufacturer of Non-Volatile Memory Devices who is licensed by SanDisk to produce and sell such Non-Volatile Memory Devices.

1.35 "SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer" means a Third Party manufacturer of Non-Volatile Memory System Products who is licensed by SanDisk under SanDisk Licensed Patent Claims to produce and sell Non-Volatile Memory System Products.

1.36 "SanDisk Patent Claims" means all claims in all classes or types of patents, utility models and design patents (including originals or divisions, continuations, continuations-in-part or reissues), in all countries or jurisdictions of the world now owned or controlled by SanDisk or acquired by SanDisk during the Term which (a) are issued before the expiration or termination of this Agreement, (b) except for consideration paid to employees, are not burdened by a requirement that SanDisk pay consideration to another for SanDisk's grant of a license under this Agreement and (c) cover the design, use or manufacture of Non-Volatile Memory Products.

1.37 "Subsidiary" means any corporation, company or other entity: (a) more than fifty percent of whose outstanding shares or stock entitled to vote for the election of directors (other

than any shares or stock whose voting rights are subject to restriction) is now or hereafter owned or controlled by either SanDisk or Licensee, directly or indirectly, but such corporation, company or other entity will be deemed to be a Subsidiary only so long as such ownership or control exists; or (b) which does not have outstanding shares of securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent of whose ownership interest representing the right to make the decisions for such corporation, company or other entity is now or hereafter, owned or controlled, directly or indirectly, by a signatory hereto, but such corporation, company or other entity will be deemed to be a Subsidiary only so long as such ownership or control exists.

1.38   "Term" means the period from and including the Effective Date to and including the seventh anniversary of the Effective Date.

1.39   "Thin Client Computing" means programmable processing of data, in which an application program runs on a removable device.

1.40   "Third Party" means (a) in the case of software, any software that (i) did not originate with either Licensee or SanDisk or (ii) whose copyright is not owned by Licensee or SanDisk; (b) in the case of firmware or hardware, any firmware or hardware design that (i) did not originate with either Licensee or SanDisk or (ii) is not owned by Licensee or SanDisk; and (c) in all other cases a Person that is not a Party (including Related Parties).

1.41   "Third Party Foundry Product" means a Non-Volatile Memory Product (a) manufactured by Licensee or SanDisk on behalf of a Third Party where the design (other than industrial design) of such Non-Volatile Memory Product (i) did not originate with Licensee or SanDisk or (ii) is not exclusively owned by Licensee or SanDisk; or (b) designed, manufactured, reproduced, sold, leased, licensed or otherwise transferred through or by Licensee or SanDisk to a Third Party (or to Customers of, or as directed by, that Third Party) for the purpose of attempting to circumvent the terms of Article 3 or 4 that would otherwise apply to such Non-Volatile Memory Product if manufactured and licensed directly by such Third Party.

1.42   "3D Memory" is any type of memory that is monolithically formed in a plurality of physical levels of arrays of memory cells disposed above a silicon substrate, and circuitry associated with the operation of the memory cells.

## Article 2
## Releases and Covenants

2.1   **SanDisk Release.**  SanDisk releases, acquits and forever discharges Licensee, and only Licensee, from any and all claims or liability for infringement of any SanDisk Licensed Patent Claims arising before the Effective Date, to the extent that such infringement would be within the scope of the license granted herein by SanDisk. SanDisk further releases Licensee Customers from claims of patent infringement relating to Licensee's products that arose before the Effective Date to the extent that the acts giving rise to such claims would be licensed under this Agreement if the acts occurred after the Effective Date and during the Term.

**2.2**  **Licensee Release.**  Licensee releases, acquits and forever discharges SanDisk, and only SanDisk, from any and all claims or liability for infringement of any Licensee Patent Claim arising before the Effective Date, to the extent that such infringement would be within the scope of the license granted herein by Licensee.  Licensee further releases SanDisk Customers from claims of patent infringement relating to SanDisk's products that arose before the Effective Date to the extent that the acts giving rise to such claims would be licensed under this Agreement if the acts occurred after the Effective Date and during the Term.

**Article 3**
**Grant of Licenses By SanDisk**

**3.1**  **SanDisk License.**  SanDisk hereby grants to Licensee a non-sublicensable, non-exclusive, non-transferable (except as expressly stated herein), worldwide royalty bearing license under SanDisk Licensed Patent Claims to make, to Have Made, to use, to sell, to offer for sale, and to import the Licensee Licensed Products.  Under the terms of this license, Licensee is permitted to use the names of Third Party original equipment manufacturers or resellers on Licensee Licensed Products, but is not licensed to manufacture Third Party Foundry Products.

**3.2**  **License Limitations.**  Subject to Section 3.3, nothing in this Agreement will be construed to either expressly or impliedly give Licensee the right to sublicense SanDisk Licensed Patent Claims to others.  The sale of Licensee Licensed Products will not be construed to provide or give rise to an implied license, by estoppel or otherwise, to third parties to any SanDisk Licensed Patent Claims, including combinations of such Licensee Licensed Products with any other products or methods of using such combinations.  SanDisk has, and may during the term acquire, ownership interests in Persons that are not Subsidiaries of SanDisk and no license is granted hereunder with respect to patent claims owned or controlled by such non-Subsidiary Persons.

**3.3**  **Customer Protection.**  Notwithstanding any other provision of this Article 3, SanDisk releases Licensee Customers from claims of infringement for acts that occur during the Term to the extent (a) such acts are within the scope of this license granted to Licensee from SanDisk for Licensee Licensed Products and (b) such acts relate to the inherent operation of Licensee Licensed Products and do not include combinations of Licensee Licensed Products with any other products or methods of using such combinations.

**3.4**  **No Patent Laundering.**  Subject to Section 3.3, nothing in this Article 3 will be construed to grant any Third Party an express or implied license to make, Have Made, use, sell, offer for sale or import Third Party Non-Volatile Memory Products.  At all times, SanDisk retains the right to enforce its intellectual property rights against third parties for the infringement of SanDisk Licensed Patent Claims or any other SanDisk intellectual property right.  Nothing in this Section 3.4 limits Licensee's Have Made license rights.

**3.5**  **Patent License Only.**  Nothing in this Article 3 will be construed to expressly or impliedly grant any license (a) to any SanDisk Patent Claims that are not SanDisk Licensed Patent Claims, or (b) to any SanDisk copyrights, trademarks, service marks, trade secrets, know-how, or confidential information.

**3.6**   **Rights Conferred.**  The licenses granted in this Agreement confer freedom of action to use the SanDisk Licensed Patent Claims.  The royalties or other consideration paid or furnished under this Agreement are solely for that freedom of action, and do not depend on actual use of any of the SanDisk Licensed Patent Claims.

## Article 4
## Grant of Licenses by Licensee

**4.1**   **Licensee License.**   Licensee grants to SanDisk non-exclusive, non-transferable (except as expressly stated herein), royalty-free, worldwide licenses under Licensee Patent Claims (without the right to sublicense), to make, to Have Made, to use, to sell and offer to sell, and to import SanDisk Licensed Products.  Under the terms of this license, SanDisk is permitted to use the names of Third Party original equipment manufacturers or resellers on SanDisk Licensed Products, but is not licensed to manufacture Third Party Foundry Products.

**4.2**   **License Limitations.**  Subject to Section 4.3, nothing in this grant to SanDisk or otherwise contained in this Agreement will either expressly or impliedly give SanDisk the right to sublicense Licensee Patent Claims to others.  The sale of SanDisk Licensed Products will not be construed to provide or give rise to an implied license, by estoppel or otherwise, to third parties to any Licensee Patent Claims, including combinations of SanDisk Licensed Products with any other products or methods of using such combinations.

**4.3**   **Customer Protection.**  Notwithstanding any other provision of this Article 4, during the Term, Licensee releases SanDisk Customers from claims of infringement for acts that occur during the Term to the extent (a) such acts are within the scope of this license granted to SanDisk from Licensee for SanDisk Licensed Products and (b) such acts relates to the inherent operation of SanDisk Licensed Products and do not include combinations of SanDisk Licensed Products with any other products or methods of using such combinations.

**4.4**   **No Patent Laundering.**   Subject to Section 4.3, nothing in this Article 4 will be construed to grant any Third Party an express or implied license to make, Have Made, use, sell, offer for sale or import SanDisk Licensed Products.  At all times, Licensee retains the right to enforce its intellectual property rights against third parties for the infringement of Licensee Patent Claims or any other Licensee intellectual property right.  Nothing in this Section 4.4 limits SanDisk's Have Made license rights.

**4.5**   **Patent License Only.**  Nothing in this Article 4 will be construed to expressly or impliedly grant any license to any Licensee copyrights, trademarks, service marks, trade secrets, know-how, or confidential information.

**4.6**   **Rights Conferred.**  The licenses granted in this Agreement confer freedom of action to use the Licensee Patent Claims.  The consideration paid or furnished under this Agreement are solely for that freedom of action, and do not depend on actual use of any of the Licensee Patent Claims.

## Article 5
## Payments

5.1   **General.**  SanDisk and Licensee agree (and covenant not to challenge) that for the convenience of the parties in order to reduce the complexities of calculating royalties for the manufacture, use and sale of Licensee Licensed Products in all countries in which SanDisk may hold a patent applicable to such products, royalties hereunder will be based on worldwide Net Sales of all Licensee Licensed Products.

5.2   **Payment Limited to Licensed Products.**  Any payment under this Agreement by Licensee to SanDisk is solely and completely directed to Licensee Licensed Products. The parties agree that SanDisk is not entitled under this Agreement to receive any payment or compensation that relates to products other than Licensee Licensed Products.

5.3   **SLC Systems.**  If: (a) the applicable Licensee Licensed Product contains only SLC Non-Volatile Memory Devices; and (b) such SLC Non-Volatile Memory Devices were either (i) manufactured by Licensee under a license with SanDisk permitting Licensee to manufacture Non-Volatile Memory Devices, or (ii) purchased by Licensee from a SanDisk Licensed Third Party Non-Volatile Memory Device Manufacturer, then (c) Licensee will pay to SanDisk a four percent royalty on worldwide Net Sales of all such Licensee Licensed Products, up to a maximum of $4.00 per unit, from and after the Effective Date for the balance of the Term calculated on a quarterly basis (four times per year).

(a)   If (i) Licensee manufactures the SLC Non-Volatile Memory Devices in such Licensee Licensed Products and (ii) Licensee has not executed a license with SanDisk permitting Licensee to manufacture Non-Volatile Memory Devices, then (iii), in addition to the royalty in the first paragraph of this Section 5.3, Licensee will pay to SanDisk an additional worldwide royalty of four percent of the fair value of the SLC Non-Volatile Memory Devices.

(b)   If (i) Licensee obtains or purchases SLC Non-Volatile Memory Devices in such Licensee Licensed Product from a Third Party who is not a SanDisk Licensed Non-Volatile Memory Manufacturer, then (ii), in addition to the royalty in the first paragraph of this Section 5.3, Licensee will pay to SanDisk an additional worldwide royalty of four percent of the purchase price of the SLC Non-Volatile Memory Devices paid to the Third Party.

(c)   If (i) Licensee obtains or purchases SLC Non-Volatile Memory Devices in such Licensee Licensed Product from a SanDisk Licensed Non-Volatile Memory Manufacturer under such Third Party's license with SanDisk, then (ii), Licensee will not owe any incremental royalties with respect to such SLC Non-Volatile Memory Devices.

Notwithstanding anything to the contrary, Sections 5.3(a) and 5.3(b) only permit Licensee to use and sell the SLC Non-Volatile Memory Devices described therein solely as embedded in Licensee Licensed Products, and do not license Licensee to make or have made any Non-Volatile Memory Devices that are not part of Licensee Licensed Products. Subject to the foregoing, SanDisk agrees not to assert the SanDisk Device Patent Claims against Licensee or its Customers, based on the fact that Licensee makes or has made Non-Volatile Memory Devices, if Licensee has paid SanDisk the required amounts under Section 5.3(a) or 5.3(b). Notwithstanding anything to the contrary, the foregoing limited agreement not to assert the SanDisk Device Patent Claims against Licensee will not be deemed a grant by SanDisk of a license (express,

implied or otherwise) to any SanDisk patent rights to, or an agreement by SanDisk not to assert any SanDisk patent rights against, any supplier, manufacturer or subcontractor of Licensee, except to the extent that Licensee has paid the required royalty hereunder for such memory components.

5.4    **MLC Systems.**    If: (a) the applicable Licensee Licensed Product contains any MLC Non-Volatile Memory Devices; and (b) such MLC Non-Volatile Memory Devices were either (i) manufactured by Licensee under a license with SanDisk permitting Licensee to manufacture Non-Volatile Memory Devices, or (ii) purchased by Licensee from a SanDisk Licensed Third Party Non-Volatile Memory Device Manufacturer, then (c) Licensee will pay to SanDisk a four percent royalty on worldwide Net Sales of all such Licensee Licensed Products, up to a maximum of $4.00 per unit, from and after the Effective Date for the balance of the Term calculated on a quarterly basis (four times per year).

(a)    If (i) Licensee manufactures the MLC Non-Volatile Memory Devices in such Licensee Licensed Products and (ii) Licensee has not executed a license with SanDisk permitting Licensee to manufacture Non-Volatile Memory Devices, then (iii), in addition to the amounts in the first paragraph of this Section 5.4, Licensee will pay to SanDisk an additional worldwide royalty of eight percent of the purchase price of the MLC Non-Volatile Memory Devices.

(b)    If (i) Licensee obtains or purchases MLC Non-Volatile Memory Devices in such Licensee Licensed Product from a Third Party who is not a SanDisk Licensed Non-Volatile Memory Manufacturer, then (ii), in addition to the royalty in the first paragraph of this Section 5.4, Licensee will pay to SanDisk an additional worldwide royalty of eight percent of the purchase price of the MLC Non-Volatile Memory Devices paid to the Third Party.

(c)    If (i) Licensee obtains or purchases MLC Non-Volatile Memory Devices in such Licensee Licensed Product from a SanDisk Licensed Non-Volatile Memory Manufacturer under such Third Party's license with SanDisk, then (ii), Licensee will not owe any incremental royalties with respect to such MLC Non-Volatile Memory Devices.

Notwithstanding anything to the contrary, Sections 5.4(a) and 5.4(b) only permit Licensee to use and sell the MLC Non-Volatile Memory Devices described therein solely as embedded in Licensee Licensed Products, and do not permit Licensee to make or have made any Non-Volatile Memory Devices that are not part of Licensee Licensed Products. Subject to the foregoing, SanDisk agrees not to assert the SanDisk Device Patent Claims against Licensee or its Customers, based on the fact that Licensee makes or has made Non-Volatile Memory Devices, if Licensee has paid SanDisk the required amounts under Section 5.4(a) or 5.4(b). Notwithstanding anything to the contrary, the foregoing limited agreement not to assert the SanDisk Device Patent Claims against Licensee will not be deemed a grant by SanDisk of a license (express, implied or otherwise) to any SanDisk patent rights to, or an agreement by SanDisk not to assert any SanDisk patent rights against, any supplier, manufacturer or subcontractor of Licensee, except to the extent that Licensee has paid the required royalty hereunder for such memory components.

5.5   **Component Valuation.**   If Licensee itself manufactures, or does not have direct ownership of, the SLC Non-Volatile Memory Devices or MLC Non-Volatile Memory Devices, as applicable, obtained from the non-SanDisk licensed Third Party manufacturer, or Licensee cannot otherwise reasonably determine the price of said SLC Non-Volatile Memory Devices or MLC Non-Volatile Memory Devices, as applicable, then Licensee will use a price for such SLC Non-Volatile Memory Devices or MLC Non-Volatile Memory Devices that is not less than the midpoint or higher of the spot price as of the date of procurement of those devices as reported by a reputable tracking site such as DRAM Exchange (www.dramexchange.com).or as otherwise agreed upon in writing between the parties, as the price basis to be used in the royalty calculation under Sections 5.3(a), 5.3(b), 5.4(a) and 5.4(b).

5.6   **Component Non-Assert.**   SanDisk agrees not to assert any one of its SanDisk Patent Claims against a Licensee Licensed Product for the Non-Volatile Memory Controller component contained within such Licensee Licensed Product, if Licensee has paid SanDisk the required royalty amounts for the Licensee Licensed Product as set forth in this Agreement. This limited agreement not to assert the SanDisk Patent Claims against the Non-Volatile Memory Controller component of a Licensee Licensed Product will not be deemed a grant by SanDisk of a license (express, implied or otherwise) to any SanDisk patent rights to, or an agreement by SanDisk not to assert any SanDisk patent rights against, any supplier, manufacturer or subcontractor of Licensee.   This limited agreement not to assert SanDisk Patent Claims against the Non-Volatile Memory Controller component of a Licensee Licensed Product shall not, in any manner, expand or alter the definition of "Licensee Licensed Product" in Section 1.12.   This limited agreement not to assert SanDisk Patent Claims against the Non-Volatile Memory Controller component of a Licensee Licensed Product does not alter or modify Section 3.2.   At all times, SanDisk retains the right to assert SanDisk Patent Claims against Licensee Licensed Products that have been combined with other products or methods such that the combination would (a) fall outside the scope of SanDisk Licensed Patent Claims and/or (b) transform Licensee Licensed Products into the excluded products set forth in Section 1.12.

5.7   **Purchased Licensed System Products.**   Licensee will not owe any royalty payment for any Non-Volatile Memory System Product sold by Licensee if the Non-Volatile Memory System Product was purchased by Licensee from a SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer and the SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer has paid the required royalty to SanDisk for such Non-Volatile Memory System Product.   However, before Licensee can withhold royalties on a product sold by the Licensee on the ground that Licensee purchased such product from a SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer, Licensee must obtain written certification from (a) SanDisk (under Section 5.8) or (b) SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer that such product is licensed by SanDisk,  If the written certification is from SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer, the written certification must also include a statement that the SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer has and/or will pay any applicable royalty to SanDisk under the terms of its license agreement with SanDisk.   If a SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer fails to pay the required royalties, SanDisk will make commercially reasonable efforts to collect the royalty from the SanDisk Licensed Third

Party Non-Volatile Memory System Product Manufacturer before seeking to recover any unpaid royalties from Licensee.

5.8    **Licensee Verification.**  Upon Licensee's request, SanDisk will verify whether a supplier of Licensee is a SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer  or  SanDisk  Licensed  Third  Party  Non-Volatile  Memory  Device Manufacturer for a particular product purchased by Licensee.  Such Licensee request will include the following information: (a) the name of the SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer, (b) the identity (e.g., product name, type and capacity) of the particular product to be purchased and (c) the address where the  product  will  be  manufactured.  SanDisk  will  within  fifteen  days  of  receiving Licensee's request for verification respond to the request by indicating the duration and scope of licensed products of such potential vendor.

5.9    **No Double Royalties.**  SanDisk is a member and may become a member, of consortia and/or associations offering licenses under intellectual property of SanDisk and/or other members of such consortia and/or associations, for the manufacture, use or sale of specific products, form factors and/or specifications incorporating or relating to non-volatile memory technology.   The royalty and/or other consideration furnished hereunder are in addition to any royalty and/or consideration paid or furnished to any such consortia and/or associations, even though the products licensed by such entities are the same as licensed hereunder.  The rights received by Licensee under this Agreement are different from and in addition to any SanDisk patent claims licensed through such consortia and/or associations. If Licensee joins or becomes a licensee of such consortia and/or association and thereby becomes obligated to pay under this Agreement and under the licensing program of such consortia and/or association for patent claims already paid for and licensed under this Agreement, the parties will negotiate in good faith a solution to avoid double payment of royalties by Licensee for the SanDisk Patent Claims licensed by such consortia and/or association.

If Licensee makes any royalty payment to SanDisk under Section 5.3(a), 5.3(b), 5.4(a) or 5.4(b) for purchases by Licensee of Non-Volatile Memory Devices included in Licensee Licensed Products without requesting verification under Section 5.8 of whether a Licensee supplier is a SanDisk Licensed Third Party Non-Volatile Memory System Product Manufacturer or is a SanDisk licensed Third Party Non-Volatile Memory Device Manufacturer, such payments will be considered an additional license fee and not a royalty, and such payment will not be refundable.

5.10   **Quarterly Payments.**  Licensee will make payments four times a year for royalties earned in each quarterly period.  A quarter will be a calendar quarter as follows: (a) January 1 through March 31; (b) April 1 through June 30; (c) July 1 through September 30; and (d) October 1 through December 31.  Royalties due for each quarter will be paid by Licensee to SanDisk within forty five days from the end of each quarter.

5.11   **Quarterly Reports.**  Licensee will provide to SanDisk a statement of the most recent quarterly worldwide sales of the royalty bearing Licensee Licensed Products within thirty days of the end of each quarterly period.  SanDisk will have the right to have an independent Third Party accounting firm audit, at SanDisk's expense, Licensee's compliance with Article 5, upon reasonable notice to Licensee of not less then ten days, during normal business hours, at the premises of Licensee, and without unreasonable

interference with Licensee's normal business operations. The auditor will maintain in confidence any price, cost, margin, or other financial information obtained during the course of the audit, and will not disclose such information to SanDisk or any Third Party. The auditor may only notify SanDisk whether or not Licensee is in compliance with Article 5, and, if not, what the correct royalties should have been. Such auditor will sign the non-disclosure agreement and will be paid on other than a contingency basis. Such an audit will be conducted no more than once a year. Licensee will maintain appropriate records for three years after each accounting year. Licensee will promptly remedy any failure to pay the correct royalty. If any such audit reveals an underpayment of ten percent or more, Licensee will remit the amount of the underpayment and also pay a penalty equal to the underpayment plus interest at the prime rate of interest plus 250 basis points reported in *The Wall Street Journal* on the date that SanDisk has given notice of the audit to PNY. In addition, Licensee will pay the reasonable costs of such audit if any such audit reveals an underpayment of ten percent or more. Reimbursement will be made within thirty days by SanDisk for any overpayment, and if such reimbursement is not timely received, Licensee shall have the right to offset the overpayment against future royalty payments. To the extent an exchange rate between a foreign currency and U.S. currency is required for any obligation hereunder, the rate used will be the exchange rate on the last business day of the semiannual period in which the obligation is due as determined by that day's *The Wall Street Journal* (Western Edition).

5.12   **Underpayment.** Subject to Section 5.13, it will constitute a material breach of this Agreement if Licensee in any quarterly period, underpays royalties by more than ten percent as determined by the auditor, and this error is substantiated by a second audit conducted by an independent, mutually agreed auditor at Licensee's expense and Licensee does not pay such amount within thirty days after notice, where such notice is provided after the second audit substantiates the first audit. The second audit must be completed within thirty days of the first.

5.13   Licensee shall have the right, in good faith, to dispute all or part of any audit findings by providing the auditor with a written notice specifying its objections within ten days after receiving the auditor's report. No interest or other penalty shall accrue during the period of any dispute as to the disputed portion of the audit report. Licensee shall seek to resolve the dispute with the auditor within forty five days after the audit report; Licensee shall have the right to request the assistance of an independent auditor (not on a contingent fee basis) to assist in the dispute. The SanDisk auditor shall consider any additional information supplied by Licensee or by Licensee's auditor, and shall issue a second report to all parties. Under no circumstances shall the SanDisk Auditor's fees be payable by Licensee for any dispute resolution process. Any unresolved dispute shall be resolved under the procedures set forth in Section 7.9(c).

5.14   **First Sale.** Royalties for Licensee Licensed Products will accrue upon the earliest of (a) first sale (e.g., shipment), (b) transfer from Licensee to a Third Party, (c) lease of any Licensee Licensed Product, or (d) Licensee's receipt of payment thereof.

5.15   **No Circumvention.** Under no circumstances will Licensee or a Related Party transact any sale or other distribution of Licensee Licensed Products, the effect of which is to artificially reduce the royalties due to SanDisk from Licensee. Licensee will be free to determine the selling price of the Licensee Licensed Products, but in any such sale or

14

other distribution of Licensee Licensed Products, the invoice price or transfer price must be based on a price that is reasonably equivalent to the then-prevailing fair market price of the Licensee Licensed Product as a whole.

**5.16   Payment Mechanics.**

(a)   All payments will be in U.S. dollars, wire transferred to SanDisk in accordance with the instructions provided from time to time by SanDisk.  SanDisk will bear all taxes imposed on it with respect to the payments under this Article 5, and Licensee will take reasonable actions to minimize such taxes or enable SanDisk to obtain refunds of withheld taxes.

(b)   All royalty and license fee obligations for licensed products of the parties are expressly stated and identified in this Article 5.

(c)   Licensee will remain fully liable for all fees and royalties payable to SanDisk under this Agreement.

**Article 6**
**Effective Date, Term and Termination**

**6.1   Term.**  This Agreement will become effective on the Effective Date, and will continue in effect, unless sooner terminated as elsewhere provided in this Agreement, for the Term. Either Party may notify the other to negotiate for an extension of this Agreement at any reasonable time before or within ninety days after the end of the Term.

**6.2   Termination for Breach.**  If either Party commits a material breach of this Agreement and does not correct such breach within forty-five days after written notice complaining thereof is given to such Party (or within such longer period if (a) the parties mutually agree in writing to extend the cure period, or (b) the cure, by its nature requires more than forty-five days to cure), this Agreement may be terminated forthwith by a second written notice to that effect from the complaining Party.

**6.3   Other Termination Rights.**  Either Party may terminate this Agreement by giving written notice of termination to the other at any time upon or after:

(a)   the filing by the other Party of a petition in bankruptcy or insolvency;

(b)   any adjudication that the other Party is bankrupt or insolvent;

(c)   the filing by the other Party of any petition or answer seeking reorganization, readjustment or arrangement of its business under any law relating to bankruptcy or insolvency;

(d)   the appointment of a receiver for all or substantially all of the property of the other Party;

(e)   the making by the other Party of any assignment for the benefit of creditors; or

(f)   the institution of any proceedings for the liquidation or winding up of the other Party's business or for the termination of its corporate charter.

15

This Agreement will terminate on the forty-fifth day after such notice of termination is given.

6.4    **Effect of Termination.**  If this Agreement is terminated pursuant to Section 6.2, the licenses granted to the defaulting Party will terminate forthwith, but the licenses granted the non-defaulting Party will survive such termination for the balance of the term of this Agreement.  If this Agreement is terminated pursuant to Section 6.3, the licenses granted by the non-terminating Party will survive the termination for the balance of the term of this Agreement, and the licenses granted by the terminating Party will terminate forthwith.  Regardless of the date of termination pursuant to Section 6.3, and to the extent that licenses granted to Licensee herein survive such termination, the payments owing by Licensee under Article 5 will be made as scheduled to SanDisk or its successor company.  Notwithstanding the foregoing paragraph, the provisions of this Agreement shall survive termination with respect to any Licensee Licensed Products purchased by Licensee's Customers for which the required royalty has been paid.

6.5    **Change of Control of SanDisk.**  If SanDisk is acquired by or is merged into a Third Party, or if SanDisk transfers all or substantially all its Non-Volatile Memory Product business to a Third Party, the licenses granted by Licensee to SanDisk under Article 4 may be transferred to the combined company, but (a) the licenses granted by Licensee to SanDisk so transferred will become effective only from the date of such merger, acquisition, or transfer of the Non-Volatile Memory Product business, and (b) the licenses granted by Licensee to SanDisk so transferred will be limited to the using, making, having made, selling and offering to sell (directly or indirectly), and importing SanDisk Licensed Products.

6.6    **Change of Control of Licensee.**  If Licensee is acquired by or is merged into a Third Party company, or if Licensee transfers all or substantially all its Non-Volatile Memory Product business to such Third Party company, the licenses granted by SanDisk to Licensee under Article 3 may be transferred to the successor company, but the licenses granted by SanDisk to Licensee so transferred will become effective only from the date of such merger, acquisition, or transfer of the Non-Volatile Memory Product business. The transfer permitted pursuant to this Section 6.6 is not intended to provide a license to such acquirer for products that were made, developed or sold by such acquirer prior to such transfer.  If the transferee or successor has a separate license with SanDisk, SanDisk will resolve any conflict between the two license agreements in its sole discretion by terminating this Agreement or the separate license between SanDisk and the transferee or successor.

6.7    **Patent Challenge.**  If either Party asserts the invalidity or unenforceability of any patent or patent claims licensed hereunder (other than an interference or opposition proceeding in front of the USPTO, the European Patent office or similar body), then the other Party will have the right to immediately terminate the licenses granted herein while retaining the benefit of all licenses granted to it by virtue of this Agreement.

6.8    **Post-Termination Rights to Sell Licensed Product.**

(a)    Upon the expiration of this Agreement, the licenses granted pursuant to this Agreement by SanDisk to Licensee under SanDisk Licensed Patent Claims will terminate, but such termination will not give SanDisk any right of action against Licensee Licensed Products

that have had its royalty paid for before termination, or which are paid after expiration or termination for sales to Licensee Customers that occurred prior to expiration or termination. No termination or expiration otherwise shall give SanDisk any right of action against any Licensee Licensed Products sold, made, or Have Made before expiration or termination so long as royalties are paid to SanDisk with respect thereto.

(b)     Upon the expiration or termination of this Agreement, the licenses granted pursuant to this Agreement by Licensee to SanDisk under Licensee Patent Claims will terminate, but such termination will not give Licensee any right of action against any SanDisk Licensed Products sold, made, or Have Made before termination.

### Article 7
### Miscellaneous Provisions

7.1     **Representations and Warranties.** Each of the parties represents and warrants that it has the right to grant the other the licenses granted hereunder and that this Agreement has been duly authorized, executed and delivered by such Party.

7.2     **No Implied Agreements or Warranties.** Nothing contained in this Agreement will be construed as: (a) a warranty or representation that any manufacture, sale, lease, use or other disposition of SanDisk Licensed Products or Licensee Licensed Products hereunder will be free from infringement of patents, utility models and/or design patents; (b) a warranty or representation of the validity of any SanDisk Licensed Patent Claims or Licensee Patent Claims; (c) a warranty or representation that any SanDisk Licensed Patent covers any Licensee Licensed Product or that any Licensee Patent Claim covers any SanDisk Licensed Product; (d) an agreement to bring or prosecute actions or suits against third parties for infringement or conferring any right to bring or prosecute actions or suits against third parties for infringement; (e) conferring any right to use in advertising, publicity, or otherwise, any trademark, trade name or names, or any contraction, abbreviation or simulation thereof, of either Party; (f) conferring by implication, estoppel or otherwise, upon any Party licensed hereunder, any license or other right under any class or type of patent, utility model or design patent except the licenses and rights expressly granted hereunder; (g) conferring by implication, estoppel or otherwise, upon any Party licensed hereunder, any license or other right under any copyright, maskwork, or trade secret right; (h) an obligation on any Party to furnish any technical information or know-how; or (i) an obligation on any Party to enforce any licensed patents against any third parties.

7.3     **Assignment.** This Agreement is personal to the parties, and, except as set forth in Sections 6.5 and 6.6, this Agreement or any right or obligation hereunder, is not assignable or delegable, whether in conjunction with a change in ownership, or the sale or transfer of the whole or any part of a Party's business or assets, either voluntarily, by operation of law, or otherwise, without the prior written consent of the other Party, which shall not be withheld, conditioned or delayed unreasonably. Any such purported assignment or transfer will be null and void. Assignment by either Party of any of its patents, or the applications thereof, which qualify as Licensee Patent Claims or SanDisk Licensed Patent Claims will not affect the license rights acquired hereunder to such patents, and any such assignment will be subject to the continuing license rights of the other Party.

7.4    **Notices.** All notices required or permitted to be given hereunder will be in writing and will be valid and sufficient if dispatched by internationally recognized overnight courier (such as DHL), freight prepaid, or delivered personally as follows:

If to SanDisk:

> SanDisk Corporation
> 601 McCarthy Blvd.
> Milpitas, California 95035
> United States of America
> Attention: Chief Intellectual Property Counsel

If to Licensee:

> PNY Technologies, Inc.
> 299 Webro Road
> Parsippany, NJ 07054
> Attention: Gadi Cohen, Chairman and CEO

With a copy (which will not constitute notice) to:

> William J. Heller, Esq.
> McCarter & English LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102

Either Party may give written notice of a change of address and, after notice of such change has been received, any notice or request will thereafter be given to such Party as above provided at such changed address.

7.5    **Counterparts.** This Agreement may be executed in one or more counterparts (whether delivered by facsimile or otherwise), each of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other Party.

7.6    **Entire Agreement.** This Agreement: (a) constitutes the entire agreement and supersedes all prior agreements, negotiations, arrangements and understandings, both written and oral, between the parties with respect to the subject matter hereof, and (b) is not intended to confer upon any Person, other than the parties, any rights, benefits or remedies of any nature whatsoever.

7.7    **Severability.** Any term or provision of this Agreement that is held to be invalid, void or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid, void or unenforceable term or provision in any other situation or in any other jurisdiction. If any term or provision of this Agreement is declared invalid, void or unenforceable, the parties agree that the authority making such determination will have the power to and shall, subject to the discretion of such authority, reduce the scope, duration, area or applicability of the term or provision, to

delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the original intention of the invalid or unenforceable term or provision.

**7.8    Governing Law.**  This Agreement will be governed by the substantive laws of the State of California, all rights and obligations of the parties of this Agreement and the interpretation, construction and enforceability hereof will also be governed by the laws of the State of California.

**7.9    Enforcement.**

(a)    SanDisk and Licensee each agree (i) to submit to the jurisdiction of the United States District Court for the Northern District of California for any action properly brought pursuant to this Agreement; (ii) to waive any objection they may have now or hereafter to the venue of any suit brought pursuant to clause (i) above; and (iii) that service of process may be made by in the manner specified in Section 7.4.

(b)    Irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms.  Accordingly, the parties will be entitled to specific performance of the terms of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity.

(c)    No failure or delay on the part of either Party in the exercise or assertion of any right under this Agreement will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation or agreement herein, nor will any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

(d)    All disputes arising directly under the express terms of this Agreement will be resolved as follows:  First, the senior management of both parties will engage in good faith negotiations for up to thirty days in an attempt to resolve such disputes.  If the disputes cannot be resolved by the senior management within the thirty day good faith negotiation period, the parties will engage in a full-day (8 hours) mediation, with authorized senior executives of each Party present for the duration of the mediation. Should the mediation fail to result in an agreement-in-principle, either Party may initiate litigation proceedings in the Northern District of California.  The parties are not obligated to comply with this Section 7.9(d) if compliance would cause any applicable statute of limitation to expire.

(e)    Any agreement on the part of a Party to any extension, waiver, amendment, modification or supplement of this Agreement or its rights hereunder will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**7.10    No Public Announcement.**  The content of this Agreement will not be published or disclosed to any Third Party without the other Party's written permission except as required by law or as may be required for reasonable auditing purposes or required securities law or stock exchange listing agreement disclosure.  Notwithstanding the above, the parties will jointly publish a mutually agreed to press release promptly after execution of this Agreement date, and each Party may thereafter disclose or publish to

19

any Third Party any information disclosed in the mutually agreed to press release without the other Party's permission.

**7.11** **Export Control Laws.** Anything contained in this Agreement to the contrary notwithstanding, the obligations of the parties hereto and of the Subsidiaries of the parties will be subject to all laws, present and future and including export control laws and regulations, of any government having jurisdiction over the parties hereto or the Subsidiaries of the parties, and to orders, regulations, directions or requests of any such government. Each Party will undertake to comply with and be solely responsible for complying with such laws applicable to such Party.

**7.12** **Construction and Interpretation.** When a reference is made in this Agreement to a section or article, such reference will be to a section or article of this Agreement, unless otherwise clearly indicated to the contrary. Whenever the words "include," "includes" or "including" are used in this Agreement they will be deemed to be followed by the words "without limitation". The words "hereof," "herein" and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, exhibit and schedule references are references to the articles, sections, exhibits and schedules of this Agreement, unless otherwise specified. The plural of any defined term will have a meaning correlative to such defined term and words denoting any gender will include all genders and the neuter. Where a word or phrase is defined herein, each of its other grammatical forms will have a corresponding meaning. Any reference to a Party will include such Party's permitted successors and permitted assigns. If any ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. No prior draft of this Agreement will be used in the interpretation or construction of this Agreement. Each provision of this Agreement will be given full separate and independent effect. Although the same or similar subject matters may be addressed in different provisions of this Agreement, except as expressly provided in this Agreement, each such provision will be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content). Headings are used for convenience only and will not in any way affect the construction or interpretation of this Agreement. The doctrine of election of remedies will not apply in constructing or interpreting the remedies provisions of this Agreement or the equitable power of a court considering this Agreement or the transactions contemplated hereby.

**7.13** **No Implied Warranty.** EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE LICENSES GRANTED HEREUNDER ARE GRANTED WITHOUT ANY WARRANTY OF ANY KIND. EACH PARTY HEREBY DISCLAIMS ANY IMPLIED WARRANTIES OF ANY KIND INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.

**7.14** **Damage Limitation.** EXCEPT FOR INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR FOR LOST PROFITS OR COSTS ASSOCIATED WITH OBTAINING SUBSTITUTE PERFORMANCE HEREUNDER,

ARISING FROM THIS AGREEMENT OR THE BREACH THEREOF, REGARDLESS OF WHETHER SUCH PARTY HAD BEEN WARNED OF SUCH DAMAGES, AND REGARDLESS OF THE THEORY UPON WHICH SUCH DAMAGES ARE CLAIMED, INCLUDING, FOR BREACH OF CONTRACT, WARRANTY, TORT, NEGLIGENCE OR STRICT LIABILITY.

The parties have duly executed and delivered this Agreement as of the date first written above.

SANDISK CORPORATION                    PNY TECHNOLOGIES, INC.

By: _~Richard S Chernicoff~_           By: _Mark Ciano_
Name: RICHARD S. CHERNICOFF            Name: MARK J. CIANO
Title: SENIOR VICE PRESIDENT           Title: VICE PRESIDENT FINANCE