UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PNY TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SANDISK CORPORATION, <br><br> Defendant. | Case No. 11-cv-04689-WHO <br><br> **ORDER GRANTING MOTION TO DISMISS FIFTH AND SIXTH CAUSES OF ACTION IN THIRD AMENDED COMPLAINT** <br><br> Re: Dkt. No. 237 |

**INTRODUCTION**

On April 25, 2014, I granted defendant SanDisk Corporation's motion to dismiss plaintiff PNY Technologies, Inc.'s Fifth and Sixth Causes of Action in the Second Amended Complaint ("SAC") because PNY failed to adequately allege that SanDisk's short-term, easily terminable exclusivity agreements with retailers unlawfully foreclosed competition in, or constituted an illegal attempt to monopolize, the market for Secure Digital cards ("SD cards"). Dkt. No. 218 ("Order"). I also granted PNY leave to amend its pleading. *Id.* On May 5, 2014, PNY filed a Third Amended Complaint ("TAC"). Dkt. Nos. 224, 250.

Because the TAC suffers from the same fundamental deficiency as the SAC, SanDisk's motion to dismiss PNY's Fifth Cause of Action for attempted monopolization and Sixth Cause of Action for exclusive dealing in the TAC is GRANTED.

**FACTUAL BACKGROUND**

PNY alleges the following new facts in its TAC[1]:

---

[1] This order incorporates the legal and factual discussions from the April 25, 2014, Order granting SanDisk's motion to dismiss, as well as SanDisk's Request for Judicial Notice which it referenced. Order 4 n.4. I will not repeat facts pleaded in the TAC identical to ones already recited in that Order.

1    SanDisk has entered into agreements with retailers making it their exclusive supplier of SD
2    cards for sale to consumers. Many retailers enter these agreements because the agreements
3    contain significant incentives in exchange for exclusivity. SanDisk's competitors, including PNY,
4    are thus unable to reach consumers and competition is thereby harmed. SanDisk has attempted to
5    monopolize the SD card market through these exclusive-dealing arrangements.

6    The United States retail channel is dominated by a limited number of retailers, such as Best
7    Buy, RadioShack, Verizon, CVS, Target, and Costco. TAC ¶ 173. Of 16 major retailers, SanDisk
8    has exclusive arrangements with 11. TAC Table 7. Of the five retailers where PNY is present,
9    SanDisk is the only other competitor. TAC Table 7. "[O]n information and belief SanDisk has
10   never lost an exclusive arrangement once it has been established." TAC ¶ 98. "[O]n information
11   and belief, SanDisk has been known to threaten retaliation in the event [retailers] terminate their
12   arrangements." TAC ¶ 184.

13   All of SanDisk's contracts with retailers identified in the TAC had terms ranging from one
14   year to three years, with only one contract lasting three years. *See, e.g.*, TAC ¶¶ 204, 220, 225,
15   235, 246. "SanDisk's exclusive arrangements, in practice and effect, are long-term" because
16   retailers almost always renew those arrangements. *See* TAC ¶ 179. For example, SanDisk has
17   had an exclusive agreement with Costco since 2001. TAC ¶ 179. Costco, however, has
18   previously tested carrying the products of a competing manufacturer, Kingston; it is also currently
19   testing products from Lexar. TAC ¶¶ 214-15.

20   SanDisk's agreements with retailers have "massive hard dollar incentives, corresponding
21   penalties for non-exclusivity, and economic investments that make no sense for any rational
22   economic action except to create a monopoly." TAC ¶ 168. For example, an internal SanDisk
23   email from September 2012 shows that it was prepared to offer Rite Aid nearly ▇▇▇ dollars
24   in marketing development funds and markdown funding in exchange for exclusivity (though there
25   is no allegation that SanDisk actually presented such an offer). TAC ¶ 168. Similarly, SanDisk
26   has offered up to ▇▇▇ in marketing funds and rebates for a 19-month exclusivity period.
27   TAC ¶¶ 190-96. RadioShack's 2013 agreement included a ▇▇▇ marketing development
28   fund contingent on exclusivity. TAC ¶ 206.

2

"Some of SanDisk's written exclusive dealing agreements have provisions that make it very difficult or expensive for retailers to terminate the arrangement." TAC ¶ 180. For example, through the use of "co-op funding," a retailer can accrue advertising funds based on its purchases from a manufacturer, but if the funds are not fully used by the end of a contract term, the retailer will be "leaving unused funding on the table" if it does not extend its agreement. TAC ¶ 180. Another "practical" impediment to ending an exclusive agreement is retailers' use of "planograms," i.e., schedules for arranging product displays, which occur on pre-determined cycles that may not coincide with the term of a supply contract. TAC ¶ 181. "To the extent the end of an exclusive dealing agreement and the end of the planogram cycle do not align, it may not be possible for a competing seller of SD cards to persuade a retailer to terminate the exclusive arrangement." TAC ¶ 181. Finally, SanDisk's SD cards are considered a "must-have" product for retailers. TAC ¶ 182.

"SanDisk's exclusive arrangements with retailers are reflected in written agreements but may also be based on oral or informal understandings, not found in the written agreements . . . . Accordingly, the terms and conditions of SanDisk's exclusive arrangements may not be determined solely from SanDisk's written agreements." TAC ¶ 178. Staples's agreement does not have an exclusivity requirement, but it is "economically motivated to maintain the exclusive arrangement." TAC ¶ 248.

"PNY has made numerous attempts to compete with SanDisk at retailers at which SanDisk has established an exclusive arrangement. These attempts have been unavailing." TAC ¶ 185. For example, Costco once rejected PNY's offer of pricing on SD cards "that was below PNY's cost on a special promotion." TAC ¶ 185. Similarly, RadioShack, CVS, and Walgreens have "expressly communicated to PNY that it is precluded from even *entertaining* a proposal from PNY because of its exclusive arrangement with SanDisk." TAC ¶ 157; *see also* TAC ¶¶ 183, 186.

SanDisk's internal documents reflect that it targeted PNY in its drive for exclusivity. TAC ¶ 170. A November 2012 SanDisk email chain shows that while SanDisk was negotiating an exclusive agreement with Best Buy, Best Buy said that "while [SanDisk] sell[s] more, PNY provides more margins." TAC ¶ 188 (original brackets). In response, SanDisk prepared a

3

spreadsheet showing a benefit of ▓▓▓▓▓ to Best Buy premised on replacing PNY's lower-priced products with SanDisk's higher-priced products. TAC ¶ 188. SanDisk and Best Buy also discussed selling SanDisk products under another brand name so that consumers would not know that "one vendor manages the entire category," though there is no allegation that this was done. TAC ¶ 189. Another email from April 2011 shows that SanDisk hoped that PNY would be out at Walgreens. TAC ¶ 234.

In 2007, SanDisk's market share in retail sales of SD cards was 32 percent. TAC ¶ 162. In July 2011, SanDisk's market share was 47 percent; by December 2013, after entering into exclusive agreements with Best Buy, CVS, Walgreens, and BJ's, its market share reached 66.1 percent. TAC ¶ 172. Concurrently, PNY's market share dropped from 22.3 percent to 11 percent. TAC ¶ 172. During the same period, Lexar's share grew from 5.8 to 6.4 percent; Sony's share fell from 4.7 to 3.9 percent, Transcend's share fell from 4.3 to 2.6 percent, and other retailers fell from 15.8 to 10 percent.[2] TAC Table 6. In March 2014, SanDisk accounted for over 60 percent of SD card sales. TAC ¶ 95. SanDisk "recently enticed" Walmart to enter into an exclusive agreement with it—if Walmart accepts, SanDisk will control over 75 percent of the retail distribution channel for SD cards. TAC ¶ 251.

Despite the fact that the price of flash memory (a component of SD cards) has dropped by 45 to 52 percent, SanDisk's prices on SD cards at Best Buy have been "nearly level" and have not been reduced since July 2013, when SanDisk entered an exclusive agreement with Best Buy. TAC ¶¶ 278-80 & Tables 14, 15. Though the components of an SD card and a USB flash drive are very similar and thus their costs are similar (though USB flash drives cost slightly more because they require additional outer housing), Best Buy has been charging over 50 percent more for 16 gigabyte SD cards—for which SanDisk has an exclusive agreement with Best Buy—than it charges for similarly sized USB flash drives—for which PNY competes with SanDisk on Best Buy's shelves. TAC ¶ 282. A similar trend has occurred at Staples, where SanDisk dropped its price for a short time when PNY competed against it, then raised its prices when it reached an

---

[2] Other manufacturers include Memorex and Kingston. *See* TAC ¶ 177.

4

exclusive deal. TAC ¶¶ 281 & Tables 16, 17.

Over the course of 2011, "brick and mortar" retailers accounted for approximately 81 to 87 percent of SD card sales while "e-tail" sales—which include direct sales by manufacturers—accounted for approximately 13 to 19 percent. TAC ¶ 105 & Table 5. PNY's own experience with direct sales "confirms that the direct sales channel is not a viable alternative to the retail channel": PNY has invested heavily in promoting its products online, offering better prices than retailers, yet its direct-channel sales in 2013 were less than one percent of its total SD card sales. TAC ¶ 102. SanDisk's internal documents show that it "places an emphasis on driving the retail business." TAC ¶ 161.

"On information and belief, no other major manufacturer of SD cards—including giants like Toshiba, Samsung, and Micron—has had any meaningful success in building a direct sales channel." TAC ¶ 103. One "likely" reason is that SD cards are often purchased at the point of sale along with devices such as cameras and cell phones since consumers would rather not wait for SD cards to be delivered through the mail a few days later. TAC ¶ 103. Because SD cards are often purchased as part of a bundle, "customers are often insensitive to the price of SD cards, do not consider alternative sources for SD cards, and are willing to pay an inflated price at retail for their SD card." TAC ¶ 104. "Because of the need for personalized service and product demonstrations, established brick and mortar retailers have a substantial advantage over internet sales" and online sales have been stagnant, at least from January to December 2011. TAC ¶¶ 103-04 & Table 5.

"On information and belief," it has become considerably more expensive and difficult for a new market entrant to develop the necessary distribution network, relationships, and brand recognition to become a meaningful competitor in the SD card market. TAC ¶ 100. Other constraints prevent expansion by existing firms, including: SanDisk's ability to deprive a firm of its license from SD-3C ("an entity combining certain SanDisk, Panasonic, and Toshiba intellectual property"); the short supply of components needed to produce SD cards; and "the severe constraints on the distribution network." TAC ¶¶ 46, 106.

"SanDisk has not merely used its power in the flash memory technology market to obtain

1   an advantage in the SD card market.  It has used it to maintain a monopoly position in the SD card
2   market, or at a minimum, to create a dangerous probability of obtaining a monopoly position in
3   that market." TAC ¶ 97.

**PROCEDURAL HISTORY**

On February 28, 2014, SanDisk moved to dismiss PNY's Fifth and Sixth Causes of Action for exclusive dealing and attempted monopolization in the SD card market. Dkt. No. 195. On April 25, 2014, I granted the motion to dismiss but allowed PNY an opportunity to amend its complaint to further support its claims. Dkt. No. 218. On May 5, 2014, PNY filed its TAC. Dkt. Nos. 224, 250. SanDisk again moves to dismiss the Fifth and Sixth Causes of Action for exclusive dealing and attempted monopolization. Dkt. No. 237. A hearing on the motion was held on June 25, 2014.

**LEGAL STANDARD**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and brackets omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

# DISCUSSION

## I. EXCLUSIVE DEALING[3]

### A. Legal Standard for Exclusive Deaning

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). "[A]n exclusive dealing arrangement violates Section 1 [of the Sherman Act] only if its effect is to foreclose competition in a substantial share of the line of commerce affected." *Allied Orthopedic Appliances*, 592 F.3d at 996 (citations and internal punctuation omitted); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3 [of the Clayton Act]."). Actual exclusivity is not a prerequisite to finding unlawful exclusive dealing under the rule of reason. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir. 1982).

"[T]he short duration and easy terminability of [ ] agreements negate substantially their potential to foreclose competition." *Omega Envtl.*, 127 F.3d at 1163. If the contracts at issue are short-term or easily terminated, "a competing manufacturer need only offer a better product or a better deal" to get contracts of its own. *Id.* at 1164.

"[E]xclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Id.* at 1162 (quoting with approval *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235 (8th Cir. 1987) ("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of

---

[3] In the Order, I said that I will disregard PNY's request that I declare that SanDisk's "exclusive dealing arrangements" violate Section 16720 of California's Cartwright Act because there is no cause of action being asserted under that statute. Order 7 n.5. The prayer for relief in the TAC still contains such a request. I will again disregard PNY's request that I declare that SanDisk's "exclusive dealing arrangements" violate the Cartwright Act.

7

proof of 'substantial foreclosure.'")). "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition *any* part of the relevant market." *Id.* at 1163.

In sum, "The prevailing rule in districts and circuits across the country is that where exclusive or semi-exclusive contracts are short in duration, easily terminable, incentive-based, and leave open alternative channels to competitors, they are not exclusionary." *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 903 (N.D. Cal. 2012), *vacated in part on other grounds*, No. 10-cv-4429-EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1821d3, at 200 (3d ed. 2011) ("even a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short *and* there are no other impediments to switching").

### B. PNY Fails To Plead That The Contracts Unlawfully Foreclose Competition.

In my earlier Order, I concluded that "PNY fail[ed] to plead adequate facts showing that SanDisk's agreements unlawfully foreclose competition. As SanDisk correctly argue[d], nearly all of its contracts have short terms: more than half are a year long and only two are more than two years long, with the longest one being three years." Order 9. Courts in this circuit have found contracts with terms ranging up to three, and even five, years to be acceptable. Order 9-10. The facts demonstrated that SanDisk's contracts are also easily terminable, none requiring more than 45-days' notice to cancel.[4] Since the "short duration and easy terminability" of SanDisk's agreements "negate substantially their potential to foreclose competition," *Omega Envtl.*, 127 F.3d at 1163, in order for its renewed claim of exclusive dealing to succeed, PNY must plead that, despite their terms, the contracts have the "practical effect" of unreasonably suppressing competition, *see* Order 8-9 (citing *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457

---

[4] PNY points out that SanDisk's agreement with Best Buy "reveals no [ ] 'at will' termination provision. Opp'n 7 n.2 (citing Mot. 5 n.5). However, as the agreement states—and the TAC recognizes—Best Buy may cease carrying SanDisk products exclusively (apparently at any time during the term of the contract), at which point the marketing and markdown funding provided by SanDisk will be pro-rated. RJN Ex. 1 ¶ E; TAC ¶ 194.

8

(1922)).

PNY argues that "[s]ubstantial foreclosure can coexist with short-term exclusive agreements." Opp'n 4. In addition, PNY asserts that there may be a question about whether supposedly "at will" contracts are truly terminable at will. Opp'n 5. PNY contends that SanDisk's agreements with retailers are not in fact short-term or easily terminable because (1) SanDisk has had exclusive arrangements with Costco and RadioShack for eight to ten years, Opp'n 7 (citing TAC ¶¶ 178, 179, 199-215); (2) it has exclusive arrangements with 11 of 16 major retailers that carry SD cards, Opp'n 7 (citing TAC ¶¶ 173-75 & Table 7); (3) no exclusive arrangement has ever been terminated, Opp'n 7 (citing TAC ¶¶ 98, 198, 208, 215, 213, 231, 241); (4) RadioShack, CVS, and Walgreens have all "refused to even entertain competing offers from PNY," Opp'n 7 (citing TAC ¶¶ 157, 172, 183, 186)[5]; and (5) SanDisk's market share has grown nearly 30 percent in the last seven years despite the fact that its products are higher-priced than competitors, Opp'n 7 (citing TAC ¶¶ 95, 164, 172).

SanDisk rejects PNY's allegations that SanDisk offered retailers various incentives, such as marketing funding and rebates, to wrongfully create a "disincentive" for those retailers to terminate their relationship with SanDisk. Mot. 3 (citing TAC ¶¶ 168, 197, 201, 248).[6] It contends that "[t]he existence of these incentives does not change the fact that SanDisk's retailer agreements are short-term and easily terminable." Mot. 4. In particular, "PNY fails to plead facts that could establish that the incentives that SanDisk offers to retailers could foreclose competition." Mot. 5. Out of 16 named retailers, only three—Best Buy, RadioShack, and Staples—are alleged to have benefits that "disincentivize" them from ending their agreements with SanDisk.[7] Mot. 5 (citing TAC ¶¶ 197, 201, 248). SanDisk points out that the TAC never alleges

---

[5] PNY's brief asserts that PNY has "made multiple attempts to outbid SanDisk, but retailers refused to even entertain PNY's offers." Opp'n 9. The TAC does not allege that PNY has attempted to outbid SanDisk.

[6] SanDisk points out that "[t]o the extent PNY seeks to allege that SanDisk has offered retailers SD cards at below-cost prices (*see* TAC ¶¶ 168-69), the TAC does not plead any facts to support such a theory." Mot. 3 n.3. PNY does not respond to this point.

[7] SanDisk notes that BJ's, CVS, and Walgreens receive financial incentives from SanDisk, but PNY does not allege that these benefits create any "disincentive" for them. Mot. 5 (citing TAC ¶¶ 221-22, 227-28, 236, 239).

9

that it has prevented PNY or any other firm from offering more favorable incentives to retailers to draw them away from SanDisk. Mot. 5. Indeed, PNY does not allege that it failed to win a retailer's business despite offering better terms than SanDisk, nor does it allege that any retailer has said that its relationship with SanDisk prevents the retailer from accepting a better deal offered by another SD card supplier. Mot. 5-6. SanDisk says that PNY's allegation that RadioShack, CVS, and Walgreens have told PNY that they "could not even entertain an offer from PNY as a result of its exclusive arrangement with SanDisk" is unsupported by facts and cannot show foreclosure from those three retailers, let alone the other 13. Mot. 6 (citing TAC ¶¶ 207, 230, 240).

SanDisk also rejects PNY's allegation that "SanDisk's exclusive arrangements, in practice and effect, are long-term" because it "has had exclusive arrangements in place with certain retailers for years." Mot. 4 (citing TAC ¶ 179). SanDisk argues that, as a legal matter, agreements are not "long-term" simply because they have never been terminated. In addition, while PNY alleges that SanDisk's exclusive relationship with Costco, which dates to 2001, is evidence that SanDisk's long-standing relationship with certain retailers illustrates foreclosure, that assertion is belied by the TAC's allegation that "Costco is currently testing Lexar product." Mot. 7 (citing TAC ¶¶ 179, 214).[8]

Again, SanDisk's arguments are persuasive: while PNY has added over 100 paragraphs to its complaint, the new allegations in no way plausibly show that SanDisk's agreements unlawfully foreclosed competition in the market for SD cards. None of the new facts PNY offers to illustrate "the practical effect of SanDisk's exclusive dealing arrangements"—such as that SanDisk has exclusive contracts with 11 of 16 retailers or that no such contract has ever been terminated— evince unlawful foreclosure as opposed to the fruits of legitimate competition.

PNY's assertion that SanDisk's agreements constitute exclusive dealing based on the fact

---

[8] SanDisk also disputes PNY's allegations that SanDisk has coerced retailers into exclusive dealing arrangements, saying that PNY fails to plead any facts to support its allegations. Mot. 8. PNY rightly points out that coercion is not a necessary element of the claim, Opp'n 12 n.7, and SanDisk does not meaningfully respond. See Reply 6 n.15. Accordingly, there is no need to address this issue.

10

that retailers have entered into and continually renew contracts with SanDisk is not plausible because PNY has not pleaded (beyond naked assertions) facts showing that it failed to win contracts despite offering better terms or that SanDisk somehow thwarted its efforts to secure business through conduct other than competition on the merits. That a manufacturer has a long-standing exclusive relationship with a retailer does not mean that their agreement constitutes actionable exclusive dealing. It may be the case that SanDisk has continually offered Costco and RadioShack better terms than PNY has—as an example, the TAC points out, "Although SanDisk competitors have attempted to sell to Costco, SanDisk has responded by temporarily lowering its cost to induce Costco not to go forward with testing of competitors' products." TAC ¶¶ 214. Absent allegations of predatory pricing or some other anticompetitive conduct, that is the essence of competition.[9] Indeed, the TAC acknowledges that despite SanDisk's allegedly exclusive relationship with Costco and the offer of lower prices, Costco has tested two other manufacturers' products. *See* TAC ¶¶ 214-15. Notably, PNY does not explain why it cannot seek its own exclusive contracts with the five major retailers in which it already has a presence or the 13 retailers that did not allegedly tell PNY that they could not entertain offers from it. It is not enough for PNY to simply observe that SanDisk has gained several contracts through the years while PNY has been unable to do so and that SanDisk has maintained existing ones—PNY must plead facts plausibly showing that SanDisk's contracts have the practical effect of wrongfully foreclosing competition. It has not done so.

Other allegations PNY provides are conclusory. For example, PNY has baldly alleged on four separate instances that RadioShack, CVS, and Walgreens have explicitly told PNY that they cannot even entertain competing offers from PNY due to their exclusive agreements. Each of those allegations is bereft of any supporting facts. *See* TAC ¶¶ 157, 172, 183, 186. PNY argues that these allegations are not conclusory because "there is no requirement for PNY to allege the dates or further specifics of these conversations." Opp'n 9 (citing TAC ¶ 157). While PNY need

---

[9] PNY does not allege that SanDisk engaged in predatory pricing, which may be actionable. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) ("in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes").

11

not plead with specificity, it must still give "some further factual enhancement" for its allegations to be more than bare assertions that cannot support a cognizable claim. *Twombly*, 550 U.S. at 557. Without more detail, it is unclear that the retailers meant that they are actually prevented from considering SanDisk's competitors or that their deal with SanDisk is simply too good to forego, not something more nefarious.[10] PNY does not allege in the TAC that it offered better terms to these retailers than SanDisk (contrary to PNY's assertion in its brief that it "made multiple attempts to outbid SanDisk," Opp'n 9). PNY fails to explain why competition has been substantially foreclosed despite the fact that SanDisk's arrangements with all three of these retailers are both short-term and easily terminable and that 13 other retailers apparently have not expressed this sentiment. Because PNY has not "nudged [its] claims across the line from conceivable to plausible, [its causes of action] must be dismissed." *Twombly*, 550 U.S. at 570.

PNY claims that the TAC "explains, in detail, *why* no retailer has ever terminated its exclusive arrangements with SanDisk," namely, because "termination of an exclusive arrangement with SanDisk is too expensive," six-month "planogram" cycles prevent retailers from terminating their arrangements,[11] and "because SanDisk is the category leader for SD cards, retailers feel compelled to carry its products and are powerless against SanDisk's insistence on exclusivity." Opp'n 7-8 (citing TAC ¶¶ 180-82). Those allegations are conclusory, overly general, and

---

[10] For this reason, PNY's argument that "retailers cannot afford to lose the incentives provided for in the agreements" is unpersuasive. Opp'n 8. Any entity engaged in commerce will generally pick a better economic arrangement than a worse economic arrangement. The question is whether competition has been harmed, not just whether a competitor lost out on a deal. Similarly, it is of no moment that "[r]etailers are typically required to return or forego large incentives if they violate [ ] the exclusivity provision" in their contracts. Opp'n 8 n.5. That dynamic reflects the essence of a contractual exchange. *Cf. Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 903 (N.D. Cal. 2012) ("The only consequence is that retailers may not receive a rebate based on" their decision to not abide by an arrangement.), *vacated in part on other grounds*, No. 10-cv-4429-EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012). Without adequately pleading facts showing that the contracts unreasonably foreclose competition despite their short term and easy terminability, such contracts are not actionable under the antitrust laws.

[11] PNY alleges that "[t]here are many practical impediments to a retailer terminating an exclusive arrangement for SD cards," identifying as an example "planogram cycles," for which a store determines its store product placement. TAC ¶ 181. PNY claims that "the opportunity to introduce new products to a planogram comes up only at pre-planned intervals" and "[t]o the extent the end of an exclusive dealing agreement and the end of the planogram cycle do not align, it may not be possible for a competing seller of SD cards to persuade a retailer to terminate the exclusive arrangement." *Id.* But PNY has not alleged that this has in fact happened or explained why easily terminable contracts do not mitigate any such "impediment."

speculative. PNY does not identify any particular retailer for which any of its allegations are true, and instead relies on abstract claims about unidentified "retailers." Indeed, these allegations are contradicted by other portions of the TAC. For example, PNY's claim about "SanDisk's insistence on exclusivity" goes against the TAC's recognition that five of 16 named retailers do not have exclusive arrangements with SanDisk and that Costco is considering carrying another manufacturer's products.

The TAC contains allegations suggesting valid reasons for retailers to want exclusive relationships with SanDisk and that its ability to gain and maintain such arrangements was achieved through procompetitive means. For example, PNY alleges that "SanDisk for many years has been the largest seller of SD and MicroSD cards," suggesting an incumbent advantage. TAC ¶ 182. Additionally, SanDisk "has marketed its cards heavily" and "many retailers believe they must stock SanDisk's SD cards" due to the "brand preference for SanDisk." TAC ¶ 182. The TAC lists in great detail the incentives SanDisk offers to many retailers to carry and market its product. For example, SanDisk has lowered its price to a retailer in the face of competition from another manufacturer. TAC ¶¶ 214. On the other hand, PNY identifies only one concrete instance in which PNY offered a retailer SD cards "below PNY's cost on a special promotion." TAC ¶ 185. Notably, PNY does not allege that its price or terms were better than SanDisk's, and the TAC contains no information about any other bidding episodes. In general, the TAC is devoid of any indication that SanDisk engaged in anticompetitive conduct to preclude retailers from considering PNY or other manufacturers or to prevent PNY or other manufacturers from approaching retailers with better offers than SanDisk such that SanDisk's agreements have the practical effect of substantially foreclosing competition.

The cases PNY cites in support of its position are distinguishable. PNY asserts that volume-based incentives which "bar" retailers from terminating an exclusive agreement "have been held to support an exclusive dealing claim," citing *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, No. 10-cv-4429 EMC, 2011 WL 1225912, at *10 (N.D. Cal. Apr. 1, 2011), in support. Opp'n 8. That case is not on point because the counterclaimant there alleged that its products were "better selling, and more profitable on a per unit basis," and that displacement of its

13

product "was not based on the merits" but attributable to the retailer's arrangement with the counterdefendant. *Id.* at \*2. Here, PNY has not alleged that its product is superior, "better selling," or "more profitable" overall—it merely complains that certain retailers have decided not to carry it without plausibly pleading that there is no possible justification for their doing so.[12]

PNY points to *United States v. Dentsply International, Inc.*, No. 99-cv-5, 2001 WL 624807 (D. Del. Mar. 30, 2001), as another case in which a court allowed exclusive dealing claims to go forward despite the defendant's argument that its dealers were free to switch suppliers at any time. Opp'n 5. Citing *Minnesota Mining & Manufacturing Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999), and *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-cv-2102, 2013 WL 6229141, at \*5-6 (C.D. Cal. Dec. 2, 2013), for the same point, PNY argues that supposedly "at will" agreements may not be terminable at all given the increasing concentration and structure of the markets at issue. Opp'n 5. None of those cases help it.

In *Dentsply*, the defendant manufacturer threatened to stop supplying its other products to dealers if they purchased the product at issue from Dentsply's competitors. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005). There is no allegation of similar conduct here: as the TAC reflects, PNY products share shelf space with SanDisk products in five major retailers. Indeed, SanDisk's agreement with Best Buy contemplates the possibility of Best Buy's rescinding SanDisk's exclusivity with the consequence that any benefits offered to Best Buy would be pro-rated "to reflect the relative period of the exclusive program until such non-SanDisk branded products were added," but SanDisk has not threatened to withdraw its products. RJN Ex. 1 ¶ E.

In *Minnesota Mining*, while the court recognized that "[w]hen ascertaining the characteristics of an exclusive dealing arrangement, courts look to the 'practical effect' of the agreement, not merely to its form," the court found that the agreements "often include[d]

---

[12] Indeed, Judge Chen reaffirmed that a plaintiff must still adequately plead foreclosure and the length of the agreements at issue to state a claim for exclusive dealing, *id.* at \*15, and stated in another order in the same case "that where exclusive or semi-exclusive contracts are short in duration, easily terminable, incentive-based, and leave open alternative channels to competitors, they are not exclusionary," *Church & Dwight Co.*, 868 F. Supp. 2d at 903.

1   incentives that have the practical effect of tying up the paper sheet inventory of a merchant over a
2   period of several years." 35 F. Supp. 2d at 1144. Furthermore, there were "unique distribution
3   factors, like the high costs a paper merchant must incur to switch completely from one brand to
4   another, that ma[d]e it very difficult for a supplier to dislodge a competitive brand from an
5   exclusively dealing merchant" and "major distributors ha[d] agreed among themselves that they
6   [would] remain loyal to Appleton carbonless sheets regardless of competitors' pricing or product
7   innovations." 35 F. Supp. 2d at 1144. Here, there is no allegation that retailers' inventories were
8   tied up by SanDisk, that the retailers themselves incurred costs to carry other manufacturers'
9   products, or that the retailers would continue being exclusive with SanDisk regardless of
10  competitors' pricing or innovations.[13] In other words, there is no plausibly pleaded allegation that
11  the short-term or easily terminable nature of SanDisk's agreements is illusory.

**C. PNY Fails To Plead The Lack Of Alternative Channels Of Distribution.**

"Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more." *Omega Envtl.*, 127 F.3d at 1163; *see also Pro Search Plus*, 2013 WL 6229141, at *7 ("[T]he fact that an alternative channel could theoretically be used does not mean that it actually is used, and a *de facto* exclusive dealing arrangement could prevent a potential alternative channel of distribution from actually being used.").

In the Order, I concluded that PNY failed to plead the lack of alternative channels of distribution because its allegations that the direct sales channel was insufficient to reach customers were "nothing but bare assertions." Order 14. PNY now pleads that the retail channel is dominated by only 16 retailers, five of which carry PNY's SD cards. TAC ¶ 173 & Table 7. It alleges that because SD cards are often sold as "add-ons" to products such as cameras or cell phones, SD card purchases often occur in retail stores due to "the need for personalized service and product demonstrations," which are a "substantial advantage over internet sales." TAC ¶ 103.

---

[13] Similarly, the plaintiff in *Pro Search* alleged that despite its superior products, the cost of switching from the defendant's products to another's was prohibitive despite the short duration and easy termination of the defendant's contracts. 2013 WL 6229141, at *6. No similar allegation is present here.

In 2011, brick-and-mortar retail stores comprised 81 to 87 percent of SD card sales. TAC Table 5. PNY claims that it "routinely offers better prices through its direct channel," but "despite significant financial and business investment PNY has had very little success with its direct sales channels." TAC ¶ 102.

PNY again fails to adequately plead that there are no "potential alternative channels of distribution" by which it can reach ultimate consumers. *Omega Envtl.*, 127 F.3d at 1163. As the TAC reflects, in the latest month of data PNY provides, non-retail sales amounted to 19 percent of the SD card market in December 2011. TAC Table 5. (PNY has not provided more recent data from 2012 to the present.) That non-retail channels amounted to nearly a fifth of the market over two and a half years ago does not indicate that PNY is foreclosed from competing in selling SD cards. PNY's own inability to exploit the "e-tail" channel does not indicate harm to competition: as the data show, some manufacturers are succeeding through non-retail means to reach SD card purchasers. While PNY claims that its direct sales have been weak despite the fact that it "routinely offers better prices through its direct channel" compared to "the inflated prices consumers must pay at retailers" for SanDisk products, as the TAC acknowledges, customers have a "need for personalized service and product demonstrations," and PNY's allegation does not account for any discrepancy in retail prices versus its direct-sales price that that need may have caused. Even if the vast majority of customers prefer brick-and-mortar retailers, Opp'n 10, the TAC reflects that there is a substantial number for which the lack of a physical store is not an insurmountable deterrent to purchasing through e-tail. In sum, PNY has not adequately pleaded any significant barriers to entering direct or e-tail sales and that competition through such means has been foreclosed.[14]

### D. Direct Evidence Of Harm Alone Is Insufficient To State A Claim.

PNY argues that its allegations about direct evidence of competitive harm are sufficient to sustain a charge of exclusive dealing. Opp'n 2, 4. Specifically, PNY claims that "SanDisk's

---

[14] PNY again relies on *Dentsply* for the proposition that "direct sales are insufficient" to provide "an effective means of competition." Opp'n 11. I have already rejected PNY's reliance on *Dentsply* on that point in my Order and explained why it is distinguishable from the facts here even as pleaded in the TAC. Order 14.

16

exclusive dealing in the SD card market violates Section 1 of the Sherman Act and Section 3 of the Clayton Act because it has caused harm to competition in the form of supra-competitive prices," pointing to the allegedly high retail prices of SD cards at Best Buy and Staples relative to the allegedly falling USB drives (which allegedly cost nearly the same to manufacture and has dropped in manufacturing cost by about half).[15]  Opp'n 3 (citing TAC ¶¶ 278-82).

PNY cites no authority establishing that it can state a claim for exclusive dealing without pleading substantial foreclosure of competition.  The crux of an exclusive-dealing case is the allegation that competitors are shut out of the market.  It is not enough to point to supposed "direct evidence of competitive harm" that cannot be attributed to the claimed exclusion.[16]  None of the cases PNY cites supports it and, indeed, the cases directly contradict it.  *Dentsply*—a Section 2 case—still required a plaintiff to establish that "the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *Dentsply Int'l*, 399 F.3d at 191.  Similarly, *ZF Meritor, LLC v. Eaton Corporation* confirms that "[t]he legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition."  696 F.3d at 271; *see also id.* ("There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of

---

[15] SanDisk points out that the TAC shows that the prices for both PNY's and SanDisk's USB drives have actually remained steady at Best Buy.  Reply 3 (citing TAC Table 18).  SanDisk also persuasively argues that there is no basis for PNY's contention that SD cards and USB drives should be priced similarly simply because of their allegedly similar component costs, rather than based on supply and demand, and cites testimony from another case in which a PNY executive represented that "firms set their prices [for USB drives] according to the market price rather than on their costs."  Reply 3 n.8 (quoting *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 863 F. Supp. 2d 815, 831 (W.D. Wis. 2012)).  Finally, SanDisk points out that it does not set prices in retailers' stores—the retailers do.  Reply 3 n.4, 7 n.18.  PNY has not alleged otherwise.

[16] At the hearing, counsel for PNY noted that the alleged foreclosure in the SD card market is well over 30 percent.  However, "a high foreclosure rate does not necessarily tell us anything about how competitively a market is performing."  AREEDA & HOVENKAMP ¶ 1820b, at 175.  Rather, high numbers "only encourage closer scrutiny based on factors" such as contract duration and alternative distribution channels.  *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (Boudin, J.); AREEDA & HOVENKAMP ¶ 1821d, at 197-209.  For the reasons discussed in this order, those other factors do not weigh in PNY's favor.

likely or actual anticompetitive effects considered in light of any procompetitive effects.") (citations omitted). Finally, *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.* makes clear that finding a Section 1 exclusive-dealing violation involves "assess[ing] whether competition has been foreclosed in a substantial share of the relevant market." 676 F.2d 1291, 1302 (9th Cir. 1982).[17]  PNY's argument is unsuccessful.[18]

### E. Intent Is Irrelevant Here.

PNY argues that evidence of intent can be relevant to establishing the likely effect of allegedly anticompetitive conduct. Opp'n 11. In making that assertion, PNY cites authority relevant to Section 2 (for which intent is indeed an element), rather than Section 1, and a century-old case that does not appear to have direct applicability to the case at hand. Opp'n 11 (citing *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918); *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)). Because intent is not necessary to establish a Section 1 offense and PNY fails to adequately plead substantial foreclosure, and because PNY does not cite relevant authority for the point it asserts, there is no need to further address this issue.

## II. ATTEMPTED MONOPOLIZATION

"[E]xclusive dealing arrangements can constitute an improper means of acquiring or maintaining a monopoly." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). "To establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing

---

[17] For this reason, PNY's assertion that "SanDisk's exclusive dealing in the SD card market violates Section 1 of the Sherman Act and Section 3 of the Clayton Act because it has caused harm to competition in the form of supra-competitive prices" is unavailing because the existence of supra-competitive prices does not, in itself, suggest foreclosure. There could be any number of reasons to explain why SD card prices at certain retailers may have stayed steady or risen, but needless to say, the mere fact that exclusive arrangements with SanDisk were in place at the time does not indicate causality.

[18] To be clear, as one leading treatise states, "any rule of reason inquiry must focus on the likelihood that the challenged restraint will result in reduced output and higher prices in some relevant market." AREEDA & HOVENKAMP ¶ 1820b, at 178. But "it must also show a foreclosure coverage sufficient to warrant an inference of injury to competition, depending on the existence of other factors that give significance to a given foreclosure percentage, such as contract duration, presence or absence of high entry barriers, or the existence of alternative sources of distribution or resale." *Id.* ¶ 1821, at 179-80.

18

that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995). "[A]ll three elements [of an attempted monopolization claim] may be proved with evidence of conduct that is either: (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary." *Twin City Sportservice*, 676 F.2d at 1309.

In my earlier Order, I concluded that "PNY fail[ed] to adequately allege actionable exclusive dealing" and thus "fails to plead anticompetitive conduct sufficiently and therefore cannot sustain a claim for attempted monopolization." Order 16. Because I again conclude that the TAC does not sufficiently plead actionable exclusive dealing, PNY cannot state a claim for attempted monopolization.[19] *See R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 395 (M.D.N.C. 2002) ("because Plaintiffs have alleged no other anticompetitive acts, Plaintiffs' [ ] attempted monopolization claims fail as a matter of law").

PNY also asserts that SanDisk is using its power in the flash memory technology market to improperly attempt to obtain a second monopoly in the SD card market.[20] Opp'n 13 (citing TAC ¶ 97). However, the allegations upon which PNY relies are ones already rejected in the previous Order. *See* Order 17; Opp'n 13 (citing TAC ¶¶ 94-96). PNY's sole new paragraph about monopoly leveraging is wholly conclusory. TAC ¶ 97 ("SanDisk has not merely used its power in the flash memory technology market to obtain an advantage in the SD card market. It has used it to maintain a monopoly position in the SD card market, or at a minimum, to create a dangerous probability of obtaining a monopoly position in that market."). Absent new facts pleaded, there is no need to reconsider the Order's analysis.

---

[19] For this reason, I will not address PNY's arguments concerning intent and barriers to entry. *See* Opp'n 13-15. For the record, I have considered them and do not find them persuasive.
[20] SanDisk points out that PNY does not allege that SanDisk's licensing practices are themselves antitrust violations and does not explain how its licensing of the technology to enter the SD card market is consistent with its alleged intention of excluding firms from that market. Reply 9 n.22.

19

**CONCLUSION**

The Supreme Court has said, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (citation omitted). Accordingly, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* (citation omitted).

In dismissing the SAC, I gave PNY another opportunity to state a claim for exclusive dealing and attempted monopolization in the SD card market. Careful review of the TAC shows that PNY has not adequately pleaded that SanDisk's "superior market share was achieved or maintained by means other than the competition on the merits." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) (internal punctuation omitted). Even so, at the hearing, PNY's counsel indicated that there is only about a month of discovery left and that I should allow PNY to continue discovery to further support its claims regarding SD cards.

This case was filed in 2011, several of these agreements have been in place for multiple years, discovery *has* been ongoing, motion practice has been robust, and PNY filed its motion for leave to add these causes of action to its complaint in December 2013. PNY—represented by able antitrust counsel—has not pleaded sufficient facts to state a claim despite being given two opportunities to do so. There is no basis to allow PNY to conduct further discovery on this issue.

For the reasons above, SanDisk's motion to dismiss the Fifth and Sixth Causes of Action of the TAC is GRANTED and the causes of action are DISMISSED WITH PREJUDICE. SanDisk shall file its answer within 10 days.

**IT IS SO ORDERED.**

Dated: July 2, 2014

WILLIAM H. ORRICK
United States District Judge